**[ORAL ARGUMENT SCHEDULED FOR MAY 7, 2026]**

**No. 26-5070**

## IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

MARK KELLY, United States Senator Representing the State of Arizona,

Plaintiff-Appellee,

v.

PETE HEGSETH, in his Official Capacity as Secretary of Defense; U.S. DEPARTMENT OF DEFENSE; JOHN C. PHELAN, in his Official Capacity as Secretary of the Navy; U.S. DEPARTMENT OF THE NAVY,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Columbia

## BRIEF FOR APPELLANTS

BRETT A. SHUMATE
 *Assistant Attorney General*

BRAD HINSHELWOOD
CYNTHIA BARMORE
JOHN BAILEY
 *Attorneys, Civil Division*
 *Room 3618*
 *U.S. Department of Justice*
 *950 Pennsylvania Avenue NW*
 *Washington, DC 20530*
 *(202) 305-1754*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    Parties and Amici

Defendants-Appellants are Pete Hegseth, in his official capacity as Secretary of Defense; the U.S. Department of Defense; John C. Phelan, in his official capacity as Secretary of the Navy; and the U.S. Department of the Navy.  Plaintiff-Appellee is Mark Kelly, United States Senator representing the State of Arizona.

Amici in the district court include Vet Voice Foundation and 41 former service secretaries and retired senior military officers.  The 41 individuals are Former Secretary of the Army Louis E. Caldera; Former Secretary of the Navy Sean C. O'Keefe; Admiral C. Steve Abbot, U.S. Navy (Ret.); Admiral Thad W. Allen, U.S. Coast Guard (Ret.); Admiral Dennis C. Blair, U.S. Navy (Ret.); General George W. Casey, Jr., U.S. Army (Ret.); General Michael V. Hayden, U.S. Air Force (Ret.); Admiral Gregory G. Johnson, U.S. Navy (Ret.); Admiral John. B. Nathman, U.S. Navy (Ret.); Admiral William A. Owens, U.S. Navy (Ret.); Vice Admiral Donald C. Arthur, U.S. Navy (Ret.); Vice Admiral Michael T. Franken, U.S. Navy (Ret.); Lieutenant General Walter E. Gaskin, U.S. Marine Corps (Ret.);

Lieutenant General Claudia J. Kennedy, U.S. Army (Ret.); Lieutenant General Charles P. Otstott, U.S. Army (Ret.); Rear Admiral (Upper Half) William D. Baumgartner, U.S. Coast Guard (Ret.); Major General Richard T. Devereaux, U.S. Air Force (Ret.); Major General Paul D. Eaton, U.S. Army (Ret.); Rear Admiral (Upper Half) F. Stephen Glass, U.S. Navy (Ret.); Major General Jonathan S. Gration, U.S. Air Force (Ret.); Rear Admiral (Upper Half) Donald J. Guter, U.S Navy (Ret.); Major General Richard S. Haddad, U.S. Air Force (Ret.); Major General Irving L. Halter, Jr., U.S. Air Force (Ret.); Rear Admiral (Upper Half) Janice Hamby, U.S. Navy (Ret.); Major General Dennis Laich, U.S. Army (Ret.); Major General Steven J. Lepper, U.S. Air Force (Ret.); Major General Randy E. Manner, U.S. Army (Ret.); Major General Frederick H. Martin, U.S. Air Force (Ret.); Rear Admiral (Upper Half) David R. Oliver, Jr., U.S Navy (Ret.); Major General Antonio Taguba, U.S. Army (Ret.); Major General F. Andrew Turley, U.S. Air Force (Ret.); Brigadier General Clara Adams-Ender, U.S. Army (Ret.); Rear Admiral (Lower Half) James A. Barnett, Jr., U.S. Navy (Ret.); Brigadier General Bela J. Chain, Jr., U.S. Army (Ret.); Rear Admiral (Lower Half) Jay A. DeLoach, U.S. Navy (Ret.); Brigadier General John W. Douglass, U.S. Air Force (Ret.); Brigadier General Robert J. Felderman, U.S. Army (Ret.); Rear Admiral (Lower Half) Charles D. Harr, U.S. Navy

ii

(Ret.); Brigadier General David R. Irvine, U.S. Army (Ret.); Rear Admiral (Lower Half) Harold L. Robinson, U.S. Navy (Ret.); Brigadier General John M. Schuster, U.S. Army (Ret.).

There were no intervenors in district court, and there have been no amici or intervenors in this Court to date.

## B.    Rulings Under Review

The rulings under review (issued by Judge Richard J. Leon) are the memorandum opinion and order filed on February 12, 2026.  The opinion is available on Westlaw at *Kelly v. Hegseth*, No. 26-81, 2026 WL 391777 (D.D.C. Feb. 12, 2026) and in the Joint Appendix at JA16-44.  The order is included in the Joint Appendix at JA14-15.

## C.    Related Cases

There are no related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

*/s/ John Bailey*
John Bailey

# TABLE OF AUTHORITIES

**Cases:**                                                        **Page(s)**

*Arkansas Dairy Co-op Ass'n v. U.S. Dep't of Agric.,*
   573 F.3d 815 (D.C. Cir. 2009) ................................................................. 27

*Bader v. United States,*
   97 F.4th 904 (Fed. Cir. 2024) ...............................................................12

*Barker v. Kansas,*
   503 U.S. 594 (1992) ............................................................................... 43

*Bergdahl v. United States,*
   683 F. Supp. 3d 24 (D.D.C. 2023) ........................................................ 47

*Bois v. Marsh,*
   801 F.2d 462 (D.C. Cir. 1986) .............................................................. 28

*Bond v. Floyd,*
   385 U.S. 116 (1966) ..................................................................25, 51, 52

*Brandenburg v. Ohio,*
   395 U.S. 444 (1969) ......................................................................... 28-29

*Closson v. United States ex rel. Armes,*
   7 App. D.C. 460 (D.C. Cir. 1896) ......................................................... 45

*Doe v. McMillan,*
   412 U.S. 306 (1973) ...............................................................................51

*Goldman v. Weinberger,*
   475 U.S. 503 (1986) .................................................................29, 31, 32

*Kahn v. Anderson,*
   255 U.S. 1 (1921) ............................................................................ 3, 43

*Kiyemba v. Obama,*
   561 F.3d 509 (D.C. Cir. 2009) ......................................................... 26, 27

*Larrabee v. Del Toro,*
   45 F.4th 81 (D.C. Cir. 2022) ..........................2, 5, 7, 23, 39, 42, 43, 44, 48

*McCarty v. McCarty,*
  453 U.S. 210 (1981)................................................................... 43

*Miller v. Lehman,*
  801 F.2d 492 (D.C. Cir. 1986)...................................... 7-8, 8, 12

*Millican v. United States,*
  744 F. Supp. 2d 296 (D.D.C. 2010)................................. 21, 32, 33, 35, 36

*United States ex rel. New v. Rumsfeld,*
  448 F.3d 403 (D.C. Cir. 2006).................................................31

*Parker v. Levy,*
  417 U.S. 733 (1974) ...........1, 3, 4, 21, 22, 24, 28, 29, 30, 35, 36, 38, 44, 45,
                                                              46, 48, 50

*Perpich v. Department of Def.,*
  496 U.S. 334 (1990) ................................................................ 39

*Priest v. Secretary of the Navy,*
  570 F.2d 1013 (D.C. Cir. 1977) ............................. 21, 28, 29, 31, 34, 35, 45

*Selective Draft L. Cases,*
  245 U.S. 366 (1918)................................................................. 39

*Sherley v. Sebelius,*
  644 F.3d 388 (D.C. Cir. 2011)................................................. 26

*Solorio v. United States,*
  483 U.S. 435 (1987) ................................................................ 42

*Tarble's Case,*
  80 U.S. (13 Wall.) 397 (1871) ................................................. 39

*Thornley v. United States,*
  113 U.S. 310 (1885) ................................................................ 43

*United States v. Begani,*
  81 M.J. 273 (C.A.A.F. 2021)....................................................40

*United States v. Bergdahl,*
  80 M.J. 230 (C.A.A.F. 2020) .................................24, 26, 47, 53

*United States v. Brewster,*
    408 U.S. 501 (1972) ............................................................51

*United States v. Daniels,*
    42 C.M.R. 131 (C.M.A. 1970).............................................31

*United States v. Hooper,*
    26 C.M.R. 417 (C.M.A. 1958) ........................... 23, 40, 44, 45, 46

*United States v. New,*
    55 M.J. 95 (C.A.A.F. 2001) ............................................ 31-32

*United States v. Priest,*
    45 C.M.R. 338 (C.M.A. 1972)...............................29, 31, 34, 35

*United States v. Stone,*
    37 M.J. 558 (A.C.M.R. 1993)............................................. 33

*United States v. Tyler,*
    105 U.S. 244 (1881)........................................................... 43

*United States v. Wilcox,*
    66 M.J. 442 (C.A.A.F. 2008) ............................................. 33

*White v. Treibly,*
    19 F.2d 712 (D.C. Cir. 1927) ............................................. 39

*Wilson v. Curtis,*
    150 F.4th 1359 (10th Cir. 2025)........................................ 42

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008)............................................................... 26

## U.S. Constitution:

Art. I, § 8, cl. 12.......................................................................... 39

Art. I, § 8, cl. 13.......................................................................... 39

vi

**Statutes:**

Act of Aug. 3, 1861, ch. 42, 12 Stat. 287 .................................................. 6, 39

Act of May 5, 1950, ch. 169, 64 Stat. 107 ...................................................... 6

10 U.S.C. § 101(b)(7) ......................................................................................... 7

10 U.S.C. § 688(a) ............................................................... 2, 5, 24, 40, 46

10 U.S.C. § 802(a)(4) ....................................................................................5, 41

10 U.S.C. § 837(a)(3) ..................................................................................... 47

10 U.S.C. § 888 ................................................................................................. 49

10 U.S.C. § 933 ...............................................................................................14

10 U.S.C. § 934 ...............................................................................................14

10 U.S.C. § 1370 ........................................................................................ 7, 17

10 U.S.C. § 1370(a)(1) .................................................................................. 7, 9

10 U.S.C. § 1370(a)(2) ...................................................................................... 9

10 U.S.C. § 1370(b)(6) ...................................................................................... 9

10 U.S.C. § 1370(f)(2) ....................................................................................... 9

10 U.S.C. § 1370(f)(2)(D) ................................................................................. 9

10 U.S.C. § 1370(f)(3) ....................................................................................... 9

10 U.S.C. § 1370(f)(4) ....................................................................................... 9

10 U.S.C. § 1370(f)(6)(A) ......................................................................... 10, 11

10 U.S.C. § 1407 ................................................................................................. 7

10 U.S.C. § 1552(a)(1) ....................................................................................12

10 U.S.C. § 8013 ................................................................................................ 7

10 U.S.C. § 8323(a)(1) ............................................................................ 4

10 U.S.C. § 8323(e)............................................................................7, 41

10 U.S.C. § 8333 .................................................................................... 7

18 U.S.C. § 2387(a)............................................................................... 35

28 U.S.C. § 1292(a)(1) ........................................................................... 3

28 U.S.C. § 1331.................................................................................... 3

37 U.S.C. § 908 ................................................................................5, 41

**Regulations:**

32 C.F.R. pt. 723................................................................................12

32 C.F.R. § 723.2 .............................................................................. 11

32 C.F.R. § 723.2(b)..........................................................................12

32 C.F.R. § 723.3(e)(1).......................................................................12

32 C.F.R. § 723.6(e).........................................................................12

32 C.F.R. § 723.6(e)(1) .....................................................................12

**Rule:**

Fed. R. App. P. 4(a)(1)(B)........................................................................ 3

**Legislative Material:**

53 Cong. Rec. 12,844 (1916) ...........................................................6, 40, 44

**Other Authorities:**

J. Mackey Ives & Michael J. Davidson, *Court-Martial Jurisdiction Over Retirees Under Articles 2(4) and 2(6): Time to Lighten Up and Tighten Up?*, 175 Mil. L. Rev. 1 (2003) ...................................................... 6, 39, 40

*Navy Reactivating Old Battleships*, J. of Com. (Sep. 14, 1986), https://perma.cc/L8XB-6WP3 ...............................................................41

Oriana Pawlyk, *Air Force Could Recall as Many as 1,000 Retirees to Active Duty*, Military.com (May 24, 2018), https://perma.cc/N8LG-CXLF ......41

Kyle Rempfer, *About 25,000 Veterans Volunteer to Return to Army for COVID-19 Response*, ArmyTimes (Apr. 13, 2020), https://perma.cc/GTS4-FYT5 ...............................................................41

U.S. Dep't of Def., Instr. 1352.01, *Management of Regular and Reserve Retired Military Members* (Dec. 8, 2016)................................................. 5
    para. 1.2(a) .................................................................................. 5, 40
    para. 1.2(b) ........................................................................................ 6
    para. 1.2(c)................................................................................... 5, 40
    para. 3.2........................................................................................... 6
    para. 3.2(a) ..................................................................................5, 41
    para. 3.2(b)..................................................................................5, 41
    para. 3.2(h)..................................................................................5, 41
    para. 3.3............................................................................................ 6
    para. 3.4............................................................................................ 6

U.S. Dep't of Def., *Joint Ethics Regulation* (May 15, 2024).....................7, 41

U.S. Dep't of Def., *Manual for Courts-Martial* (2024)...............................31

U.S. Dep't of the Navy, JAGINST 5800.7G, *Manual of the Judge Advocate General* ch. 1 (Dec. 1, 2023)................................................................... 8
    § 0114A ............................................................................................ 8
    § 0114A(a)........................................................................................ 8
    § 0114A(b) .................................................................................... 8, 9

U.S. Dep't of the Navy, NAVPERS 15665J, *Uniform Regulations* (Jul. 30, 2025)...............................................................................................7, 41

U.S. Dep't of the Navy, Sec'y of the Navy Instr. 1920.6D, *Administrative Separation of Officers* enclosure 9 (Jul. 24, 2019)............................. 10, 11

William Winthrop, *Military Law and Precedents* (2d ed. 1920) (reprint of 1896 ed.)........................................................................ 32, 43

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION ................................................................................. 1

STATEMENT OF JURISDICTION.................................................................3

STATEMENT OF THE ISSUE.................................................................3

STATEMENT OF THE CASE ................................................................4

    A.    Statutory and Regulatory Framework. ......................................4

    B.    Factual Background.................................................................. 13

    C.    Prior Proceedings ................................................................... 18

SUMMARY OF ARGUMENT ................................................................ 21

STANDARD OF REVIEW ................................................................26

ARGUMENT................................................................................26

I.    The First Amendment Does Not Protect Speech By Servicemembers That Counsels Disobedience To Lawful Orders. ....28

II.    Retired Officers Are Not Entitled To Counsel Disobedience To Lawful Orders. .................................................................36

CONCLUSION................................................................................54

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

**GLOSSARY**

UCMJ                    Uniform Code of Military Justice

## INTRODUCTION

This appeal challenges a preliminary injunction that halts military proceedings to discipline a member of the armed forces.  Those proceedings arose out of public statements by Senator Mark Kelly, a retired Captain in the Navy.  The Secretary of War determined that those statements, in context, "counseled members of the armed forces to refuse lawful orders," including orders "related to National Guard deployments and counter-narcotics operations."  JA100.  Consequently, the Secretary issued a letter of censure to be placed in Kelly's military file and ordered further proceedings to determine whether to reduce Kelly's retired grade and, in turn, his retired pay.

Over 50 years ago, the Supreme Court made clear that speech by "a commissioned officer publicly urging enlisted personnel to refuse to obey orders which might send them into combat" is "unprotected under the most expansive notions of the First Amendment" because of the prejudicial effect that speech has on the military's unique need for discipline and "response to command."  *Parker v. Levy*, 417 U.S. 733, 759, 761 (1974).  The district court here did not question the Secretary's determination that Kelly's speech was of the type the Supreme Court identified as unprotected in *Parker*, or that identical speech by an active-duty officer would be subject

to discipline.  It instead issued a preliminary injunction based on the sweeping theory that all military retirees are indistinguishable from civilians for First Amendment purposes, such that the military has no greater ability to discipline their speech in any respect—even speech identical to that at issue in *Parker*.

That holding was gravely wrong and sweeps far beyond Kelly's suit, calling into question the military's ability to maintain discipline among servicemembers.  Retired servicemembers like Kelly undoubtedly enjoy substantial First Amendment freedoms:  They have a broad right to criticize military policy, participate in public debate, and express even vehement disagreement with military leaders.  But at the same time, retired officers play an important and longstanding role in the military.  Unlike discharged servicemembers—who have severed their connection to the military, are not subject to the Uniform Code of Military Justice (UCMJ), and enjoy all the rights of ordinary civilians—retired servicemembers form a unique reserve force.  They may be ordered to active duty "at any time," 10 U.S.C. § 688(a), remain subject to other military obligations, and enjoy various military benefits.  *See Larrabee v. Del Toro*, 45 F.4th 81, 84 & n.2 (D.C. Cir. 2022).

As such, retired officers are still "officers in the military service of the United States," *Kahn v. Anderson*, 255 U.S. 1, 6-7 (1921), and like other officers, their words and actions can undermine military discipline. Retired officers thus do not have a right to invoke their military rank and credentials, directly address active-duty servicemembers, and counsel them to disobey lawful orders. *Parker* recognized the military's vital interest in ensuring that servicemembers obey orders. Whatever other speech rights he may have, Kelly is not exempt from the military's efforts to ensure discipline in this crucial respect, and the district court erred in disregarding the Secretary's authority to maintain good order and discipline among military personnel.

## STATEMENT OF JURISDICTION

Kelly invoked the district court's subject matter jurisdiction under 28 U.S.C. § 1331. JA106. On February 12, 2026, the district court entered a preliminary injunction. JA14-15. On February 24, 2026, the government filed a timely notice of appeal. JA12; Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

In *Parker v. Levy*, 417 U.S. 733 (1974), the Supreme Court held that servicemembers have fewer First Amendment protections than civilians.

3

The Court recognized "the different character of the military community and of the military mission," cautioning that "[t]he armed forces depend on a command structure that at times must commit men to combat." *Id.* at 758-59. Thus, "a commissioned officer publicly urging enlisted personnel to refuse to obey orders which might send them into combat" is "unprotected under the most expansive notions of the First Amendment." *Id.* at 761.

The question presented is whether this rule applies to Captain Kelly, a retired Naval officer, such that the First Amendment does not confer a right upon him to invoke his military rank, speak directly to servicemembers, and counsel them to disobey lawful orders.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Framework.

**1.** Servicemembers who complete a minimum number of years on active duty typically have three options for their future relationship with the military: They may remain in the military on active duty; they may remain in the military as a retired servicemember; or they may be discharged from the military. These options are all available to a Naval officer like Captain Kelly after more than 20 years of active service. *See, e.g.*, 10 U.S.C. § 8323(a)(1).

4

This choice has significant consequences for the servicemember's ongoing obligations to the military. Servicemembers like Kelly who choose to retire (or continue on active duty) remain in the military. Among other things, retirees may be recalled to active duty "at any time," 10 U.S.C. § 688(a), and those entitled to pay are subject to the UCMJ, *id.* § 802(a)(4). They also are subject to employment restrictions, 37 U.S.C. § 908, and must comply with reporting and potential training requirements, *see* U.S. Dep't of Def., Instr. 1352.01, *Management of Regular and Reserve Retired Military Members* paras. 3.2(a), (b), (h) (Dec. 8, 2016). In contrast, servicemembers who choose to be discharged sever their formal connection to the military. They may not be recalled to active duty, they are not subject to the UCMJ, and they enjoy all the rights of ordinary civilians. *See Larrabee v. Del Toro*, 45 F.4th 81, 84 & n.2 (D.C. Cir. 2022).

Retired servicemembers' military obligations reflect their important role as a reserve force. Retirees are subject to active-duty recall because their military service may be "necessary in the interests of national defense." Instr. 1352.01, *supra*, para. 1.2(a). In practice, retired servicemembers may be called to serve "as a manpower source of last resort after other sources are determined not to be available or a source for unique skills not otherwise obtainable." *Id.* para. 1.2(c). The Department of War

thus has extensive policies governing the management and mobilization of retired servicemembers, recognizing that they "must be managed to ensure they are accessible for national security and readiness requirements." *Id.* para. 1.2(b); *see id.* para. 3.2 (management provisions); *id.* paras. 3.3, 3.4 (mobilization criteria).

Retirees have played this important reserve role for more than a century. Since Congress first enacted the UCMJ in 1950, it has required retired servicemembers to comply with its provisions. Act of May 5, 1950, ch. 169, 64 Stat. 107, 109, 114. And since the mid-1800s, when Congress created the retired lists, it has included retired servicemembers in the armed forces by statute and has subjected them to court-martial jurisdiction. *See* J. Mackey Ives & Michael J. Davidson, *Court-Martial Jurisdiction Over Retirees Under Articles 2(4) and 2(6): Time to Lighten Up and Tighten Up?*, 175 Mil. L. Rev. 1, 4 nn.7-10 (2003); Act of Aug. 3, 1861, ch. 42, 12 Stat. 287, 289-90. As President Wilson explained in 1916, there is a "sharp distinction in status" between "retired officers" and "mere pensioners." 53 Cong. Rec. 12,844 (1916). Retired officers "are regarded and governed at all times as an effective reserve of skilled and experienced officers and a potential source of military strength," whereas "no further military service is expected" from pensioners. *Id.*

Retired servicemembers receive various benefits in exchange for accepting these obligations. A retired officer like Kelly typically receives retired pay, 10 U.S.C. § 8323(e); may wear the uniform, insignia, and qualifications corresponding to his rank, U.S. Dep't of the Navy, NAVPERS 15665J, *Uniform Regulations*, art. 61002 (Jul. 30, 2025); and may use his military title, U.S. Dep't of Def., *Joint Ethics Regulation* para. 2-503 (May 15, 2024). The amount of an officer's retired pay depends in part on his "retired grade," 10 U.S.C. §§ 1370, 1407, 8323(e), 8333, which is roughly synonymous with rank, *id.* § 101(b)(7). An officer like Kelly typically retires "in the highest permanent grade in which such officer is determined to have served on active duty satisfactorily." *Id.* § 1370(a)(1).

**2.** Retired servicemembers also are subject to administrative discipline. *See Larrabee*, 45 F.th at 101; 10 U.S.C. § 8013. Among other things, a letter of censure may be issued and placed in the servicemember's official record. Various officials may issue letters of censure, including, as relevant here, the Secretary of War. His authority to issue a letter of censure is inherent in his office. With respect to such letters issued by the Secretary of the Navy, this Court has explained that the "inherent" authority to issue secretarial letters of censure "has been recognized since the earliest days of the Republic." *Miller v. Lehman*, 801 F.2d 492, 498

7

(D.C. Cir. 1986).  Such letters are "an essential instrument for maintaining discipline and protecting the integrity of the service."  *Id.*

The Department of the Navy has issued guidance regarding secretarial letters of censure, specifically those issued by the Secretary of the Navy.  U.S. Dep't of the Navy, JAGINST 5800.7G, *Manual of the Judge Advocate General* ch. 1, § 0114A (C2, Dec. 1, 2023) (JAGMAN).  The Department has explained that all members, "including retirees," may be censured.  JAGMAN § 0114A(a).  "The Secretary may, within his or her discretion, when he or she believes it is for the good of the service, send communications to subordinate officers that may be in the nature of a reprimand."  *Id.*  "This right is necessarily vested in him or her as chief officer of that department" and "is in its own class," distinct from other forms of censure issued by lower-ranking officials.  *Id.*

Departmental guidance specifies how a secretarial letter of censure may be challenged and the effect it may have.  "Unless otherwise directed, a copy of the letter will be filed in the official record of the member censured."  JAGMAN § 0114A(a).  If a servicemember disagrees with the letter, he "has no right of appeal" through the chain of command, but he "may submit a rebuttal" that will be included in the member's official record alongside the letter of censure.  *See* JAGMAN § 0114A(b).  The letter

8

ultimately may be used in making other service-related determinations, such as fitness reports or other administrative actions.  *See id.*

**3.**  Retired servicemembers also may have their retired grade (and thus their pay) reduced.  Congress provided that a retired grade "may be reopened" in four circumstances, including when "the applicable Secretary determines, pursuant to regulations prescribed by the Secretary of Defense, that good cause exists."  10 U.S.C. § 1370(f)(2).  If a retired grade is reopened, the applicable Secretary "shall notify the officer of the reopening" and "may not make an adverse determination on the retired grade of the officer until the officer has had a reasonable opportunity to respond regarding the basis for the reopening of the officer's retired grade."  *Id.* § 1370(f)(4).  Congress generally required the Secretary of War (or the President) to make determinations for certain high-ranking officers, while allowing the Secretary of the Navy or other military department Secretaries to make determinations for lower-ranking officers.  *See id.* § 1370(a)(1), (2), (b)(6), (f)(2)(D), (3).

In 2023, then-Secretary of Defense Austin issued a memorandum to implement this authority.  Add.1.  For officers in lower grades, he provided that "[t]he Secretaries of the Military Departments may ... determine that there may be facts or other matters relating to a retired officer that

constitute good cause to reopen the officer's retired grade determination." *Id.* "Such determinations shall be in writing and no adverse determination may be made on the officer's retired grade until the officer has been notified of the reopening and the basis for it and has had a reasonable opportunity to respond in writing and, at the discretion of Secretary of the Military Department concerned, make an oral presentation before an official designated by such Secretary." *Id.* He further delegated to "the Secretaries of the Military Departments the authority under 10 U.S.C. § 1370(f)(6)(A) to change the retired grade of a retired officer," with certain limitations not relevant here. *Id.*

The Department of the Navy has issued additional guidance to govern reopening proceedings. A decision to reopen triggers review by the Secretary of the Navy, who holistically evaluates whether a change in retired grade is warranted based on a comprehensive assessment of the servicemember's conduct and record. *See* U.S. Dep't of the Navy, Sec'y of the Navy Instr. 1920.6D, *Administrative Separation of Officers* enclosure 9, at 8 (Jul. 24, 2019) (providing that the "reopened retirement grade determination" is made "in accordance with the guidance, specific factors, and procedural requirements set forth in paragraph 2 of this enclosure"). This review includes "all relevant factors." *See id.* at 2-3 (identifying six

factors that guide the inquiry).  For example, conduct warranting a lower retired grade may include "an act or omission that adversely affects the ability of the military unit or the organization to maintain discipline, good order, and morale."  *Id.* at 3.  "However, when the officer's record … is otherwise so meritorious as to demonstrate that the officer served satisfactorily in the grade currently held, the recommendation should be for retirement in that grade"—"in spite of" the officer's "misconduct."  *Id.*

As noted, the Secretary of the Navy ordinarily exercises delegated authority to make the final decision whether to change the retired grade of an officer like Kelly.  *See* Add.1; 10 U.S.C. § 1370(f)(6)(A).  Here, as discussed below, the Secretary of War retained his authority to make the final decision regarding a potential change in Kelly's retired grade, which he intends to make after the Secretary of the Navy provides a recommendation based on the above factors.  *See* JA101; *infra* p. 17.

**4.**  A member of the Navy who is dissatisfied with either a letter of censure or a change in retired grade generally may seek further review from the Board for Correction of Naval Records (Board).  The Board is an administrative body comprised of at least three civilians appointed by the Secretary of the Navy.  32 C.F.R. § 723.2.  The Board's function is to consider applications alleging "the existence of error or injustice" in Naval

11

records. *Id.* § 723.2(b); *see* 10 U.S.C. § 1552(a)(1). The Board routinely decides applications challenging a letter of censure or grade determination. *See, e.g.*, *Miller*, 801 F.2d at 495 (request to expunge letter of censure); *Bader v. United States*, 97 F.4th 904, 908 (Fed. Cir. 2024) (request to change retired grade).

Naval regulations govern Board proceedings. 32 C.F.R. pt. 723. When a servicemember applies for relief, the Board reviews the application and "all pertinent evidence of record" to determine "whether to authorize a hearing" or whether to grant or deny the application without a hearing. *Id.* § 723.3(e)(1). The Board's decision is ultimately a recommendation to the Secretary of the Navy, who has authority to make the "final decision" whether to modify Naval records. *Miller*, 801 F.2d at 497. For many types of decisions, the Secretary of the Navy has delegated this authority to the Board, which "is authorized to take final corrective action on behalf of the Secretary." 32 C.F.R. § 723.6(e)(1). Here, however, a final decision based on the Board's recommendation regarding Kelly's letter of censure or retired grade would be "reserved for decision by the Secretary of the Navy." *See id.* § 723.6(e).

12

### B.    Factual Background.

**1.**  Mark Kelly is a retired Naval officer and a sitting United States Senator from Arizona.  JA103.  He retired from the Navy in 2011 with a retired grade of O-6, Captain.  JA107.  As a retired officer, he receives military pay and benefits commensurate with his retired grade.  He is also subject to various military obligations, including to return to active duty if ordered and to comply with the UCMJ at all times.  *See supra* pp. 5, 7.

On January 5, 2026, the Secretary of War issued a letter of censure to Captain Kelly.  JA99.  The Secretary determined that "[b]etween June 2025 and December 2025," Kelly "engaged in a sustained pattern of public statements that characterized lawful military operations as illegal and counseled members of the Armed Forces to refuse orders related to those operations."  JA99.  Most prominently, Kelly "participated in and distributed a video titled 'Don't Give Up the Ship,'" in which he stated that he was "'a Captain in the United States Navy'" and said "'We want to speak directly to members of the military.'"  JA99.  He continued, "'This Administration is pitting our uniformed military … against American citizens … .  You can refuse illegal orders.  You must refuse illegal orders.'"  JA99.  He concluded, "'Know we have your back. …  Stand up for our laws, for our Constitution.'"  JA99.

The Secretary noted that, thereafter, Kelly "issued a joint statement defending the video and reinforcing [his] call for refusal of what [he] characterized as 'unlawful orders.'"  JA99.  Over the next few days, Kelly "criticized military leadership for 'firing admirals and generals' and surrounding themselves with 'yes men,' asserting [he] would 'ALWAYS defend the Constitution.'"  JA99.  Kelly also "stated that intimidation would not work and called [his] advice to refuse orders 'non-controversial.'"  JA99.  Additionally, over the next month, Kelly "continued to accuse [the Secretary] and senior military officers of war crimes and to frame resistance to lawful orders as protecting against overreach."  JA99; *see* JA47 (stating that "[a]ll of the statements relied upon" here "were public statements that [Kelly] made on social media and in news interviews").

The Secretary determined that this conduct warranted censure as "prejudicial to good order and discipline in the Armed Forces of the United States, conduct which brings discredit upon the same and conduct unbecoming an officer."  JA99; *see also* 10 U.S.C. § 933 (prohibiting "conduct unbecoming an officer"); *id.* § 934 (prohibiting "all disorders and neglects to the prejudice of good order and discipline in the armed forces" and "all conduct of a nature to bring discredit upon the armed forces").  The Secretary found that, "viewed in totality," Kelly's statements presented a

14

"pattern of conduct" that "demonstrates specific intent to counsel servicemembers to refuse lawful orders," including those "related to National Guard deployments and counter-narcotics operations."  JA100.  "This pattern demonstrates that [Kelly was] not providing abstract legal education about the duty to refuse patently illegal orders," but rather, was "specifically counseling servicemembers to refuse particular operations that [he has] characterized as illegal."  JA100.  Furthermore, "[b]y publicly accusing the Secretary of War and senior military officials of war crimes and characterizing lawful operations as illegal," Kelly "directly attacked the legitimacy of military leadership and the lawfulness of their orders" and brought "discredit upon the armed forces by falsely portraying lawful military operations as criminal acts."  JA100.  Kelly's statements also "create confusion among servicemembers about their duty to obey lawful orders" and encourage them "to second-guess lawful orders."  JA100.

The Secretary therefore determined that Kelly's conduct "undermines the chain of command," "counsels disobedience," "creates confusion about duty," "brings discredit upon the armed forces," and "is conduct unbecoming an officer."  JA100 (citation modified).  "By counseling servicemembers to refuse orders while simultaneously characterizing specific operations as illegal," Kelly "engaged in conduct that

15

seriously compromises [his] standing as an officer and brings dishonor to the officer corps." JA100. "When a retired officer with a previously distinguished service record and a current position of authority tells servicemembers that their appointed leaders are committing war crimes and that they must refuse orders, it: undermines trust in leadership; creates legal confusion; encourages insubordination; damages morale; and harms public confidence." JA100. The Secretary concluded that Kelly's "use of [his] military rank and credentials to undermine lawful military operations and to counsel servicemembers to refuse lawful orders is incompatible with the trust and confidence placed in commissioned officers," finding that Kelly's "conduct has had, and continues to have, a detrimental impact on military discipline and good order." JA100.

The Secretary indicated that the letter of censure "will be placed in [Kelly's] official military personnel file." JA101. He further noted that Kelly does "not have a right to appeal this administrative action" but may "submit a written rebuttal" that "will be placed in [Kelly's] official military personnel file along with" the letter of censure. JA101.

**2.** In the letter, the Secretary also notified Kelly of proceedings to revisit his retired grade. The Secretary indicated that, for the same reasons censure was warranted, "good cause exists to reopen the determination of

16

[Kelly's] retired grade under the provisions of 10 U.S.C. § 1370." JA101. The Secretary stated that he "will direct the Secretary of the Navy to recommend to [him] whether a reduction in grade is appropriate in [Kelly's] case." JA101. "After receiving the Secretary of the Navy's recommendation," the Secretary of War "will determine if a reduction is warranted," which "would result in a corresponding reduction in retired pay." JA101.

That same day, the Chief of Naval Personnel provided Kelly with additional information about the grade proceeding. The notice indicated that Kelly's "retirement paygrade will be revisited under the provisions" of the Naval instructions summarized above. JA96. The notice explained that the "factual basis supporting this action" is the letter of censure, and that "[t]he Secretary of the Navy will review the circumstances" of that letter "and make a recommendation to the Secretary of War on an appropriate retirement grade." JA96. The "least favorable outcome" in Kelly's case would be that his "separation is characterized as Honorable and that [he is] retired at an inferior pay grade." JA96. The notice further advised that Kelly "may submit a statement (to include matters in mitigation), rebuttal, or decline to make a statement," confer with counsel, and request "copies of the materials that will be forwarded to the Secretary of the Navy to support

17

his recommendation." JA96.  While the notice directed Kelly to respond within 10 days, JA96, the deadline was extended to facilitate preliminary injunction proceedings.

### C.    Prior Proceedings

On January 12, 2026, Kelly filed suit in district court to challenge the letter of censure and the reopening of his retired grade.  Among other things, Kelly claimed that those actions violated the First Amendment because they were "based on the content and viewpoint of his speech," JA135-37, and he moved for a preliminary injunction.

One month later, the district court granted a preliminary injunction. The order broadly prohibits the government from "giving effect" to the letter of censure or "taking any steps" to revisit Kelly's retired grade.  JA14-15.  The court thus prohibited the government from completing administrative proceedings to determine whether Kelly's retired grade should be reduced.

The district court first held that Kelly's claims were judicially reviewable.  JA24-32.  Among other things, the court acknowledged that "federal courts grant substantial deference to the military when it acts within its sphere of authority" and that "[c]ourts are rightly wary of second-guessing 'professional military judgments' as to 'the composition, training,

equipping, and control of a military force.'" JA24. The court concluded, however, that it could review Kelly's First Amendment claim without "adjudicat[ing] the merits of discretionary military decisions" or the Secretary's "discretionary judgments," including whether Kelly's speech "*in fact* disrupted the chain of command, eroded confidence in leadership, or constituted conduct unbecoming an officer." JA26. The court noted that Kelly's "legal arguments do not, at their core, challenge those underlying discretionary judgments" but rather, assert a First Amendment violation "*regardless* of Secretary Hegseth's ultimate judgment as to the effect of that speech." JA26.

The district court next held that Kelly is likely to succeed on his First Amendment claim and declined to reach Kelly's other claims. JA33-40. The court framed that dispute as "largely hing[ing]" on whether Kelly "engaged in protected speech," and the court concluded that Kelly's speech "is fully protected under the First Amendment." JA33-38, 40 n.6. The court acknowledged "precedent establishing that First Amendment protections are more limited in the military context," but rejected that precedent as categorically inapplicable to "retired servicemembers." JA33. The court noted that those cases "involve *active-duty* servicemembers or speech on military bases" and reasoned that the rationale to restrict their

19

speech "does not hold true for retired servicemembers." JA35-36.  In the court's view, "[s]peech from retired servicemembers—even speech opining on the lawfulness of military operations—does *not* threaten 'obedience, unity, commitment, and esprit de corps' in the same way as speech from active-duty soldiers." JA36-37.  The court also reasoned that Kelly, as "a sitting Member of Congress," enjoys "heightened free speech protection." JA37.

The district court further held that the remaining preliminary injunction factors favor Kelly.  Having identified a likely First Amendment violation, the court concluded that Kelly demonstrated irreparable harm to his speech interests.  JA41-42.  The court also held that, in light of those interests, the balance of equities and public interest favor an injunction. JA42-43.  The court dismissed the government's concern that injunctive relief "would 'interfere with the military's ability to maintain good order and discipline.'"  JA43.  While the court cited a "tradition" of retired servicemembers "routinely contributing to the public discourse in ways critical of current military policy," it identified no tradition of retired officers counseling servicemembers to disregard lawful orders.  JA43-44.

20

**SUMMARY OF ARGUMENT**

**I.** It is firmly established that active-duty servicemembers have substantially reduced First Amendment rights relative to civilians. For example, in *Parker v. Levy*, 417 U.S. 733 (1974), the Supreme Court held that a servicemember's speech is "constitutionally unprotected" when it "undermine[s] the effectiveness of response to command." *Id.* at 759 (quotation marks omitted). That is because "[t]he armed forces depend on a command structure that at times must commit men to combat." *Id.* Thus, the military's interest in restricting speech is at its height when a servicemember counsels disobedience to lawful orders. *Parker* itself involved such speech, leading the Court to conclude that "a commissioned officer publicly urging enlisted personnel to refuse to obey orders" is "unprotected under the most expansive notions of the First Amendment." *Id.* at 761. Other courts have affirmed similar convictions for speech that counseled disobedience to lawful orders, recognizing that such statements are inherently prejudicial to military discipline—even where the officer believed that the order was unlawful, *Millican v. United States*, 744 F. Supp. 2d 296, 307-08 (D.D.C. 2010), and even without evidence demonstrating "the likely effect of the words on military efficiency," *Priest v. Secretary of the Navy*, 570 F.2d 1013, 1018 (D.C. Cir. 1977).

Under these principles, Captain Kelly's speech at issue here is not entitled to First Amendment protection. As the Secretary found, Kelly identified his military rank, spoke "directly to members of the military," and "counseled members of the armed forces to refuse lawful orders," among other things. JA99-100. The Secretary determined that those statements were "prejudicial to good order and discipline." JA99. *Parker* makes clear that the First Amendment does not protect these types of statements, 417 U.S. at 758-61, regardless of Kelly's belief that the relevant orders may have been unlawful.

**II.** The district court did not question that *Parker* would foreclose a First Amendment claim by an active-duty servicemember based on statements like Kelly's, nor did the court question any of the Secretary's findings. Instead, the court rested its injunction on the sweeping proposition that the military has *no* greater ability to restrict the speech of retired servicemembers than the speech of civilians, even speech that counsels disobedience to lawful orders. That holding is gravely wrong, ignores the relationship that retired officers have with the military, and has far-reaching implications for military discipline.

Retired officers like Kelly are unquestionably in the armed forces. Since the earliest days of the Civil War, Congress has provided that retired

22

officers are in the armed forces, pursuant to its constitutional authority to create those forces. The Executive Branch likewise has long recognized that retired servicemembers are in the armed forces, having tried retirees by courts-martial since the mid-1800s. Critically, retired servicemembers are subject to recall to active duty and repeatedly have been recalled in recent history. Correspondingly, retired servicemembers remain subject to various military obligations and receive military benefits. This Court and others thus have recognized the military status and influence that retired servicemembers have. For example, this Court recently held that Congress may constitutionally subject retired servicemembers to military discipline because retirees have the requisite military status. *Larrabee v. Del Toro*, 45 F.4th 81, 84 & n.2 (D.C. Cir. 2022). And since the 1800s, the Supreme Court has repeatedly "recognized military retirees as part of the nation's armed forces." *Id.* at 96-97.

As members of the armed forces, retired servicemembers remain subject to military discipline for their words and actions that undermine military order. That conclusion applies with special force to retired officers like Kelly who "form a vital segment of our national defense." *United States v. Hooper*, 26 C.M.R. 417, 425 (C.M.A. 1958). They are in the armed forces and their statements counseling disobedience to lawful orders inherently

23

threaten "the effectiveness of response to command." *Parker*, 417 U.S. at 758-59. When a retired officer like Kelly invokes his rank, speaks directly to active-duty servicemembers, and tells them to disobey lawful orders, his statements are imbued with authority commensurate with his retired rank, and he may exert influence in that capacity—especially since he may be recalled to active duty "at any time," 10 U.S.C. § 688(a), to command the very servicemembers whose disobedience he just urged. The influence wielded by retired officers has been recognized in multiple contexts, including in cases where retired officers have been accused of exerting unlawful command influence. *See United States v. Bergdahl*, 80 M.J. 230, 234-35 (C.A.A.F. 2020).

Thus, while retired officers may well have greater speech rights than active-duty servicemembers in some respects, the district court erred in holding that they are indistinguishable from civilians for purposes of First Amendment analysis. The court reasoned that retired officers cannot undermine discipline as significantly as active-duty servicemembers, but that conclusion is unsupportable. Regardless, even assuming that speech by active-duty servicemembers has a greater effect on military discipline, that would not justify the court's all-or-nothing approach, which gives *no* weight to the military's interests—even in a case like this, where the

Secretary determined that a retired officer issued the same type of statements at issue in *Parker*. This Court need not decide the precise scope of retired servicemembers' First Amendment rights to reverse the district court's injunction. Here, the court did not question the Secretary's determination that Kelly's speech involved a commissioned officer invoking his rank and counseling disobedience to lawful orders. As discussed, such speech is at the very heart of the interests that justify greater speech restrictions in the military context. There is no doubt that the military may discipline retired officers who engage in such speech.

The district court also erred insofar as it suggested that Kelly is entitled to heightened First Amendment protection because he is a Member of Congress. Whatever enhanced speech rights Kelly has in that capacity, they come from other constitutional provisions, not the First Amendment. The court relied on *Bond v. Floyd*, 385 U.S. 116 (1966), but that case did not hold that legislators have "heightened" First Amendment rights; it held that legislators do not have *less* First Amendment protection by virtue of their legislative office. *Id.* at 132-33. If anything, Kelly's role in Congress provides more, not less, reason to hold him as accountable as other servicemembers for counseling disobedience to lawful orders, given that his

"leadership position" as a member of the Senate Armed Services Committee gives him "unique sway over the military." *See Bergdahl*, 80 M.J. at 236.

## STANDARD OF REVIEW

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008)). "A court considering a request for preliminary relief must examine four factors: (1) the moving party's likelihood of success on the merits; (2) irreparable injury to the moving party if an injunction is denied; (3) substantial injury to the opposing party if an injunction is granted; and (4) the public interest." *Kiyemba v. Obama*, 561 F.3d 509, 513 (D.C. Cir. 2009). To the extent "the district court's decision hinges on questions of law," this Court's "review is *de novo*." *Id.* (quotation marks omitted). "If the moving party can show no likelihood of success on the merits, then preliminary relief is obviously improper and the appellant is entitled to reversal of the order as a matter of law." *Id.*

## ARGUMENT

Captain Kelly is a retired Naval officer and thus a member of the armed forces. While he enjoys substantial First Amendment freedoms, he

26

is also subject to military discipline when his statements cross the line into unprotected speech. Here, the Secretary found that Kelly invoked his military rank, spoke directly to servicemembers, and counseled them to disobey lawful orders in the context of ongoing military operations. The district court did not question the Secretary's assessment of Kelly's statements or whether those statements, if made by an active-duty servicemember, would support disciplinary action. As the court recognized, speech "that undermines the chain of command, and the obedience, order, and discipline it is designed to ensure," is not protected under the First Amendment. JA35 (quotation marks omitted).

The district court erred, however, in holding that Kelly is exempt from these rules because he is a retired officer and Member of Congress. Like other servicemembers, Kelly is constitutionally subject to military discipline for statements that counsel disobedience to lawful orders. Because Kelly "cannot prevail on the merits of [his] present claim," "the Government is entitled to reversal of the order[] as a matter of law." *Kiyemba v. Obama*, 561 F.3d 509, 514 (D.C. Cir. 2009).[1]

---

[1] Because Kelly's failure to show likely success on the merits of his First Amendment claim is dispositive, it is unnecessary to evaluate the remaining preliminary injunction factors. *See Arkansas Dairy Co-op Ass'n v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009) (declining "to review the other three preliminary injunction factors" where the plaintiffs

*Continued on next page.*

## I.    The First Amendment Does Not Protect Speech By Servicemembers That Counsels Disobedience To Lawful Orders.

**1.** For decades, the Supreme Court and this Court have held that active-duty servicemembers have substantially reduced First Amendment rights relative to civilians.  In *Parker v. Levy*, 417 U.S. 733 (1974), the Supreme Court held that a servicemember's speech is "constitutionally unprotected" when it "undermine[s] the effectiveness of response to command." *Id.* at 759 (quotation marks omitted).  Likewise, in *Priest v. Secretary of the Navy*, 570 F.2d 1013 (D.C. Cir. 1977), this Court held that a servicemember's speech is unprotected where it "tend[s] to interfere with responsiveness to command or to present a clear danger to military loyalty, discipline, or morale." *Id.* at 1017.  This is an easier standard to satisfy than the standard set forth in *Brandenburg v. Ohio*, 395 U.S. 444 (1969) (per

---

showed "no likelihood of success on the merits").  For the same reason, the government also assumes for purposes of this appeal that Kelly's First Amendment claim is subject to judicial review at this time.  In other cases, particularly those involving less direct involvement by the Secretary of War, the government may continue to press an argument that a plaintiff must exhaust available remedies before seeking judicial review.  For example, servicemembers routinely exhaust similar challenges within the chain of command and before the Board prior to filing suit in federal district court. *See supra* pp. 8-12; *e.g.*, *Bois v. Marsh*, 801 F.2d 462, 467-68 (D.C. Cir. 1986).

curiam), to punish speech by civilians urging unlawful conduct; that standard "is inapposite in a military context." *Priest*, 570 F.2d at 1017.

The military's greater ability to restrict speech by servicemembers stems from "the different character of the military community and of the military mission." *Parker*, 417 U.S. at 758. "The armed forces depend on a command structure that at times must commit men to combat, not only hazarding their lives but ultimately involving the security of the Nation itself." *Id.* at 758-59 (quoting *United States v. Priest*, 45 C.M.R. 338, 344 (C.M.A. 1972)). These exigencies convey a "fundamental necessity for obedience, and the consequent necessity for imposition of discipline." *Id.* at 758. As the Court has explained, the "inescapable demands of military discipline and obedience to orders cannot be taught on battlefields; the habit of immediate compliance with military procedures and orders must be virtually reflex with no time for debate or reflection." *Goldman v. Weinberger*, 475 U.S. 503, 508 (1986) (quotation marks omitted). The armed forces thus may prohibit speech that "undermine[s] the effectiveness of response to command," even if that same speech would be "protected in the civil population." *Priest*, 570 F.2d at 1017 (quoting *Parker*, 417 U.S. at 759).

As the Supreme Court has recognized, the military's interest in restricting such speech is at its height where the speech in question counsels disobedience to lawful orders.  *Parker* itself involved such speech: Parker was an Army captain who was responsible for training other servicemembers during the Vietnam War.  417 U.S. at 736.  He "made several public statements to enlisted personnel at the post," urging, among other things, that soldiers "should refuse to go to Viet Nam and if sent should refuse to fight."  *Id.* at 736-37.  Based on those statements, a court-martial convicted him of acting contrary to "good order and discipline in the armed forces" under Article 134 of the UCMJ and for "conduct unbecoming an officer" under Article 133 of the UCMJ.  *Id.* at 737-40 (quotation marks omitted).  The Court upheld his conviction, concluding that "a commissioned officer publicly urging enlisted personnel to refuse to obey orders which might send them into combat" was "unprotected under the most expansive notions of the First Amendment."  *Id.* at 761.

The lower courts also uniformly have held that speech counseling disobedience to lawful orders is categorically unprotected.  Even before *Parker*, the Court of Military Appeals—the predecessor to today's Court of Appeals for the Armed Forces—repeatedly affirmed convictions of servicemembers court-martialed for speech that included exhortations to

30

disobey lawful orders.  For example, in *United States v. Daniels*, a soldier was court-martialed after repeatedly urging fellow soldiers to refuse orders to go to Vietnam, 42 C.M.R. 131, 135-36 (C.M.A. 1970), while in *Priest*, the court affirmed a conviction for the publication of newsletters that "encourage[d] members of the armed forces to abandon their oaths and seek sanctuary in a foreign haven," 45 C.M.R. at 342.  This Court subsequently rejected a collateral challenge to Priest's conviction, concluding that the servicemember's statements "were plainly calculated to subvert discipline" and therefore provided sufficient evidence "to support a conviction under First Amendment standards." *Priest*, 570 F.2d at 1018.

These principles hold true even if an officer subjectively believes that he is counseling disobedience to *unlawful* orders.  As noted, military effectiveness demands that servicemembers develop a "habit of immediate compliance with military procedures and orders" that is "virtually reflex." *Goldman*, 475 U.S. at 508.  Thus, while servicemembers have a duty to disregard "patently illegal" orders, military orders are presumed to be lawful, and they are "disobeyed at the peril of the subordinate." *See* U.S. Dep't of Def., *Manual for Courts-Martial* pt. IV, at 24 (2024); *United States ex rel. New v. Rumsfeld*, 448 F.3d 403, 409 (D.C. Cir. 2006) (noting "the presumption of lawfulness that attaches to military orders"); *United*

31

*States v. New*, 55 M.J. 95, 108 (C.A.A.F. 2001) (noting that subjective belief "that the order is illegal based on [a servicemember's] interpretation of applicable law" is not a defense to a charge of violating lawful orders); William Winthrop, *Military Law and Precedents* 296-97 (2d ed. 1920) (reprint of 1896 ed.) ("But for the inferior to assume to determine the question of the lawfulness of an order given him by a superior would of itself, as a general rule, amount to insubordination, and such an assumption carried into practice would subvert military discipline.").  Just as servicemembers are not required to engage in extensive "debate or reflection" on the battlefield, *Goldman*, 475 U.S. at 508, officers may not counsel disobedience to orders based on their personal belief that those orders may be unlawful.

Thus, where an officer encouraged subordinates to disobey orders to receive an anthrax vaccine, a court in this Circuit rejected a First Amendment challenge to administrative sanctions by the military that led the officer to be denied the possibility of promotion.  *Millican v. United States*, 744 F. Supp. 2d 296, 307-08 (D.D.C. 2010).  The court explained that such conduct fell "squarely within the realm of unprotected speech," despite the officer's assertion that the anthrax vaccine program was unlawful, and despite the existence of an injunction from another court

concluding that the anthrax vaccine program was in fact unlawful. *Id.* at 307; *see id.* at 305-06 (discussing litigation over legality of military anthrax vaccine program). The court recognized that the First Amendment does not curtail "the military's ability to censure an officer for protesting a policy he believes to be illegal by encouraging others to disobey orders" and rejected the contention that the other injunction "retroactively validated" the officer's "actions encouraging dissent among his peers and undermining his leaders." *Id.* at 305-07.

As these decisions illustrate, "by their very nature," statements encouraging disobedience to lawful orders inherently "are prejudicial to good order and discipline." *See United States v. Stone*, 37 M.J. 558, 563 (A.C.M.R. 1993) (quotation marks omitted) (explaining that courts uphold "sanctions for *disloyal* statements" without requiring specific evidence of effect on command response); *United States v. Wilcox*, 66 M.J. 442, 450 (C.A.A.F. 2008) (noting the "palpable and obvious" effect "on the military mission" of speech "directed to servicemembers"). For example, in *Priest*, this Court refused to require evidence that the newsletter at issue "either undermined or was likely to undermine the effectiveness of response to command," reasoning that the relevant question was "the potential of the words themselves to erode loyalty, discipline, and morale, in light of the

context in which they are uttered, to determine the likely effect of the words on military efficiency." 570 F.2d at 1018. Because there was a "clear tendency of this type of speech" to diminish "loyalty, discipline or morale," the servicemember's speech could be punished regardless of whether military discipline had "already been impaired." *Id.* (quoting *Priest*, 45 C.M.R. at 344).

**2.** Under these principles, Captain Kelly's speech at issue here is not entitled to First Amendment protection. The Secretary found that between June and December 2025, Kelly "engaged in a sustained pattern of public statements that characterized lawful military operations as illegal and counseled members of the Armed Forces to refuse orders related to those operations." JA99. Kelly invoked his military rank and spoke "directly to members of the military." JA99. While he purportedly urged them to disregard illegal orders, his statements in context "counseled members of the armed forces to refuse lawful orders" including those "related to National Guard deployments and counter-narcotics operations." JA100. Furthermore, Kelly accused senior leadership of war crimes, which "directly attacked the legitimacy of military leadership" and brought "discredit upon the armed forces." JA100. The Secretary determined that Kelly's statements were thus "prejudicial to good order and discipline in the Armed

Forces of the United States, conduct which brings discredit upon the same and conduct unbecoming an officer." JA99.

*Parker* makes clear that the First Amendment does not protect these types of statements. Kelly, invoking his military rank and speaking directly to servicemembers, "counseled members of the armed forces to refuse lawful orders." JA100. Such statements inherently "undermine the effectiveness of response to command," as the Secretary found here. *See Priest*, 570 F.2d at 1017 (quoting *Parker*, 417 U.S. at 759). Indeed, Congress has recognized that such statements are so prejudicial to military order that even non-servicemembers may be prohibited from making them in certain circumstances. *See* 18 U.S.C. § 2387(a) ("Whoever, with intent to interfere with ... discipline of the military" urges "refusal of duty" by servicemembers is subject to criminal penalties). Because there is a "clear tendency of this type of speech" to diminish "loyalty, discipline or morale," Kelly may be disciplined regardless of whether military discipline has "already been impaired." *Priest*, 570 F.2d at 1018 (quoting *Priest*, 45 C.M.R. at 344).

Kelly also may be disciplined regardless of whether he believed the relevant orders were unlawful. *See Millican*, 744 F. Supp. 2d at 307-08. While servicemembers have a duty to disobey "patently illegal" orders,

35

*supra* pp. 31-32, Kelly inaccurately advised that servicemembers have a broader duty, counseling that they "must refuse illegal orders" without qualification. JA99. As the Secretary found, Kelly's statements "viewed in totality" demonstrate that he was "not providing abstract legal education about the duty to refuse patently illegal orders" but rather, was "specifically counseling servicemembers to refuse particular operations" that Kelly "characterized as illegal." JA100; *see* JA100 (concluding that Kelly's statements "create confusion among servicemembers about their duty to obey lawful orders"). As in *Millican*, Kelly does not have a First Amendment right to "protest[] a policy he believes to be illegal by encouraging others to disobey orders." 744 F. Supp. 2d at 307. Kelly is "a commissioned officer publicly urging enlisted personnel to refuse to obey orders," and thus his statements are "unprotected under the most expansive notions of the First Amendment." *Parker*, 417 U.S. at 761.

## II. Retired Officers Are Not Entitled To Counsel Disobedience To Lawful Orders.

In light of the foregoing, the district court did not question that *Parker* would foreclose a First Amendment claim by an active-duty servicemember based on statements urging disobedience to lawful orders. *See, e.g.*, JA36 (acknowledging that "active-duty soldiers urging others to 'disregard orders' or 'calling into question a commander's credibility' may

36

directly 'undermine the effectiveness of response to command'" and "[t]he military therefore has a 'legitimate interest in prohibiting [such] conduct'"). The court also did not question any of the Secretary's findings set forth in the letter of censure, including that Kelly's statements, in context, counseled disobedience to lawful orders and undermined military discipline. To the contrary, the court expressly disclaimed any intent "to adjudicate the merits" of whether Kelly's speech "*in fact* disrupted the chain of command, eroded confidence in leadership, or constituted conduct unbecoming an officer," noting that Kelly's "legal arguments do not, at their core, challenge those underlying discretionary judgments." JA26; *see also* JA136 (premising his First Amendment claim on an "assum[ption] that the Secretary's inferences about Senator Kelly's statements are fair").

The district court instead rested its injunction on the sweeping proposition that the military has *no* ability to restrict the speech of retired servicemembers, even when that speech counsels disobedience to lawful orders. The court concluded that Kelly's statements are entitled to "full First Amendment protection" as if he were a civilian, asserting that "speech from retired servicemembers" cannot "'undermine the effectiveness of response to command' as directly as speech from active-duty soldiers" and

37

"does *not* threaten 'obedience, unity, commitment, and esprit de corps' in the same way as speech from active-duty soldiers." JA36-37.

That holding reaches far beyond Kelly and this case, calling into question the military's ability to impose discipline on any retired servicemember who, like Kelly, makes statements that go to the core of what the Supreme Court deemed "unprotected under the most expansive notions of the First Amendment": speech by "a commissioned officer publicly urging enlisted personnel to refuse to obey orders." *Parker*, 417 U.S. at 761. That holding is gravely wrong and ignores the relationship retired officers have with the military. Congress has provided that such officers are in the armed forces, are subject to recall to active duty and other military obligations, and receive various military benefits. That ongoing relationship demonstrates that the military has a compelling interest in ensuring that retired officers may be subject to discipline for counseling disobedience to lawful orders.

**1.** Retired officers like Kelly are unquestionably in the armed forces. That conclusion follows from Congress's choices, binding precedent of this Court and others, and longstanding historical practice.

Congress has long provided that the armed forces include retired servicemembers, and in particular retired officers. Since the earliest days

of the Civil War, Congress has exercised its authority to "raise and support Armies," U.S. Const. art. I, § 8, cl. 12, and to "provide and maintain a Navy," *id.* cl. 13, by formally including retired servicemembers in the armed forces by statute. *See* Ives & Davidson, *supra*, at 4 nn.7-10; Act of Aug. 3, 1861, ch. 42, 12 Stat. at 289-90 (first authorizing a "retired list" of officers). And for just as long, Congress has treated retired officers as members of the armed forces by subjecting them to court-martial jurisdiction. *See* Ives & Davidson, *supra*, at 11-20, 12 n.50; Act of Aug. 3, 1861, 12 Stat. at 290; *White v. Treibly*, 19 F.2d 712, 713 (D.C. Cir. 1927) (recognizing that, by statute, retired Naval officers were "subject to the rules and articles for the government of the Navy" (quotation marks omitted)). Congress's exercise of its "plenary and exclusive" powers in this area is entitled to deference. *Perpich v. Department of Def.*, 496 U.S. 334, 353 n.27 (1990) (quoting *Tarble's Case*, 80 U.S. (13 Wall.) 397, 408 (1871)); *see Selective Draft L. Cases*, 245 U.S. 366, 377 (1918) ("As the mind cannot conceive an army without the men to compose it," Congress has "power to provide for such men."); *Larrabee v. Del Toro*, 45 F.4th 81, 87 (D.C. Cir. 2022) ("Congress' power to raise and support the nation's fighting forces is capacious and entitled to substantial deference.").

The Executive Branch likewise has long recognized that retired servicemembers are in the armed forces, having tried retirees by courts-martial since the mid-1800s.  *See* Ives & Davidson, *supra*, at 11, 16-33. Considered opinions of the Judge Advocate General in 1896, 1912, and 1942 were supportive.  *See id.* at 12-13, 12 n.49, 13 nn.53-54, 25 & n.142 (citing opinions).  Indeed, when Congress considered removing court-martial jurisdiction over Army retirees, President Wilson vetoed the measure, and Congress acquiesced in retaining court-martial jurisdiction over retirees. 53 Cong. Rec. 12,844-85; *see United States v. Hooper*, 26 C.M.R. 417, 424-25 (C.M.A. 1958) (discussing the veto).

Critically, retired servicemembers—unlike servicemembers who separate entirely from the military—remain subject to recall to active duty "at any time."  10 U.S.C. § 688(a).  Current military policy recognizes that retirees are subject to active-duty recall because their military service may be "necessary in the interests of national defense," Instr. 1352.01, *supra*, para. 1.2(a), in particular "as a manpower source of last resort after other sources are determined not to be available or a source for unique skills not otherwise obtainable," *id.* para. 1.2(c).  And such recalls do occur.  For example, retired servicemembers were recalled during both Iraq wars.  *See United States v. Begani*, 81 M.J. 273, 279 (C.A.A.F. 2021).  Retirees also

were asked to return to active duty to enable the reactivation of battleships in the 1980s, *Navy Reactivating Old Battleships*, J. of Com. (Sep. 14, 1986), https://perma.cc/L8XB-6WP3, and to provide medical support during the COVID-19 pandemic, Kyle Rempfer, *About 25,000 Veterans Volunteer to Return to Army for COVID-19 Response*, ArmyTimes (Apr. 13, 2020), https://perma.cc/GTS4-FYT5.  And in 2018, the Air Force, facing a severe shortage of pilots, initiated a recall of up to 1,000 retirees.  Oriana Pawlyk, *Air Force Could Recall as Many as 1,000 Retirees to Active Duty*, Military.com (May 24, 2018), https://perma.cc/N8LG-CXLF.

Correspondingly, retired servicemembers remain subject to various military obligations, including military justice, 10 U.S.C. § 802(a)(4), restrictions on outside employment, 37 U.S.C. § 908, and ongoing reporting and potential training requirements, *see* Instr. 1352.01, *supra*, paras. 3.2(a), (b), (h).  In exchange, retired servicemembers receive retired pay not available to servicemembers who have been discharged, 10 U.S.C. § 8323(e), may wear the uniform, NAVPERS 15665J, *supra*, art. 61002, and may use their military title, *Joint Ethics Regulation*, *supra*, para. 2-503.

This Court recognized retired servicemembers' military status when it held that Congress may constitutionally subject them to military discipline. In *Larrabee*, this Court held that members of the Fleet Marine Corps

41

Reserve, who have "similar rights and responsibilities" as regular retirees, are "in 'the land and naval Forces'" and thus "constitutionally subject to court-martial." 45 F.4th at 84 n.2, 97; *see also Wilson v. Curtis*, 150 F.4th 1359, 1369 (10th Cir. 2025) (same for medical retirees). This Court recognized that whether such members are constitutionally subject to court-martial jurisdiction "turns 'on one factor: the military status of the accused.'" *Larrabee*, 45 F.4th at 89 (quoting *Solorio v. United States*, 483 U.S. 435, 439 (1987)). This Court found the requisite military status because Fleet Marine Corps Reservists, like regular retirees, have "a formal relationship with the military that includes an obligation to obey military orders": in particular, a statutory duty to obey an order "to reenter active-duty service," an obligation that is "central to the identity of the Fleet Marine Reserve, whose basic 'purpose ... is to maintain a ready manpower pool of trained Marines for recall and mobilization.'" *Id.* at 95. The Court further noted that they are subject to training obligations, employment restrictions, and military reporting requirements. *Id.*

As this Court observed in *Larrabee*, "the Supreme Court has recognized military retirees as part of the nation's armed forces" for more than a century, offering the "consistent and repeated acknowledgement that military retirees are properly regarded as members of the armed forces,

42

rather than civilians." 45 F.4th at 96-97. For example, in *United States v. Tyler*, 105 U.S. 244 (1881), the Court noted that while retirees are "not required to perform full service, they are [still] part of the army, and may be assigned to such duty as the laws and regulations permit." *Id.* at 245; *see also, e.g.*, *Thornley v. United States*, 113 U.S. 310, 315 (1885) (recognizing that retired officers are "still in the service"); *Barker v. Kansas*, 503 U.S. 594, 599 (1992) ("Military retirees unquestionably remain in the service and are subject to restrictions and recall … ."); *McCarty v. McCarty*, 453 U.S. 210, 221-22 (1981) ("The retired officer remains a member of the Army" and "may forfeit all or part of his retired pay if he engages in certain activities," leading "several courts, including this one, to conclude that military retired pay is reduced compensation for reduced current services"); *Kahn v. Anderson*, 255 U.S. 1, 6-7 (1921) ("[I]t is not open to question … that such officers are officers in the military service of the United States … ."); Winthrop, *supra*, at 87 n.27 ("[R]etired officers are a part of the army and so triable by court-martial—a fact indeed never admitting of question … ." (citations omitted)).

**2.** As servicemembers, retirees are part of the military community and subject to a system of military justice that ensures order and discipline in the armed forces. As this Court recognized in *Larrabee*, the military

43

"constitutes a specialized community governed by a separate discipline from that of the civilian, and … the rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty."  45 F.4th at 99 (quoting *Parker*, 417 U.S. at 744).  Retired servicemembers thus are constitutionally subject to military discipline, including through procedures that "lack many of the constitutional protections afforded in Article III courts" such as "the right to a trial by jury."  *Id.*

These principles apply with even greater force to retired *officers*. Officers are commissioned by the President, and by virtue of that commission "hold[] a particular position of responsibility and command in the Armed Forces" that reflects the "special trust and confidence" placed in those officers.  *Parker*, 417 U.S. at 744 (quotation marks omitted). Congress thus has regarded retired officers "as an effective reserve of skilled and experienced officers and a potential source of military strength." *Hooper*, 26 C.M.R. at 424 (quoting 53 Cong. Rec. 12,844).  Such officers "form a vital segment of our national defense for their experience and mature judgment are relied upon heavily in times of emergency," and their "preparedness depends" in part on "their continued responsiveness to discipline."  *Id.* at 425.  They are "members of the Military Establishment

44

distinguished by their long service, and, as such, examples of discipline to the officers and men" currently in active service. *Id.* at 424 (quoting 43 Cong. Rec. at 12,844); *see also Closson v. United States ex rel. Armes*, 7 App. D.C. 460, 477 (D.C. Cir. 1896) (recognizing the effect that retired officers can have on military order, such that if the court were to prevent a commanding officer from "directing the arrest" of an offending retired officer, it would "subvert the discipline of the army" and "destroy the efficiency of that body").

Given those concerns, the First Amendment does not protect speech by retired officers that counsels disobedience to lawful orders, because that speech inherently threatens "the effectiveness of response to command." *Parker*, 417 U.S. at 758-59; *see Priest*, 570 F.2d at 1017. As *Parker* explained, "[i]n the armed forces some restrictions exist for reasons that have no counterpart in the civilian community." 417 U.S. at 758-59. A range of even violent speech "is tolerable in the civilian community," because it ordinarily "does not directly affect the capacity of the Government to discharge its responsibilities." *Id.* "In military life, however, other considerations must be weighed." *Id.* Most critically, "[t]he armed forces depend on a command structure that at times must commit men to combat, not only hazarding their lives but ultimately involving the

45

security of the Nation itself." *Id.* Thus, the First Amendment tolerates enhanced restrictions on servicemembers' speech—notwithstanding that the same speech may be "protected in the civil population." *Id.*

These principles support the constitutionality of the administrative measures taken against Captain Kelly. When a retired officer like Kelly invokes his rank, speaks directly to servicemembers, and tells them to disobey lawful orders, his statements are imbued with authority commensurate with his retired rank. Such statements risk undermining military discipline regardless of Kelly's belief that the relevant orders may have been unlawful. It is evident that he may exert influence, particularly among enlisted servicemembers, in his capacity as a retired officer of superior rank. *See Hooper*, 26 C.M.R. at 424. And as a retired senior officer and experienced Naval aviator, he may be recalled to active duty "at any time," 10 U.S.C. § 688(a), to command the very servicemembers whose disobedience he just urged. Indeed, although Kelly may disagree with the Secretary's assessment of his statements, there can be little disagreement that the desire to exert influence over active-duty servicemembers is the reason Kelly made the statements in the first place, for example by invoking his military rank and stating that he "want[ed] to speak directly to members of the military." JA99.

46

The influence wielded by retired officers has been recognized in multiple contexts.  For example, in *United States v. Bergdahl*, the U.S. Court of Appeals for the Armed Forces affirmed the court-martial conviction of Robert Bergdahl.  80 M.J. 230 (C.A.A.F. 2020).  Bergdahl challenged his conviction partly on the ground that Senator John McCain, then chairman of the Senate Armed Services Committee, made public statements that sought to influence the outcome of his court-martial.  *Id.* at 233.  "No person subject to" the UCMJ may "coerce or, by any unauthorized means, attempt to influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case," 10 U.S.C. § 837(a)(3), and as the court explained, Senator McCain was "a retired member of the United States Navy" and thus capable of violating this prohibition (though it rejected Bergdahl's challenge on the merits).  80 M.J. at 234-35.  The court emphasized that such retired officers have "capacity to influence decision makers in a court-martial" and thus cautioned that their "comments about a pending criminal matter pose a grave risk to the goal of ensuring that justice is done in every case."  *Id.* at 238; *see also Bergdahl v. United States*, 683 F. Supp. 3d 24, 53 (D.D.C. 2023) (agreeing that Senator McCain was subject to the prohibition on attempting to influence court-martial proceedings).

47

**3.** The district court's holding that retired officers are indistinguishable from civilians for purposes of First Amendment analysis improperly disregarded the military's interest in ensuring that retired officers, who are "members of the armed forces, rather than civilians," *Larrabee*, 45 F.4th at 96-97, do not undermine military discipline by counseling disobedience to lawful orders. The district court dismissed the military's interests in a single paragraph, stating its view that retirees are not "fully immersed" in the military community and thus cannot undermine discipline "in the same way" or "as directly" as active-duty servicemembers. JA36-37.

That conclusion is insupportable. The considerations that led the Supreme Court in *Parker* to hold that speech by "a commissioned officer publicly urging enlisted personnel to refuse to obey orders" is "unprotected under the most expansive notions of the First Amendment," 417 U.S. at 761, are equally applicable to materially identical speech by retired officers. Such officers retain significant influence in the armed forces and may undermine military discipline through their words and actions. *See supra* pp. 43-48. The court sought to characterize Kelly's speech as merely "critical of current military policy," analogizing to statements by other retired officers who have criticized military leadership. JA44. But the

48

Secretary's determination rested on the specific conclusion that Kelly's speech had "a detrimental impact on military discipline and good order" because it reflected "specific intent to counsel servicemembers to refuse lawful orders." JA100. Kelly thus was not censured for simple criticism of "current military policy," no matter how harsh. Nor did the Secretary's censure letter rely on other limitations, such as the UCMJ provision proscribing "contemptuous" speech by officers directed at certain officials. *See* 10 U.S.C. § 888. Instead, the censure letter is directed at the type of speech that the Supreme Court in *Parker* deemed unprotected: speech by a commissioned officer urging disobedience to lawful orders.

Furthermore, even assuming the district court was correct that speech by active-duty servicemembers has a greater effect on military discipline, that would not justify the court's all-or-nothing approach, which gives *no* weight to the military's interest in regulating speech effectively identical to the speech in *Parker* when a retired officer is the speaker. This Court need not decide the precise scope of retired servicemembers' First Amendment rights to reverse the district court's injunction. Even assuming a retired officer might prevail on a First Amendment claim challenging an action taken based on his utterance of "contemptuous" words, and whatever arguments other retired servicemembers might raise as to other

49

restrictions on speech, there should be no doubt that the military may properly discipline retired officers who counsel disobedience to lawful orders. Here, the court did not question the Secretary's conclusion that Kelly's speech involved a commissioned officer counseling disobedience to lawful orders, and Kelly's subjective opinion about the lawfulness of such orders would not matter in any event. As discussed, such speech is at the very heart of the interests that justify greater speech restrictions in the military context, because counseling disobedience to lawful orders inherently threatens "the effectiveness of response to command." *Parker*, 417 U.S. at 758-59.

The same error undergirds the district court's concern that recognizing limitations on speech by retired officers would restrict the ability of "retired veterans" to "contribut[e] to public discussion on military matters and policy." JA43. There is no doubt that Kelly, like other retired officers, enjoys substantial First Amendment freedoms. There is no dispute that he may criticize military policy, question the legality of military operations, advocate for legislative change, and participate vigorously in public debate on national security issues. As discussed, the censure letter is not based on Kelly's "views on military policy" generally, JA44, but instead rests on the Secretary's determination that Kelly's speech "counsel[s]

servicemembers to refuse lawful orders" in ongoing military operations, with corresponding effects on military discipline.  JA100.

**b.**  Finally, the district court erred insofar as it suggested that Kelly's position as "a sitting Member of Congress" conferred special status or additional First Amendment protections.  JA37.  Whatever enhanced speech rights Kelly has in that capacity, they come from other constitutional provisions, not the First Amendment.  For example, the Speech and Debate Clause protects Members of Congress for their "legislative acts."  *See Doe v. McMillan*, 412 U.S. 306, 311-12 (1973).[2]  Those protections do not, however, affect the scope of their other constitutional rights or otherwise "make Members of Congress super-citizens."  *United States v. Brewster*, 408 U.S. 501, 516 (1972).

The district court offered no basis to conclude otherwise.  The court relied on *Bond v. Floyd*, 385 U.S. 116 (1966), to conclude that legislators enjoy "heightened free speech protection," JA37, but *Bond* addressed the converse scenario, holding that state legislators do not have *less* First Amendment protection by virtue of their legislative office.  385 U.S. at 132-33.  The Georgia House of Representatives had excluded an elected official

---

[2] The district court did not address Kelly's separate claim under the Speech and Debate Clause.  JA23.  The merits of that claim are not before this Court.

51

based on his statements that were protected "expressions in opposition to national foreign policy in Vietnam and to the Selective Service system." *Id.* at 132. The Court recognized that those statements did "not demonstrate any incitement to violation of law" and thus that the official "could not have been convicted for these statements consistently with the First Amendment." *Id.* at 134. The Court rejected the State's argument that it was "constitutionally justified in exacting a higher standard of loyalty from its legislators than from its citizens," as nothing justifies "extending more protection to citizen-critics than to legislators." *Id.* at 135-37.

*Bond* nowhere suggests legislators are immune from speech restrictions that otherwise would constitutionally apply to them if they did not hold that office. If anything, the Court suggested that legislators remain subject to generally applicable speech restrictions, such as incitement. *See Bond*, 385 U.S. at 134 (citing "the many decisions of this Court which establish that Bond could not have been convicted for these statements" on the ground of "incitement to violation of law"). As discussed, the censure letter is based on speech by Kelly that the Supreme Court has recognized is not entitled to First Amendment protection because of its effect on military discipline and order, and Kelly's legislative office does not immunize him from those generally applicable principles.

52

To the extent it is relevant at all, Kelly's role in Congress provides more, not less, reason to recognize that speech by a retired officer can be detrimental to military discipline.  Kelly, as a member of the Senate Armed Services Committee, serves in a role with "unique sway over the military" that makes him uniquely positioned among retired officers to influence the military, such as by "delay[ing] or block[ing] assignments or promotions of senior military personnel." *See Bergdahl*, 80 M.J. at 236.  That capacity only makes it more damaging for Kelly to counsel servicemembers to disobey lawful orders in specific ongoing military operations, as the Secretary determined here.

* * *

In sum, as a retired Naval officer, Kelly is a member of the armed forces.  Like other servicemembers, he has the capacity to undermine military order, including through public statements that counsel disobedience to lawful orders.  While Kelly enjoys substantial speech protections, he is not in the same position as a civilian.  Speech by a retired officer that invokes his military rank, speaks directly to servicemembers, and counsels them to disobey lawful orders is unprotected, and the military may properly hold Kelly accountable for those statements.

53

## CONCLUSION

For the foregoing reasons, the preliminary injunction should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

BRAD HINSHELWOOD
CYNTHIA BARMORE

 */s/ John Bailey*
JOHN BAILEY
  *Attorneys, Civil Division*
  *Room 3618*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*
  *John.Bailey@usdoj.gov*

March 2026

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,257 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Georgia 14-point font, a proportionally spaced typeface.

*/s/ John Bailey*
John Bailey

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*/s/ John Bailey*
John Bailey

**ADDENDUM**



**SECRETARY OF DEFENSE**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

MAR 3 0 2023

MEMORANDUM FOR SECRETARIES OF THE MILITARY DEPARTMENTS
UNDER SECRETARY OF DEFENSE FOR PERSONNEL AND
READINESS

SUBJECT: Implementation of Authority to Reopen a Retired Grade Determination for Good Cause and Delegation of Authority to Change an Officer's Retired Grade after Reopening of a Retired Grade Determination

This memorandum implements 10 U.S.C. § 1370(f)(2)(D) and delegates the authority of the Secretary of Defense under 10 U.S.C. § 1370(f)(6)(A) to the Secretaries of the Military Departments.

Section 1370(f)(2)(D) authorizes the Secretary of a Military Department, or the Secretary of Defense in the case of an officer retired in the grade of O-9 or O-10, to reopen a retired officer's retired grade determination upon determining, pursuant to regulations prescribed by the Secretary of Defense, that good cause exists to reopen the retired grade determination. This memorandum constitutes such regulations.

The Secretaries of the Military Departments may, with respect to officers retired in a grade at or below the grade of O-8 under their respective jurisdictions, determine that there may be facts or other matters relating to a retired officer that constitute good cause to reopen the officer's retired grade determination. Such determinations shall be in writing and no adverse determination may be made on the officer's retired grade until the officer has been notified of the reopening and the basis for it and has had a reasonable opportunity to respond in writing and, at the discretion of Secretary of the Military Department concerned, make an oral presentation before an official designated by such Secretary. The Under Secretary of Defense for Personnel and Readiness will incorporate this guidance in an appropriate DoD issuance.

I hereby delegate to the Secretaries of the Military Departments the authority under 10 U.S.C. § 1370(f)(6)(A) to change the retired grade of a retired officer whose retired grade determination has been reopened under 10 U.S.C. § 1370(f)(2) to a grade at or below the grade of O-8. This authority may not be further delegated. A retired grade of O-9 or O-10 may not be changed until the Secretary of Defense has withdrawn the certification of satisfactory service in that grade, and the Secretaries of the Military Departments must advise the Secretary of Defense of their intent to lower the retired grade of a retired general or flag officer in advance of the completion of such action.

cc:
Chairman of the Joint Chiefs of Staff



OSD001855-23/CMD002363-23