# In the United States Court of Appeals for the District of Columbia Circuit

MARK KELLY, United States Senator
Representing the State of Arizona,

*Plaintiff-Appellee,*

*v.*

PETE HEGSETH, in his official capacity as
Secretary of Defense, *et al.*,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia
No. 26-cv-81 (Hon. Richard J. Leon)

## BRIEF FOR APPELLEE SENATOR MARK KELLY

| | |
|---|---|
| Paul J. Fishman | Benjamin C. Mizer |
| ARNOLD & PORTER | Deborah A. Curtis |
| KAYE SCHOLER LLP | Jeffrey H. Smith |
| One Gateway Center | Samuel F. Callahan |
| Suite 1025 | Bonnie E. Devany |
| Newark, NJ 07102 | Aaron X. Sobel |
| (973) 776–1900 | ARNOLD & PORTER |
| | KAYE SCHOLER LLP |
| | 601 Massachusetts Avenue NW |
| | Washington, DC 20001 |
| | (202) 942-5000 |

*Counsel for Senator Mark Kelly*

# CERTIFICATE AS TO PARTIES, RULINGS & RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1) and Federal Rule of Appellate Procedure 26.1, counsel certifies:

**Parties and *Amici*.** Defendants-Appellants are Pete Hegseth, in his official capacity as Secretary of Defense; the U.S. Department of Defense; John Phelan, in his official capacity as Secretary of the Navy; and the U.S. Department of the Navy. Plaintiff-Appellee is Mark Kelly, United States Senator representing the State of Arizona. The Vet Voice Foundation, joined by former service secretaries and retired senior military officers, were amici in the district court.

**Rulings Under Review.** The ruling under review is a Memorandum Opinion and Order entered on February 12, 2026, in *Kelly v. Hegseth*, No. 26-cv-81 (D.D.C.), ECF Nos. 37, 38 by Richard J. Leon, granting Senator Kelly's motion for a preliminary injunction. The ruling is reported at 2026 WL 391777.

**Related Cases.** This case has not previously been before this or any other court other than the district court below. Counsel is unaware of any related cases currently pending in this Court or any other court.

*/s/ Benjamin C. Mizer*
Benjamin C. Mizer

i

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS & RELATED CASES .........i

TABLE OF CONTENTS.................................................................................ii

TABLE OF AUTHORITIES ...................................................... iii

GLOSSARY.............................................................................................ix

INTRODUCTION .................................................................................1

STATEMENT OF THE ISSUE .................................................4

STATEMENT OF THE CASE ....................................................4

    A.  Senator Kelly and His Statements.................................................4

    B.  Defendants' Response and Punitive Actions ..................................7

    C.  Procedural History.................................................................10

    D.  The Decision Below................................................................12

SUMMARY OF ARGUMENT.....................................................13

STANDARD OF REVIEW ...........................................................15

ARGUMENT ..........................................................................................16

  I.  Defendants' Actions Likely Violate the First Amendment................16

    A.  The district court correctly concluded that Defendants' actions likely violated the First Amendment. ...........................................16

    B.  Defendants' appeal hinges on a distortion of the record, an unsustainable analogy to *Parker*, and an unprecedented demand for total secretarial deference....................................................21

    C.  Defendants provide no basis for equating the speech of retirees and active-duty servicemembers under the First Amendment...32

    D.  Defendants' concerns about "all-or-nothing" treatment of retiree speech are misplaced. ...............................................................43

    E.  Senator Kelly's senatorial service does not diminish his First Amendment rights. ..................................................................44

  II.  Senator Kelly's Claim Is Reviewable and Satisfies the Remaining Preliminary Injunction Factors.................................................46

CONCLUSION.......................................................................................48

CERTIFICATE OF COMPLIANCE .................................................49

CERTIFICATE OF SERVICE........................................................50

# TABLE OF AUTHORITIES*

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis,*
  600 U.S. 570 (2023)................................................................16

*Aref v. Lynch,*
  833 F.3d 242 (D.C. Cir. 2016)..............................................17, 19, 20

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett,*
  564 U.S. 721 (2011)................................................................29

*Ashcroft v. ACLU,*
  542 U.S. 656 (2004)..............................................................20, 21

*Autor v. Pritzker,*
  740 F.3d 176 (D.C. Cir. 2014)..................................................42

*Bd. of Cnty. Comm'rs v. Umbehr,*
  518 U.S. 668 (1996)................................................................42

*Bergdahl v. United States,*
  683 F. Supp. 3d 24 (D.D.C. 2023)..........................................35

*Bond v. Floyd,*
  385 U.S. 116 (1966)..........................................................18, 34, 45

*Bose Corp. v. Consumers Union of U.S., Inc.,*
  466 U.S. 485 (1984)............................................................29, 30

*Capitol Servs. Mgmt. v. Vesta Corp.,*
  933 F.3d 784 (D.C. Cir. 2019)..................................................46

*Chappell v. Wallace,*
  462 U.S. 296 (1983)................................................................29

---

* Authorities upon which Appellee chiefly relies are marked with asterisks.

*Chiles v. Salazar,
146 S. Ct. 1010 (2026) ........................................16, 20, 30, 35, 37

Closson v. U.S. ex rel. Armes,
7 App. D.C. 460 (D.C. Cir. 1896) ........................................34

Connick v. Myers,
461 U.S. 138 (1983)........................................17

District of Columbia v. Trump,
No. 25-5418 (D.C. Cir. 2025) ........................................5

Emory v. Sec'y of Navy,
819 F.2d 291 (D.C. Cir. 1987)........................................28

Greer v. Spock,
424 U.S. 828 (1976)........................................44

Hess v. Indiana,
414 U.S. 105 (1973)........................................27

Hous. Cmty. Coll. Sys. v. Wilson,
595 U.S. 468 (2022)........................................17, 18

Illinois v. Trump,
155 F.4th 929 (7th Cir. 2025) ........................................5

Larrabee v. Del Toro,
45 F.4th 81 (D.C. Cir. 2022)........................................35, 41

Mahmoud v. Taylor,
606 U.S. 522 (2025)........................................47

McGrain v. Daugherty,
273 U.S. 135 (1927)........................................44

Media Matters for Am. v. Paxton,
138 F.4th 563 (D.C. Cir. 2025)........................................16, 17

Miller v. Lehman,
801 F.2d 492 (D.C. Cir. 1986)........................................36

*Millican v. United States*,
744 F. Supp. 2d 296 (D.D.C. 2010) ...................................................32

*Newsom v. Trump*,
No. 25- 3727 (9th Cir. 2025) ............................................................5

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964) .........................................................................18

*Oregon v. Trump*,
No. 25-6268 (9th Cir. 2025) ............................................................5

*\*Parker v. Levy*,
417 U.S. 733 (1974)..............................2, 22, 23, 31, 32, 33, 41

*Priest v. Sec'y of the Navy*,
570 F.2d 1013 (D.C. Cir. 1977).....................................................32

*Pursuing Am.'s Greatness v. FEC*,
831 F.3d 500 (D.C. Cir. 2016).......................................................47

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015).........................................................20, 21, 44

*Roberts v. United States*,
741 F.3d 152 (D.C. Cir. 2014)........................................................29

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995).........................................................................20

*RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*,
682 F.3d 1043 (D.C. Cir. 2012).....................................................47

*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011)........................................................16

*Snyder v. Phelps*,
562 U.S. 443 (2011)..........................................................17, 18, 27

*Solorio v. United States*,
483 U.S. 435 (1987).........................................................................41

v

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014) ...................................................................46

*United States v. Alvarez,*
567 U.S. 709 (2012) ...................................................................21

*United States v. Bergdahl,*
80 M.J. 230 (C.A.A.F. 2020) .............................................35, 45

*United States v. Daniels,*
42 C.M.R. 131 (C.M.A. 1970) ...................................................32

*United States v. Hooper,*
26 C.M.R. 417 (1958) .................................................................35

*United States v. Lane,*
64 M.J. 1 (C.A.A.F. 2006) ..........................................................40

*United States v. Priest,*
45 C.M.R. 338 (C.M.A. 1972) ...................................................31

*United States v. Smith,*
68 M.J. 316 (C.A.A.F. 2010) ......................................................24

*United States v. Stevens,*
559 U.S. 460 (2010) ...................................................................35

*United States v. Wilcox,*
66 M.J. 442 (C.A.A.F. 2008) ......................................................31

*W.V. Bd. of Ed. v. Barnette,*
319 U.S. 624 (1943) ...................................................................16

**Constitutional Provisions and Statutes**

U.S. Const. Article I, § 6 .............................................................40

5 U.S.C. § 705 .............................................................................10

10 U.S.C. § 688 ...........................................................................39

10 U.S.C. § 802(a)(4) ..................................................................38

10 U.S.C. § 1370 ......................................................................9, 11, 37

37 U.S.C. § 908 ...................................................................................39

50 U.S.C. § 3803 .................................................................................40

**Executive Branch Materials**

Dep't of the Army, Army Doctrine Publication 6-22, *Army Leadership and the Profession* (July 31, 2019)............................24

Dep't of Defense, *Department of Defense Law of War Manual §* 18.3.2 (July 31, 2023)..................................................................24

DoD Instruction 1352.01 ..................................................................39

Joint Serv. Comm. on Mil. Just., *Manual for Courts-Martial,* United States pt. II (2024 ed.)...........................................24

**Other Authorities**

Aaron Parseghian, *Rep. Bergman 'pissed' at Biden's 'lack of leadership,' says troop deaths were avoidable*, FOX 17 (Aug. 26, 2021), https://bit.ly/4thjn9R......................................................36

Alexander Bolton, *2 GOP Senators Caution Hegseth on Punishing Kelly* (Jan. 5, 2026), https://bit.ly/45LIJCg ..............................19

Alexander Hamilton, *Concerning the Public Conduct and Character of John Adams, Esq., President of the United States* (Oct. 24, 1800), https://bit.ly/4qJbbxg...............................36

Former JAGs Working Group, *Statement of the "Former JAGs Working Group" on Media Reports of Pentagon "No Quarter" Orders in Caribbean Boat Strikes* (Nov. 29, 2025), perma.cc/VW2N-AJYY .................................................................5

J. Mackey Ives & Michael J. Davidson, *Court-Martial Jurisdiction over Retirees Under Articles 2(4) and 2(6): Time to Lighten Up and Tighten Up?*, 175 Mil. L. Rev. 1 (2003)........................34

Letter from Mark E. Green et al. to Lloyd J. Austin III, Sec'y of Def. (Aug. 6, 2021), https://bit.ly/3LL2jbh.................................................36

Michael Rios et al., *A Timeline of US Strikes on Boats that have Killed 115*, CNN (last updated Jan. 2, 2025), perma.cc/W697-JBFU.................................................................................................5

Sen. Elissa Slotkin (@SenatorSlotkin), X (Nov. 18, 2025, at 08:30 ET), x.com/SenatorSlotkin/status/1990774492356902948, perma.cc/8C37-HJLL .................................................................6

# GLOSSARY

NASA      National Aeronautics and Space Administration

UCMJ     Uniform Code of Military Justice

# INTRODUCTION

Senator Mark Kelly is a highly decorated retired Navy Captain who serves on the Senate's Armed Services Committee and Select Committee on Intelligence. A leading voice on military and national security issues since Arizona voters elected him in 2020, he has spoken out about this Administration's military deployments and operations, the conduct and qualifications of senior defense officials, and the obligations of servicemembers under the Uniform Code of Military Justice—subjects at the core of his Article I responsibilities. Among the Senator's statements was a November 2025 video in which he and five other Members of Congress reiterated servicemembers' venerable and uncontroverted obligation to refuse to carry out unlawful orders.

The Executive Branch immediately condemned the video and later punished Senator Kelly for his speech. The President and Secretary of Defense labeled the video "treason" and "seditious." The Secretary then issued a formal Letter of Censure characterizing Senator Kelly's speech as having "counsele[d] disobedience" and "undermine[d] the chain of command." At the Secretary's direction, and based on his findings, the Department of the Navy initiated proceedings to revisit the grade at which Senator Kelly retired nearly fifteen years ago.

The district court correctly enjoined those actions as textbook retaliation against protected speech. On appeal, Defendants abandon most of their arguments from below—including justiciability, reviewability, irreparable harm, and the balance of equities—and leave the bulk of the district court's analysis unchallenged. And even as they pay lip service to retirees' speech rights, they continue to ignore ordinary First Amendment principles guarding against viewpoint discrimination and affording full protection to speech on matters of public concern. Instead they argue that Senator Kelly's speech was categorically "unprotected" by the First Amendment based solely on an unprecedented, blanket rule: If the Secretary of Defense concludes that a military retiree has "counseled disobedience to lawful orders and undermined military discipline," the speech receives no constitutional protection under *Parker v. Levy*, 417 U.S. 733 (1974).

Defendants offer no grounds—relying on *Parker* or any other authority—for their rule giving a politically appointed civilian officer veto power over public debate. Far from resting on all fours with this case, *Parker* involved an active-duty officer directly urging soldiers at his wartime military post to refuse specific orders to deploy and fight. Senator Kelly, by contrast, is a retired

officer and legislator who publicly called, alongside other Members of Congress, for adherence to settled law, not defiance of it. Nor have Defendants ever cited a *single case* expanding *Parker*'s application from active-duty servicemembers to retirees like Senator Kelly. And their repeated insistence that retired officers are still "member[s] of the armed forces" (Br. 1) receiving retirement pay and subject to court-martial jurisdiction does not answer the constitutional question. Our Nation's proud tradition since its founding of veterans' forceful participation in public debate confirms that military service does not carry a lifetime restriction on free speech.

Rejecting Defendants' appeal does not require the Court to make any new law. *Parker* has never been extended to retirees, and the record refutes Defendants' erroneous premise that Senator Kelly counseled disobedience of lawful orders. Because Defendants offer no other arguments to justify their retaliatory actions, the Court should affirm the preliminary injunction.

## STATEMENT OF THE ISSUE

Whether, in granting a preliminary injunction, the district court appropriately concluded that Defendants' actions punishing Senator Kelly for his speech likely violated the First Amendment.

## STATEMENT OF THE CASE

### A.    Senator Kelly and His Statements

Senator Mark Kelly is a retired U.S. Navy Captain and the senior United States Senator representing the State of Arizona. Over his 25-year Navy career, Senator Kelly served the Nation with exceptional distinction, including through multiple deployments aboard the USS Midway and 39 combat missions as a naval aviator during the First Gulf War. His Navy service also included four space shuttle flights for NASA, culminating in command of the final flight of Endeavour. JA16-17. He retired honorably in 2011 as a Captain after earning many decorations for heroic and meritorious service, perseverance under extraordinary danger, and devotion to duty. JA16.

Following his election to the Senate in 2020, Senator Kelly has continued his "highly decorated record of service to our Nation" through sustained legislative leadership and oversight on military and national security policy. JA17. Among other assignments, he sits on the Armed Services Committee

and Select Committee on Intelligence—the two Senate committees at the center of Congress's military and intelligence oversight activities. JA18.

Beginning in June 2025, two sets of the Trump Administration's military actions became the subject of sustained congressional oversight and intense public debate. First, President Trump deployed National Guard troops to major cities across the country. JA18.[1] Second, between September and November 2025, the Administration carried out a campaign of more than 20 lethal strikes against boats allegedly used for narcotics smuggling in the Caribbean Sea and Pacific Ocean. JA112.[2] One of those strikes garnered significant congressional and media attention after the press reported that an order had been given to kill two survivors of a boat already destroyed by a missile. That reporting prompted congressional inquiries, briefings, proposed legislation, and new restrictions on Department of Defense funds. JA18-19; JA110.[3] Senator

[1] *Illinois v. Trump*, 155 F.4th 929 (7th Cir. 2025); *Oregon v. Trump*, No. 25-6268 (9th Cir. 2025); *District of Columbia v. Trump*, No. 25-5418 (D.C. Cir. 2025); *Newsom v. Trump*, No. 25- 3727 (9th Cir. 2025).
[2] Michael Rios et al., *A Timeline of US Strikes on Boats that have Killed 115*, CNN (last updated Jan. 2, 2025), perma.cc/W697-JBFU.
[3] Former JAGs Working Group, *Statement of the "Former JAGs Working Group" on Media Reports of Pentagon "No Quarter" Orders in Caribbean Boat Strikes* (Nov. 29, 2025), perma.cc/VW2N-AJYY.

Kelly has been an active participant in that oversight, has introduced legislation, and has participated in robust public discussions concerning the Administration's announcements and execution of military policy. *See* JA111-14.

On November 18, 2025, Senator Kelly reposted a video on his official *X* account in which he and five other Members of Congress stated that servicemembers can "refuse illegal orders." JA19.[4] All participants had distinguished careers in either the armed forces or intelligence services, and all are members of the House or Senate Armed Services Committees. A full transcript of the video is provided in the complaint. *See* JA116-17.

In the video, Senator Kelly identified himself as a Navy veteran: "I *was* a captain in the United States Navy." JA116 (emphasis added). The group acknowledged the "enormous stress and pressure" facing servicemembers and "that it's a difficult time to be a public servant." *Id.* Senator Kelly reminded servicemembers: "Our laws are clear. You can refuse illegal orders." *Id.* The video did not identify or describe any particular order—unlawful or otherwise. JA116-17.

---

[4] Sen. Elissa Slotkin (@SenatorSlotkin), X (Nov. 18, 2025, at 08:30 ET), x.com/SenatorSlotkin/status/1990774492356902948, perma.cc/8C37-HJLL.

## B. Defendants' Response and Punitive Actions

The Administration immediately responded to the video with threats of death, prosecution, imprisonment, and violence. President Trump publicly described it as "SEDITIOUS BEHAVIOR," called for the participating Members to be "ARRESTED AND PUT ON TRIAL," declared the conduct "punishable by DEATH!," and reposted content calling for them to be "HANG[ED]." JA81-82. Secretary Hegseth referred to the group as the "Seditious Six." JA88.

On November 24, the Department of Defense posted on social media that it had begun a "review" of "serious allegations of misconduct" against Senator Kelly and threatened to "recall [him] to active duty for court-martial proceedings." JA19. The next day, Secretary Hegseth referred Senator Kelly's "potentially unlawful comments" to the Secretary of the Navy for review. *Id.* In social media posts, Secretary Hegseth called Senator Kelly a "Commander" (a lower rank than his retired one as Captain) and later placed his actual rank of Captain in scare quotes. JA125.

On January 5, 2026, Senator Kelly's counsel received, by email, a Secretarial Letter of Censure against the Senator. JA99. The letter identified four categories of statements as the basis for the censure:

- **"Don't Give Up the Ship" video.** The letter first relied on Senator Kelly's statements in the November 18 video explaining that servicemembers "can refuse illegal orders." JA99. Although the letter claimed that Senator Kelly had "identified [him]self as 'a Captain in the United States Navy,'" JA99, he actually (and correctly) stated: "I *was* a Captain," JA17-19 (emphasis added); *see* JA115.

- **Comments purportedly counseling disobedience**. The letter claimed that, beyond this video, Senator Kelly had additionally and independently engaged in "a sustained pattern of public statements" that "counseled members of the Armed Forces to refuse orders related to [military] operations" between June and December 2025. JA99. The letter noted that, on November 20, 2025, Senator Kelly and the other five members issued a joint statement defending the video. In that statement, Senator Kelly and the other participants assured that they would "have [servicemembers'] backs as they fulfill their oath to the Constitution and obligation to follow only lawful orders," and that protecting these servicemembers "is not only the right thing to do, but also our duty." JA121-22. The letter also noted that Senator Kelly had labelled his statement "non-controversial" and asserted that "intimidation would not work" to silence him. JA99.

- **Statements purportedly characterizing certain military operations as unlawful.** The letter also claimed that Senator Kelly had "characteriz[ed] lawful military operations as illegal" and had "accuse[d] [the Secretary] and senior military officials of war crimes." JA99. The letter failed to identify any such specific characterizations or accusations.

- **Criticism of military leadership.** Finally, the letter asserted that on November 21 and November 23, 2025, Senator Kelly had criticized the Administration for "firing admirals and generals" that he had voted to confirm, and for replacing them with "yes men." JA99. It further faulted Senator Kelly for saying he would "ALWAYS defend the Constitution." *Id.*

Secretary Hegseth concluded in the censure letter that, "[w]hen viewed in totality," Senator Kelly's statements did not mean what they said. Rather,

he announced that the Senator had "demonstrated specific intent to counsel servicemembers to refuse lawful orders." JA100. According to the Secretary, Senator Kelly's conduct "undermines the chain of command," "counsels disobedience," "creates confusion about duty," "brings discredit upon the Armed Forces," and "is conduct unbecoming an officer." JA101. The letter then formally censured Senator Kelly; directed that the censure be placed in his military personnel file; found "good cause" to reopen his retired-grade determination; and threatened that, if the Senator were to engage in similar conduct, he could "subject [himself] to criminal prosecution or further administrative action." *Id*. The letter stated that Senator Kelly had no "right to appeal this administrative action" but provided that he could submit a response within 30 days. *Id.*

That same day, the Chief of Naval Personnel notified Senator Kelly that he would officially "revisit[]" the rank and pay at which Senator Kelly had retired. JA96. The notice identified the censure letter as the sole "factual basis supporting this action." *Id.*; *see* JA20. As the legal basis for the proceeding, the notice cited only 10 U.S.C. § 1370—a statute that does not authorize consideration of post-retirement conduct, and instead permits reductions in grade based on whether the officer "served on *active duty* satisfactorily." *Id.*

§ 1370(a)(1) (emphasis added). The notice also demanded Senator Kelly's response "within 10 working days" and asserted that "[f]ailure to respond shall constitute a waiver of these rights." JA96.

### C. Procedural History

On January 12, 2026, Senator Kelly filed this action and—given the imminent deadline to respond in the grade-determination proceeding—sought a temporary restraining order, preliminary injunction, and stay under 5 U.S.C. § 705. The parties agreed to a schedule under which Senator Kelly converted his request for a temporary restraining order into a motion for a preliminary injunction, and Defendants suspended his response deadlines and refrained from relying on the censure letter's determinations while his motion was pending. JA22.

Senator Kelly asserted multiple constitutional and statutory claims. Of most importance for this appeal, Senator Kelly argued that Defendants' censure letter and their reopening of his grade determination violated the First Amendment—both because they constituted unlawful retaliation, and because they impermissibly restricted his speech based on its content and viewpoint. *See* JA18-21, 33-40. Senator Kelly's motion also asserted that Defendants violated the Speech or Debate Clause, the separation of powers, due process, and

the statute governing reopening of grade determinations (10 U.S.C. § 1370). JA135-46; D.Ct.Dkt. 2-1 at 18-32.

In response, Defendants did not deny that they targeted Senator Kelly's speech because of its content and viewpoint. Nor did they contest that, assuming the Senator's speech was protected, their actions constituted retaliation. Rather, Defendants asserted only a categorical position: Senator Kelly's statements were not protected by the First Amendment because the Secretary of Defense "reasonably determined that [Senator Kelly's] public statements have had, and continue to have, 'a detrimental impact on military discipline and good order.'" D.Ct.Dkt.20 at 31. Defendants relied on *Parker v. Levy*— which concerned an active-duty commissioned officer who urged enlisted personnel to refuse combat orders—for the notion that "such speech 'is constitutionally unprotected,'" and that "[t]here is no exception for retired servicemembers." D.Ct.Dkt.20 at 31. Defendants also raised several threshold objections to relief—including ripeness, exhaustion, and reviewability—and argued that the Senator failed to show either irreparable harm or that the equities favored him.

### D. The Decision Below

The district court granted a preliminary injunction based on Senator Kelly's First Amendment claim. The court concluded that Senator Kelly's statements were protected speech on matters of public concern, and that Defendants had identified no authority extending *Parker* or related military-speech precedents beyond active-duty servicemembers or speech on military bases. JA33-38. The court analyzed the case principally through the retaliation framework, while explaining that the alternative viewpoint-discrimination theory was likewise likely to succeed. JA38-40.

The court also concluded that the claim was justiciable, and that no exhaustion or ripeness barrier prevented immediate review. JA20-32. And the court held that Senator Kelly satisfied the remaining preliminary-injunction factors—namely, that the official reprisal for protected speech constitutes irreparable First Amendment injury and that the public interest favored an injunction, recognizing the "particularly valuable asset for our country to have retired veterans contributing to public discussion on military matters and policy." JA41-43. The court reserved judgment on Senator Kelly's remaining constitutional and statutory claims. JA23.

## SUMMARY OF ARGUMENT

**I. A.** The district court correctly held that Defendants likely violated the First Amendment. Defendants do not dispute that they punished Senator Kelly because of his speech or that they intended to deter his speech. The only question is whether his speech was protected. It plainly was: Senator Kelly spoke on core matters of public concern, including military operations, legal obligations, and executive conduct. Because Defendants retaliated against protected speech based on its viewpoint and offered no valid First Amendment justification, the injunction was proper.

**B.** Defendants' unqualified reliance on *Parker v. Levy* depends on recasting Senator Kelly's statements as "counseling disobedience of lawful orders"—a characterization the record cannot sustain—and then treating that label as dispositive under *Parker*. Yet *Parker* involved radically different facts, and nothing in that decision authorizes the Executive to drastically rewrite protected speech and then insulate the Secretary's conclusions from judicial review through an implicit form of deference.

**C.** Defendants' theory fails for another fundamental reason: They identify no legal precedent for treating the speech of retired servicemembers as fully equivalent to the speech of active-duty servicemembers. Every case on

13

which Defendants rely involved active-duty personnel operating within the military chain of command. None extends *Parker* or similar doctrines to retirees' public speech as civilians. Nor do Defendants point to any historical tradition supporting their proposed new rule; to the contrary, retired officers have long participated freely in public debate, including on military policy.

Unable to ground their rule in precedent or history, Defendants resort to generalized, inapt points about retirees' status, obligations, and benefits. But those features say nothing about the scope of constitutional speech protections. Retirement from military service does not require permanent submission to speech controls.

**D.** Defendants' claim that the district court adopted an "all-or-nothing approach" that treats retiree speech as equivalent to civilian speech in all circumstances is both wrong and distracting. This case presents no occasion to address the outer limits of retirees' speech rights, and declining Defendants' proposed expansion of *Parker* would still allow the military to assert its interests in future cases involving retirees. This appeal simply requires the Court to reject Defendants' novel extension of *Parker* on either factual or legal grounds (or both).

14

**E.** Defendants' fallback argument—that Senator Kelly's prominence as a sitting Senator with oversight authority justifies greater restriction of his speech—inverts the First Amendment's core guarantee. The Supreme Court has squarely rejected the notion that legislators may be held to a stricter speech standard because of their office, emphasizing instead that representative government requires the widest latitude for elected officials to speak freely on their constituents' behalf. Nor does a speaker's audience, platform, or influence diminish constitutional protection; if anything, those features underscore the public's interest in hearing the speech.

**II.** Defendants' appeal rises or falls on their merits argument. They have abandoned any challenge to reviewability or the remaining preliminary injunction factors. In any event, the district court correctly held that this case is justiciable and that the loss of First Amendment freedoms constitutes irreparable harm, with the equities and public interest strongly favoring relief.

## STANDARD OF REVIEW

A plaintiff is entitled to a preliminary injunction upon showing (1) a likelihood of success on the merits; (2) a likelihood that he would suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips

in his favor; and (4) that an injunction is in the public interest. *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). This Court "review[s] the District Court's weighing of those factors for abuse of discretion, its legal conclusions *de novo*, and factual findings for clear error." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 573 (D.C. Cir. 2025).

## ARGUMENT

## I. Defendants' Actions Likely Violate the First Amendment

### A. The district court correctly concluded that Defendants' actions likely violated the First Amendment.

"The First Amendment 'envisions the United States as a rich and complex place' where all enjoy the 'freedom to think as you will and to speak as you think.'" *Chiles v. Salazar*, 146 S. Ct. 1010, 1020 (2026) (quoting *303 Creative LLC v. Elenis*, 600 U.S. 570, 584, 603 (2023)). "In this Nation, no official—'high or petty'—may command our tongues or silence our voices." *Id.* (quoting *W.V. Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943)). Two well-developed strands of First Amendment jurisprudence effectuating these freedoms apply neatly to this case: (1) the protection from governmental retaliation against protected speech, and (2) the principle that no government may discriminate against speech on the basis of its content or viewpoint.

16

The First Amendment "prohibits government officials from subjecting individuals to retaliatory actions after the fact for having engaged in protected speech." *Media Matters*, 138 F.4th at 570 (quoting *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022)). Under the retaliation framework, Senator Kelly must show that (1) he "engaged in conduct protected under the First Amendment"; (2) Defendants "took some retaliatory action sufficient to deter a person of ordinary firmness in [his] position from speaking again"; and (3) there is "a causal link between the exercise of a constitutional right and the adverse action taken against him." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016).

The district court correctly found that Senator Kelly established all three elements. *First*, as the district court determined, "[u]nder ordinary First Amendment principles, the speech at issue here is unquestionably protected speech." JA34. Decades of Supreme Court precedent emphasize that "speech on matters of public concern" "occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011) (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)). That protection includes "opposition to national foreign policy,"

*Bond v. Floyd*, 385 U.S. 116, 132 (1966), and even "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials," *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

Senator Kelly's statements—reminders to servicemembers that they can refuse unlawful orders; criticism of military leadership for "firing admirals and generals" and surrounding themselves with "yes men"; and expressions of concern that certain military operations might be illegal, JA99—are paradigmatic "matters of public concern" entitled to the First Amendment's highest protection. *Snyder*, 562 U.S. at 451-52. That would be true if Senator Kelly were speaking as a private citizen; it is no less true when he speaks as "an elected representative." *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 478 (2022). In fact, "[t]he manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy." *Bond*, 385 U.S. at 135-36; *see* JA37. That principle applies with particular force here: Senator Kelly serves on the Senate Armed Services Committee and the Senate Select Committee on Intelligence, both of which exercise core oversight jurisdiction of military and national security operations and leadership. Speaking on these topics is integral to the job that Arizonans elected him to do.

*Second*, Defendants' actions would chill "a person of ordinary firmness." *Aref*, 833 F.3d at 258. This Court has held the retaliation inquiry focuses on the objective tendency to deter speech, not whether the particular speaker was silenced. *See id.* Defendants' concrete, punitive measures meet that standard. The record shows the chilling effect is real: "[M]any veterans are today 'declining' to 'participate in public debate on important and contested issues' out of fear of 'official reprisal.'" JA39 (quoting Br. of *Amici Curiae* Former Service Secretaries, Retired Senior Military Officers, and Vet Voice Foundation, D.Ct.Dkt. 13-1, at 4). And Senators from both sides of the aisle have acknowledged that the Secretary's censure of Senator Kelly "has a chilling effect on speech." Alexander Bolton, *2 GOP Senators Caution Hegseth on Punishing Kelly* (Jan. 5, 2026), https://bit.ly/45LIJCg. Indeed, "Secretary Hegseth himself described the Retirement Grade Proceeding as a 'serious administrative action that sends real signals that we take these things incredibly seriously.'" JA39.

*Third*, causation is plain on the face of the censure letter, which identifies Senator Kelly's "sustained pattern of public statements" as the entire basis of its punishment. JA99. The causal link is easily satisfied when adverse governmental action is expressly tied to a speaker's protected statements.

*Aref*, 833 F.3d at 258. "Thus, Senator Kelly was reprimanded for exercising his First Amendment right to speak on matters of public concern." JA40.

2. *Defendants likely engaged in content- and viewpoint-based discrimination.*

An analysis under the "alternative" content- and viewpoint-discrimination test "would be just as straightforward." JA40 & n.6. Executive sanctions targeting an individual's speech based on its content trigger the strictest constitutional scrutiny and are "presumptively unconstitutional"—justifiable "only if the government proves that" its restrictions "are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). And "[w]hen the government seeks . . . to dictate what particular 'opinion or perspective' individuals may express" on a particular subject, "'the violation of the First Amendment is all the more blatant.'" *Chiles*, 146 S. Ct. at 1021 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)).

Defendants never tried to satisfy those stringent tests. Nor could they, because they "all but admit that Senator Kelly is being censured because of the 'particular views taken' in his public comments." JA40 n.6 (quoting *Rosenberger*, 515 U.S. at 829). "That is viewpoint discrimination, plain and simple." *Id.* Defendants, who bear the burden of justifying such restrictions, *Ashcroft*

*v. ACLU*, 542 U.S. 656, 666-67 (2004), do not "begin to explain how the actions taken against Senator Kelly are 'narrowly tailored' to achieve their intended purpose," *id.* (quoting *Reed,* 576 U.S. at 163), or "'why counterspeech would not suffice' to achieve the same purpose," *id.* (quoting *United States v. Alvarez,* 567 U.S. 709, 726 (2012)). Their actions violate the First Amendment.

**B.      Defendants' appeal hinges on a distortion of the record, an unsustainable analogy to *Parker*, and an unprecedented demand for total secretarial deference.**

Defendants bypass this routine First Amendment analysis and stake their case entirely on a single, categorical proposition: that Senator Kelly's speech was "unprotected" by the First Amendment because the Secretary of Defense "found that Kelly invoked his military rank, spoke directly to servicemembers, and counseled them to disobey lawful orders in the context of ongoing military operations" Br. 27. On this theory alone, Defendants aver that Senator Kelly's speech is indistinguishable from the speech at issue in *Parker v. Levy*. But *Parker* bears no plausible resemblance to this case. Defendants' misplaced reliance on it not only defies the record, but also requires an untenable (if unspoken) demand for complete deference to the Secretary.

*1.    The record forecloses Defendants' reliance on* Parker.

*Parker* cannot bear the weight Defendants place on it. Even setting aside for the moment that *Parker* cannot resolve this case because it did not address the scope of *retirees'* speech, *see infra* section I.C., the factual premise of Defendants' reliance on *Parker*—that Senator Kelly's "statements, in context, counseled disobedience to lawful orders and undermined military discipline," Br. 37—is unsupportable.

*Parker* involved statements by Howard Levy, an active-duty Army Captain and physician who served at Fort Jackson, South Carolina, at the height of the Vietnam War. 417 U.S. at 735-36. During his period of active duty, Levy made "several public statements to enlisted personnel at the post," including exhorting that "any colored soldier … should refuse to go to Viet Nam and if sent should refuse to fight because they are discriminated against and denied their freedom in the United States." *Id.* at 736-37. He also stated that "Special Forces personnel are liars and thieves and killers of peasants and murderers of women and children." *Id.*

Levy made these statements directly "to Special Forces personnel and to enlisted personnel who were patients or under his supervision," all "while in the performance of his duties at the United States Army Hospital." *Id.* at

739. He was convicted by a court martial for violating two provisions of the Uniform Code of Military Justice (UCMJ). He did not contest that his statements fell within these prohibitions, but instead claimed that they were facially invalid because they were unconstitutionally vague and overbroad. *Id.* at 740-41, 760.

The Supreme Court disagreed. Although it recognized that "members of the military are not excluded from the protection granted by the First Amendment," *id.* at 759, it held that the UCMJ's prohibitions were not facially invalid. *Id.* at 760-61. The Court observed that Levy's "conduct, that of a commissioned officer publicly urging enlisted personnel to refuse to obey orders which might send them into combat, was unprotected under the most expansive notions of the First Amendment." *Id.* at 761. The UCMJ "may constitutionally prohibit that conduct and a sufficiently large number of similar or related types of conduct so as to preclude their invalidation for overbreadth." *Id.*

Senator Kelly's speech stands in sharp contrast to that in *Parker*. The statements Defendants principally invoke come from the "Don't Give Up the Ship" video that Senator Kelly and others posted publicly on official legislative social media accounts. In that video, Senator Kelly and five other Armed Services Committee members—all with distinguished careers in the armed forces

or intelligence community—reiterated servicemembers' hornbook legal obligation to disregard unlawful orders.

The transcript and video make plain that Senator Kelly never told members of the armed forces to refuse any particular military orders. The video did not even *identify* any specific military orders or operations. JA116-17. It instead recited a bedrock principle of military law: "Our laws are clear. You can refuse illegal orders . . . No one has to carry out orders that violate the law or our Constitution. . . . We need you to stand up for our laws, our Constitution, and who we are as Americans." *Id.*

This obligation is a bedrock of the law of armed conflict. "Members of the armed forces must refuse to comply with clearly illegal orders to commit law of war violations." Dep't of Defense, *Department of Defense Law of War Manual* § 18.3.2 (July 31, 2023); *see also, e.g.*, Joint Serv. Comm. on Mil. Just., *Manual for Courts-Martial*, United States pt. II, R. 916(d) (2024 ed.); *United States v. Smith*, 68 M.J. 316, 319 (C.A.A.F. 2010). The service branches emphasize that this obligation is foundational to "[h]onorable service"—and that disobeying unlawful or immoral orders "may be the most courageous decision an Army professional ever makes." Dep't of the Army, Army Doctrine Publi-

cation 6-22, *Army Leadership and the Profession* 1-4 (July 31, 2019). Secretary Hegseth himself recited and endorsed the principle in a 2016 public speech, explaining that adherence to it distinguishes us from "our enemies." JA118.

Beyond the November video, the censure letter asserted Senator Kelly had "[a]dditionally" and independently engaged in "a sustained pattern of public statements" that "counseled members of the Armed Forces to refuse orders related to [military] operations" between June and December 2025. Br. 34; JA100. But neither statement that the letter identifies even remotely supports that determination. First, on November 20, 2025, Senator Kelly and the other five members issued a joint statement defending the video, assuring that they would "have [servicemembers'] backs as they fulfill their oath to the Constitution and obligation to follow only *lawful* orders." JA121-22 (emphasis added). Second, Senator Kelly later labelled his statement about the bedrock duty to refuse unlawful orders "non-controversial," and asserted that "intimidation would not work" to silence him. JA99.

Defendants also describe Senator Kelly as having "characterized lawful military operations as illegal" and "accused senior leadership of war crimes."

25

Br. 34. Defendants have never identified those statements, much less explained how any unidentified statements amount to counseling disobedience of lawful orders. In any event, the only two plausibly relevant statements in the record do no such thing. When asked by a reporter whether a *hypothetical* "second strike to eliminate any survivors" would constitute a war crime, Senator Kelly responded, "it seems to." JA115. Senator Kelly also stated the following day that "if there is anyone who needs to answer questions in public and under oath, it is Pete Hegseth." *Id.* Those statements are a far cry from counseling disobedience.

Finally, Defendants vaguely suggest that "context" supports their contrivance that the Senator counseled servicemembers to disobey specific military orders. Br. 34-35. Defendants have never explained what they mean by "context." But if they are referring to other, still-unidentified statements by Senator Kelly, the First Amendment requires the Executive to justify its restrictions with more than opaque references that leave speakers to defend themselves with guesswork.

Defendants further appear to suggest that the mere fact of "National Guard deployments and counter-narcotics operations"—combined with Senator Kelly's critiques of those actions—convert his recitation of a bedrock tenet

of military law into a call for disobedience as to those "specific operations." Br. 15; *see id.* at 34. But Defendants cite no authority for rewriting protected speech this way. To the contrary, the Supreme Court has been emphatic that, though "context" matters, regulators cannot use attenuated inferences about a speaker's factual "setting" to "transform the nature of [protected] speech." *Snyder*, 562 U.S. at 454-55; *see Hess v. Indiana*, 414 U.S. 105, 109 (1973) (First Amendment analysis turns on "rational inference[s] from the import of the language").

In sum, Senator Kelly and his speech are distinguishable from *Parker* across every conceivable dimension. Senator Kelly is a retiree, not an active-duty servicemember. JA17-18. He spoke in a video published on official congressional accounts, not at a military post. JA115. He made clear in the video that he was speaking as a sitting Senator and military retiree, not an active-duty servicemember. JA116-17. He reiterated an undisputed principle of military law and identified no particular commands that servicemembers should disobey. *Id.* The record supports no other interpretation.

2.   *Defendants' theory depends on complete, unreviewable deference to the Secretary of Defense.*

Without record support, the only explanation for Defendants' theory is a request for complete deference to a civilian political appointee. In their view,

27

speech by a retired servicemember is unprotected as long as the Secretary of Defense finds that the speech resembles that in *Parker*. Although Defendants in this Court do not ask for deference in so many words, it is the only way to understand their brief, because their position hinges entirely on the Secretary's characterization of Senator Kelly's speech as set forth in a censure letter that the Senator had no right to appeal. JA101. It also echoes their arguments in the district court, where they expressly sought unreviewable deference to the Secretary. *See* D.Ct.Dkt. 20 at 8 (censure letter was "quintessential matter of military discipline not within the Judiciary's purview"); *id.* at 22 ("The Secretary's determination about the effect of Plaintiff's speech on military order is not subject to judicial second-guessing").

Defendants have never identified any authority supporting their demand for unbridled deference, nor could they. Courts do not abdicate their constitutional role simply because the military invokes discipline or personnel authority. "The military has not been exempted from constitutional provisions that protect the rights of individuals," and it "is precisely the role of the courts to determine whether those rights have been violated." *Emory v. Sec'y of Navy*, 819 F.2d 291, 294 (D.C. Cir. 1987). And while the Supreme Court has recognized the need for deference in appropriate cases, it has "never held . . .

that military personnel are barred from all redress in civilian courts for constitutional wrongs." *Chappell v. Wallace*, 462 U.S. 296, 304 (1983). That is true even when the challenged action involves personnel matters. *See, e.g.*, *Roberts v. United States*, 741 F.3d 152, 158 (D.C. Cir. 2014).

Defendants also seek deference by another route, asserting that the Secretary's findings are now fixed because the district court "did not question" them. Br. 37. That argument is wrong and beside the point. In rejecting Defendants' justiciability arguments, the district court said only that ruling for Senator Kelly did not require second-guessing "Secretary Hegseth's ultimate judgment as to the effect of [the] speech." JA26 (emphasis added). But the court nowhere endorsed the Secretary's distinct and unsupportable assertion that Senator Kelly "counseled" servicemembers to disobey specific lawful orders.

In any event, even if the Secretary's mischaracterizations had gone unquestioned below, that would not insulate them in this Court. Defendants cannot suppress speech based on characterizations that "[t]he record … does not support." *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 744 (2011) (citing *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984)). Appellate courts must "exercise[] independent judgment" on

factual questions that affect whether "a particular communication is unprotected" by the First Amendment. *Bose*, 466 U.S. at 505. That "special responsibility" stems from the "principle of viewpoint neutrality that underlies the First Amendment" and "reflects a deeply held conviction that judges … must exercise such review in order to preserve the precious liberties established and ordained by the Constitution." *Id.* at 505, 510-11.

The Secretary's distortions of Senator Kelly's speech illustrate the perils that Defendants' implicit plea for deference pose to those liberties. The censure letter did not identify any specific statements that purportedly "counseled" disobedience to lawful orders. It instead collapsed a range of plainly protected speech with other unspecified statements to reach a conclusory determination that Senator Kelly engaged in misconduct. In defiance of the most basic First Amendment precepts, Defendants' requested rule would empower a single official to punish speech simply by making findings that contort the speaker's words to fit within a category unprotected by the First Amendment. "What an opportunity for the suppression of dissent this would offer." *Chiles*, 146 S. Ct. at 1025 (cleaned up).

*3.*      Parker *alone cannot support reversal.*

Even if Defendants' analogy to *Parker* were apt, it does not end the analysis. Contrary to Defendants' suggestion, courts do not read *Parker* as a categorical First Amendment carve-out for all speech that, in the Secretary's view, resembles Levy's. Rather, even for active-duty servicemembers, military courts have required a "reasonably direct and palpable connection" between the speech and "the military mission," *United States v. Wilcox*, 66 M.J. 442, 449 (C.A.A.F. 2008), or conducted a balancing of the "essential needs of the armed services" against "the right to speak out as a free American," *United States v. Priest*, 45 C.M.R. 338, 344 (C.M.A. 1972); *see also Parker*, 417 U.S. at 758 (approving *Priest*'s "sensibly expounded" framework).

Applying these standards, Senator Kelly's recitation of settled law made off-base by a retiree would implicate a lesser governmental interest—and therefore require a different First Amendment analysis—than directions by an active-duty officer to disobey specific, identified orders, made on base and during wartime, as in *Parker*. Yet Defendants make no attempt to address these differences or apply any of these standards. And their failure to do so is telling: their analogy to *Parker*, even if it were tenable, cannot sustain their appeal.

**C. Defendants provide no basis for equating the speech of retirees and active-duty servicemembers under the First Amendment.**

Defendants' theory fails for an additional, independent reason. They would extend *Parker* to cover the speech of retired military officers just the same as active-duty servicemembers, with both receiving no First Amendment protection if the Secretary deems the speech to have "undermined military discipline." Br. 37. But neither *Parker* nor any other authority Defendants invoke supports this expansion.

*1. No case supports Defendants' theory.*

Every case applying the military-speech doctrine on which Defendants rely involved *active-duty* servicemembers. And all involved statements made either on-base or to persons within the accused's chain of command. *See Parker*, 417 U.S. at 736 (active-duty officer's statements made on military base); *Priest v. Sec'y of the Navy*, 570 F.2d 1013, 1015 (D.C. Cir. 1977) (active-duty servicemember's statements distributed "to active duty military personnel in the Pentagon" while stationed there); *United States v. Daniels*, 42 C.M.R. 131, 134 (C.M.A. 1970) (active-duty servicemember's statements made "on a military base"); *Millican v. United States*, 744 F. Supp. 2d 296, 299-300 (D.D.C. 2010) (reservist's statements made to members of his unit). These decisions

are rooted in the "fundamental necessity for obedience" of soldiers and the "differences between the military and civilian communities." *Parker*, 417 U.S. at 743, 758. They do not announce a First Amendment exception for former servicemembers after they retire from the military.

*Parker* itself illustrates the wide gap in Defendants' logic. The Court recognized that "the different character of the military community and of the military mission requires a different application" of First Amendment principles because the "necessity for obedience" may justify limits "within the military" that would be "impermissible outside it." *Parker*, 417 U.S. at 758. The Court anchored that rationale in the reality that active-duty service occurs in "a specialized society separate from civilian society," where the "law is that of obedience." *Id.* at 743-44 (citation omitted). In the active-duty setting, "the Government is often employer, landlord, provisioner, and lawgiver rolled into one," and "within the military community there is simply not the same autonomy" as in civilian life. *Id.* at 751.

That rationale does not extend to retirees. Retirees do not live under a day-to-day chain of command in which the military functions as both employer and landlord. They make public statements as civilians participating in public debate, not as officers directing subordinates in an operational setting. *See id.*

at 743-44, 758. The law review article Defendants cite reads the precedent the same way: Retirees enjoy "greater First Amendment freedoms" than active-duty personnel; whereas active-duty members are "more soldier than citizen, . . . the converse appears true for retirees." J. Mackey Ives & Michael J. Davidson, *Court-Martial Jurisdiction over Retirees Under Articles 2(4) and 2(6): Time to Lighten Up and Tighten Up?*, 175 Mil. L. Rev. 1, 7, 63 (2003).

The mismatch is even starker where the speaker is a sitting Senator speaking in his capacity as a Member of Congress. The Supreme Court has emphasized in the First Amendment context that legislators have an "obligation to take positions on controversial political questions" so constituents may be informed and represented. *Bond,* 385 U.S. at 136-37. That constitutional imperative leaves no room for Defendants' theory, which would repurpose a doctrine designed for on-base command relationships into a tool for punishing political speech at the core of the First Amendment.

Defendants' other cases are even farther afield because they do not relate to the First Amendment at all. They merely address the unrelated point that non-active servicemembers may be subject to the Uniform Code of Military Justice (UCMJ) or otherwise fall under the Constitution's use of the term "land and naval forces." *See Closson v. U.S. ex rel. Armes,* 7 App. D.C. 460, 479

(D.C. Cir. 1896) (denying habeas challenge from retiree because detention was lawful); *United States v. Bergdahl*, 80 M.J. 230, 234 (C.A.A.F. 2020) (Senator McCain "subject to the UCMJ" as retiree), *vacated in part*, 683 F. Supp. 3d 24 (D.D.C. 2023); *United States v. Hooper*, 26 C.M.R. 417, 425 (1958) (member of Fleet Reserve within the Fifth Amendment's use of the term "naval forces"); *Larrabee v. Del Toro*, 45 F.4th 81, 96 (D.C. Cir. 2022) (member of Fleet Marine Reserve within Make Rules Clause's use of the term "land and naval forces"). None suggests that retirees are fully subject to the same restrictions on speech as active-duty military personnel.

### 2. *No historical tradition supports Defendants' theory.*

Defendants' proposed new carve-out for military retirees also cannot be justified on first principles. Courts may not create new categories of unprotected speech absent a well-established historical tradition of treating the speech at issue as outside the First Amendment. *See United States v. Stevens*, 559 U.S. 460, 472 (2010). The Supreme Court has "taken pains to emphasize" that "these exceptional categories are few and narrowly drawn, and all share a long and well-recognized historical pedigree"—such as "fraud, defamation, and 'fighting words.'" *Chiles*, 146 S. Ct. at 1021.

Restrictions on the speech of retired servicemembers carry no such pedigree. Our Nation has a "long tradition of retired service members, including those holding elected office, routinely contributing to the public discourse in ways critical of current military policy," JA43-44—from Alexander Hamilton's denouncing President Adams's fitness to command during the Quasi-War,[5] to retired servicemembers in Congress criticizing President Biden's withdrawal from Afghanistan[6] and his COVID-19 vaccine mandate for active-duty troops.[7]

Defendants simply ignore that centuries'-long history. Their only attempt at a historical hook is the UCMJ, which, since its enactment in 1950, has subjected military retirees to certain prohibitions that, on their face, can reach speech. Br. 6, 49. But this reliance on the UCMJ is flawed in multiple respects. First, Defendants did not impose Senator Kelly's punishment under the UCMJ: This case involves a secretarial censure letter, a measure "exempt from" relevant UCMJ provisions, *Miller v. Lehman*, 801 F.2d 492, 498-99 &

---

[5] Alexander Hamilton, *Concerning the Public Conduct and Character of John Adams, Esq., President of the United States* (Oct. 24, 1800), https://bit.ly/4qJbbxg.

[6] Aaron Parseghian, *Rep. Bergman 'pissed' at Biden's 'lack of leadership,' says troop deaths were avoidable*, FOX 17 (Aug. 26, 2021), https://bit.ly/4thjn9R.

[7] Letter from Mark E. Green et al. to Lloyd J. Austin III, Sec'y of Def. (Aug. 6, 2021), https://bit.ly/3LL2jbh.

n.2 (D.C. Cir. 1986); and a grade-determination proceeding under 10 U.S.C. § 1370, a provision not within the UCMJ. Regardless, the UCMJ—a *statute* that may impose speech restrictions on those properly subject to it—cannot define or limit *constitutional* free-speech protections. Finally, a history of subjecting retirees to the UCMJ does not amount to a "historical pedigree" of treating retirees' public, political speech as categorically unprotected. *Chiles*, 146 S. Ct. at 1021.

In fact, the UCMJ's application to retirees for more than 70 years makes the dearth of First Amendment precedent supporting Defendants' position even more glaring. In neither this Court nor the district court have Defendants ever cited a single case showing that retirees' speech has historically been subjected to diminished protections—whether in cases involving the UCMJ or otherwise. Their theory therefore lacks not just "well-recognized historical pedigree," *id.*, but any pedigree at all.

3. *No other feature of retired service or retirement pay supports Defendants' theory.*

With no precedent or historical tradition to support their exception for retiree speech, Defendants spend much of their brief arguing that retired officers—based on their statutory eligibility for recall and military benefits—are part of the "armed forces" just the same as active-duty servicemembers.

But their whole discussion is irrelevant, because they never explain how any of these features of retirement status should or does reduce retirees' protections *under the First Amendment.*

**a.** Defendants primarily rely on the fact that Congress has categorized retirees as "in the armed forces" through a variety of statutes and regulations unrelated to speech. Br. 38-41. Neither Congress nor any Executive agency could, of course, alter the scope of the First Amendment. And none of these statutes and regulations (or cases applying them) purport to address retirees' speech rights *at all.* At best, they are silent on the issue. Congress's decision to list retirees as part of the armed forces has no bearing on those retirees' speech rights. Likewise, the statutes Defendants cite for the proposition that retirees are subject to "military justice" speak only to the applicability of the UCMJ, not the limits of the Constitution. *See* 10 U.S.C. § 802(a)(4).

In fact, some of Defendants' sources implicitly *reject* the position that Congress viewed retirees and active-duty servicemembers as interchangeable. Section 688's recall provision confirms that, when Congress wanted to saddle retirees with the full responsibilities and obligations that accompany active-duty service, it required that the Executive *actually recall* the retiree to

active-duty service—not to impose those responsibilities based on retired status alone. *See* 10 U.S.C. § 688; DoD Instruction 1352.01 (prescribing administrative policy and guidance governing readiness for recall). And the restriction on foreign-government employment in 37 U.S.C. § 908 reflects not a congressional choice to impose a *statutory* restriction on retirees, but rather one to *lift* a *constitutional* restriction on retirees—namely, "section 9 of article I of the Constitution," which restricts "acceptance of emoluments, offices, or titles from a foreign government" without Congress's consent. 37 U.S.C. § 908(a). That judgment only confirms that retirees and active-duty servicemembers cannot automatically be equated. And regardless, none of these provisions can be read as reflecting Congress's intent to reduce a retiree's speech rights.

**b.** Relying on these same authorities, Defendants suggest that diminished First Amendment protection is justified because retired officers' speech poses the same threat to the command structure as active-duty speech—even though retired officers hold no current command, issue no orders, and fall outside the chain of command. *See* Br. 43-47. The closest Defendants come to supporting this proposition is the recall authority of Section 688, insofar as an officer might be in a position, if recalled, to "command … servicemembers." Br. 24.

But Section 688 permits the placement of retirees in leadership positions only if and when they have been recalled. Without recall, however, retirees have no special statutory ability to "exert influence" on active-duty service-members. Br. 23. And the mere *prospect* of a recall cannot possibly reduce a retiree's First Amendment rights. By that logic, all able-bodied men in the United States would have diminished speech rights, because they are all subject to be "inducted into the Armed Forces" when the nation requires. 50 U.S.C. § 3803.

Defendants' recall argument is uniquely inapplicable to Senator Kelly. The Senator cannot be involuntarily recalled while serving in the Senate because the Incompatibility Clause of Article I expressly forbids Members of Congress from simultaneously "holding any Office under the United States," including a military office, U.S. Const. art. I, § 6; *see United States v. Lane*, 64 M.J. 1, 6 (C.A.A.F. 2006) (holding that the Clause precludes Senator Lindsey Graham from serving as a military judge). And even if he were not a Senator, current military regulation states that retirees like him "may be used" only "as a manpower source of last resort after other sources are determined not to be available," and even then "should be deployed [only] to civilian defense

jobs." DoD Instruction 1352.01 at 4, 8, 13. So Defendants' notion that Senator Kelly could again "command . . . servicemembers" is far-fetched at best. Br. 24.

**c.** Defendants also rely heavily on this Court's decision in *Larrabee* to argue that retirees must have "military status" because "Congress may constitutionally subject them to military discipline" by court-martial. Br. 41-44, 48. But *Larrabee* answered a different question—whether a retiree may be tried in a military forum—not which First Amendment standard governs retiree speech. The existence of court-martial jurisdiction says nothing about whether particular speech is protected.

Nor could *Larrabee*'s analysis be extrapolated to speech rights. The decision rested on the Make Rules Clause of Article I and the Fifth Amendment's exception to the grand-jury requirement for "cases arising in the land or naval forces." *Larrabee,* 45 F.4th at 95. Because of that express exemption, *Larrabee* recognized that the constitutionality of court-martial jurisdiction turns "on one factor: the military status of the accused." *Id.* at 89 (quoting *Solorio v. United States*, 483 U.S. 435, 439 (1987)). The First Amendment contains no textual carve-out like the Fifth Amendment's grand-jury exception, and the Supreme Court has made clear that even active-duty servicemembers "are not excluded from the protection granted by the First Amendment." *Parker*, 417 U.S. at

758. *Larrabee*'s status-based rule for court-martial jurisdiction therefore sheds no light on the scope of constitutional speech protections for military retirees.

**d.** Finally, Defendants suggest that retirees have somehow bargained away their First Amendment rights "[i]n exchange" for "receiv[ing] retired pay." Br. 41. They relatedly suggest that "retired *officers,*" by virtue of being "commissioned by the President," cede their speech rights in exchange for the "special trust and confidence" that accompany presidential commissions. Br. 44. These arguments put a new spin on archaic reasoning: Retirees "may have a constitutional right to talk politics," but "no constitutional right" to a pension or a commission. *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996) (citation omitted). That position "ha[s] long since [been] rejected." *Id.* Defendants cannot "condition[] . . . eligibility for [a] valuable benefit" like retirement pay on the retiree's "willingness to limit" his First Amendment rights. *Autor v. Pritzker*, 740 F.3d 176, 183 (D.C. Cir. 2014). Our Nation does not force military retirees to sacrifice the First Amendment freedoms they defended just so they can collect the benefits they justly earned by doing so.

### D. Defendants' concerns about "all-or-nothing" treatment of retiree speech are misplaced.

Defendants insist that this Court must correct what they call the district court's "sweeping," "all-or-nothing approach"—namely, that "military retirees are indistinguishable from civilians for First Amendment purposes, such that the military has no greater ability to discipline their speech in any respect." Br. 2, 24. But the district court held no such thing. It was *Defendants* who pressed a categorical First Amendment exclusion: that retired military veterans have *no* constitutional protection for their speech whenever the Secretary of Defense—in his sole discretion and without identifying all of the speech at issue—concludes that it "risks undermining military discipline and good order." D.Ct.Dkt. 20 at 2-3. For that rule, Defendants relied exclusively on cases featuring speech by "*active-duty* servicemembers or speech on military bases." JA35. The district court correctly rejected that novel categorical position, and then—with Defendants having provided "no other arguments for how Senator Kelly's speech is unprotected under the First Amendment," JA38—properly found a First Amendment violation.

The district court never suggested—nor did Senator Kelly ever argue—that courts are powerless to give "weight to the military's interest." Br. 49 Defendants could have tried to justify their actions under ordinary First

Amendment standards, *e.g.*, *Reed*, 576 U.S. at 163, which account for the government's justifications for restricting speech, including when those interests relate to military good order, *see Greer v. Spock*, 424 U.S. 828, 838 (1976) (upholding viewpoint-neutral restrictions in the military-base forum). But having chosen to eschew any arguments along these lines, Defendants cannot now fault the district court for not adopting them. And rejecting Defendants' appeal would leave open the question of how, in future cases involving retirees, "the military's interests" might influence the scope of permissible speech restrictions under the First Amendment.

### E. Senator Kelly's senatorial service does not diminish his First Amendment rights.

Finally, Defendants suggest that Senator Kelly's distinguished "role in Congress" and "sway over the military" as a member of the Senate Armed Services Committee provides "more" reason to restrict his speech. Br. 53. That argument defies foundational First Amendment principles and the separation of powers. Senator Kelly's vigorous oversight of the military is "essential … to the legislative function." *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927). That is reason to robustly *protect* his right to speak in connection with those duties, not to curtail it.

*Bond v. Floyd* confirms this. In holding that the Georgia House of Representatives could not refuse to seat a duly elected member based on his criticisms of the Vietnam War and draft, the Supreme Court explained that the government cannot "apply a stricter standard to its legislators" when it comes to policing expression. 385 U.S. at 132-33. And it emphasized that "representative government requires that legislators be given the widest latitude to express their views on issues of policy," including controversial positions on national security and war. *Id.* at 135-36.

Defendants cite no authority to the contrary. *United States v. Bergdahl*, 80 M.J. 230 (C.A.A.F. 2020), did not address speech rights of retirees, let alone the First Amendment; instead it focused on whether unlawful command influence improperly tainted a servicemember's court martial conviction. Defendants' only other response is to contend that Members of Congress have no "heightened" First Amendment protections and are not "immune from speech restrictions." Br. 51-52. But the point of *Bond* is that a speaker's platform, audience, and institutional role as a legislator cannot justify the *more stringent* restrictions Defendants would impose.

## II. Senator Kelly's Claim Is Reviewable and Satisfies the Remaining Preliminary Injunction Factors

Defendants rest their entire appeal on the merits, abandoning any argument about reviewability or "the remaining preliminary injunction factors." Br. 27 n.1. That approach is sensible. The district court properly concluded that this dispute is ripe for review and that exhaustion doctrines pose no barrier. JA26-32. As to ripeness in particular, Senator Kelly's challenge poses "purely legal" questions regarding the scope of Defendants' authority; requiring him to await Defendants' punishment would impose significant "hardship," "forcing him to choose between 'refraining from core political speech on the one hand' or risking a retirement grade reduction and even 'criminal prosecution on the other.'" JA32 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167-68 (2014)). There also were independent bases for judicial review that the district court did not even reach, including under the Administrative Procedure Act. *See* JA32 n.3; *see* D.Ct.Dkt. 2-1 at 32-37.[8]

---

[8] In addition, although the district court granted Senator Kelly's motion based on his First Amendment claim, this Court could uphold that decision on several alternative grounds amply supported by the record—namely, under the Speech or Debate Clause, separation-of-powers, due process, and the statutory authority governing the reopening of military grades. D.Ct.Dkt. 2-1 at 18-32; *see, e.g.*, *Capitol Servs. Mgmt.*, 933 F.3d 784, 793 (D.C. Cir. 2019) ("This

The remaining injunction factors also overwhelmingly favored Senator Kelly. JA42-44. The court recognized that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025) (cleaned up). Because Senator Kelly showed a strong likelihood of success on his First Amendment retaliation claim, he had both the equities and the public interest on his side. *See Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). And on the other side of the ledger, Defendants never identified any cognizable harm from an order that preserves a centuries-old status quo of protecting speech like Senator Kelly's.

---

court can affirm a district court's judgment on any basis supported by the record."); *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1045 (D.C. Cir. 2012) (affirming on alternative ground).

# CONCLUSION

The Court should affirm the decision below.

Dated: April 15, 2026

Respectfully Submitted,

/s/ *Benjamin C. Mizer*

Paul J. Fishman
ARNOLD & PORTER
  KAYE SCHOLER LLP
One Gateway Center Suite 1025
Newark, NJ  07102
(973) 776-1900

Benjamin C. Mizer
Deborah A. Curtis
Jeffrey H. Smith
Samuel F. Callahan
Bonnie E. Devany
Aaron X. Sobel
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC  20001
(202) 942-5000

*Counsel for Senator Mark Kelly*

**CERTIFICATE OF COMPLIANCE**

I certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), that the attached Appellee's Brief contains 9,440 words and complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Century Expanded BT font.

Dated: April 15, 2026

*/s/ Benjamin C. Mizer*
Benjamin C. Mizer

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2026, I caused the foregoing document to be electronically filed using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: April 15, 2026

*/s/ Benjamin C. Mizer*
Benjamin C. Mizer