IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

———————————

MARK KELLY, UNITED STATES SENATOR REPRESENTING THE STATE OF ARIZONA,

*Plaintiff-Appellee*,

v.

PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF DEFENSE; U.S. DEPARTMENT OF DEFENSE; JOHN C. PHELAN, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE NAVY; U.S. DEPARTMENT OF THE NAVY,

*Defendants-Appellants*.

———————————

*On Appeal from the United States District Court
for the District of Columbia (No. 1:26-cv-00081)
Hon. Richard J. Leon*

———————————

**BRIEF OF THE CATO INSTITUTE AS *AMICUS CURIAE* IN SUPPORT
OF APPELLEE AND AFFIRMANCE**

<div align="right">

Thomas A. Berry
  *Counsel of Record*
Daniel Greenberg
Harrison Prestwich
CATO INSTITUTE
1000 Massachusetts Avenue, N.W.
Washington, D.C. 20001
(443) 254-6330
tberry@cato.org
*Counsel for Amicus Curiae*

</div>

Dated: April 22, 2026

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), counsel certifies:

**Parties and _Amici Curiae_:**

a.      All parties, intervenors, and amici appearing before the district court and in this Court are listed in the government's brief.

b.      The Cato Institute is a not-for-profit corporation, exempt from income tax under section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3); it has no parent corporation; and no publicly held company has a 10% or greater ownership interest in the Cato Institute.

**Rulings Under Review:**

References to the rulings at issue appear in the government's brief.

**Related Cases:**

There are no related cases within the meaning of D.C. Circuit Rule 28(a)(1)(c).

Dated: April 22, 2026

/s/Thomas A. Berry
Thomas A. Berry

_Counsel for Amicus Curiae_

i

**RULE 26.1 CORPORATE DISCLOSURE STATEMENT**

*Amicus Curiae* the Cato Institute is a nonprofit corporation. It has no parent companies, subsidiaries, or affiliates that have issued shares or debt securities to the public. Pursuant to D.C. Circuit Rule 26.1(b), the Cato Institute states that it is a 501(c)(3) nonprofit organization dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies helps restore the principles of constitutional government that are the foundation of liberty.

<div style="float:right">

/s/Thomas A. Berry
Thomas A. Berry

*Counsel for Amicus Curiae*
</div>

Dated: April 22, 2026

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ..................................... ii

TABLE OF CONTENTS .................................................................................. iii

TABLE OF AUTHORITIES ........................................................................... iv

INTEREST OF *AMICUS CURIAE* ..................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................1

ARGUMENT .................................................................................................4

    I.    THE GOVERNMENT CANNOT CONDITION RETIRED SERVICEMEMBER BENEFITS ON THE SURRENDER OF FIRST AMENDMENT RIGHTS. ...................................................................4

        A.   The Government's Benefits and Obligations Theory Fails Under the Unconstitutional Conditions Doctrine. ................................................5

        B.   The Government's Theory Would Weaponize Military Benefits to Silence Millions of Retired Servicemembers. ...........................................9

    II.   THE GOVERNMENT'S STATUS-BASED SPEECH THEORY WOULD CONCENTRATE UNREVIEWABLE POWER IN THE EXECUTIVE. ...........................................................................................14

CONCLUSION ............................................................................................19

CERTIFICATE OF COMPLIANCE .................................................................21

CERTIFICATE OF SERVICE ........................................................................22

# TABLE OF AUTHORITIES

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013)............5

*Bridges v. California*, 314 U.S. 252 (1941) .......................................................14

*Brown v. Glines*, 444 U.S. 348 (1980) ...............................................................19

*Colo. Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604 (1996) .................9

*Ex parte Milligan*, 71 U.S. (4 Wall) 2 (1866) .....................................................19

*Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180 (2021) ................................... 15, 18

*Marbury v. Madison*, 5 U.S (1 Cranch) 137 (1803).............................................18

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964) ..................................................4

*NAACP v. Button*, 371 U.S. 415 (1963) ........................................................ 9, 13

*Nat'l Pub. Radio, Inc. v. Trump*, 2026 U.S. Dist. LEXIS 69898
  (D.D.C. Mar. 31, 2026) .............................................................................6, 8

*NLRB v. Cath. Bishop of Chi.*, 440 U.S. 490 (1979)............................................18

*NRA of Am. v. Vullo*, 602 U.S. 175 (2024) ..........................................................5

*Parker v. Levy*, 417 U.S. 733 (1974)..................................... 4, 8, 16, 17, 18

*Perry v. Sindermann*, 408 U.S. 593 (1972)................................ 3, 5, 6, 7, 8, 9, 10

*Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)................................ 4, 14, 15, 18

*Priest v. Sec. of Navy*, 570 F.2d 1013 (D.C. Cir. 1977) ......................................16

*Regan v. Tax'n with Representation*, 461 U.S. 540 (1983)......................................5

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ..................6

*Shapiro v. Thompson*, 394 U.S. 618 (1969).........................................................6

*Sherbert v. Verner*, 374 U.S. 398 (1963)............................................................6

*Speiser v. Randall*, 357 U.S. 513 (1958)................................ 3, 5, 6, 7, 8, 9, 10, 11

*Thornburgh v. Abbott*, 490 U.S. 401 (1989) ......................................................15

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969)................ 15, 18

*Turner v. Safley*, 482 U.S. 78 (1987)................................................................15

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943)..................................18

*Wieman v. Updegraff*, 344 U.S. 183 (1952)..........................................................6

**Other Authorities**

*Financial Capability in the United States: 2012 Report of Military Findings*, FINRA (2012) ................................................................12

Gabby L'Esperance et al., *Military Family Support Programming Survey*, MIL. FAM. ADVISORY NETWORK (2023)...........................................12

Jack Tsai & Robert A. Rosenheck, *Risk Factors for Homelessness Among US Veterans*, 37 EPIDEMIOLOGIC REVS. 177 (2015) .............................12

Kathleen M. Sullivan, *Unconstitutional Conditions*, 102 HARV. L. REV. 1413 (1989) ......................................................................5

Louis W. Fisher, *Contracting Around the Constitution: An Anticommodificationist Perspective on Unconstitutional Conditions*, 21 U. PA. J. CONST. L. 1167 (2019).............................................10

*National Guard and Reserve, Life Insurance*, U.S. DEP'T OF VETERANS AFFS. (Jun. 21, 2025).......................................................13

OFF. OF THE ACTUARY, U.S. DEP'T OF DEF., STATISTICAL REPORT ON THE MILITARY RETIREMENT SYSTEM (2022) ..........................................11

Philip Hamburger, *Unconstitutional Conditions: The Irrelevance of Consent*, 98 VA. L. REV. 479 (2012) .............................................11

*Retired Service Members and Families*, DEF. HEALTH AGENCY (Sept. 23, 2025) ....................................................................13

*Survivors Pension*, U.S. DEP'T OF VETERANS AFFS. (Jan. 14, 2026).......................13

THE EMPIRE STRIKES BACK, Disney Plus (Lucasfilm Ltd. 1980) ...........................19

Tyler R. Smotherman, *Unnecessary and Improper: Why It Is Time for UCMJ Jurisdiction over Retirees to ETS*, 35 REGENT U.L. REV. 207 (2022)............ 9, 13

*VA Research on Homelessness*, U.S. DEP'T OF VETERAN AFFS. (Jan. 15, 2021) .....12

**Constitutional Provisions**

U.S. CONST. amend. I ......................................................................4

U.S. CONST. art. III, § 2 ..................................................................18

## INTEREST OF *AMICUS CURIAE*[1]

The Cato Institute is a nonpartisan public-policy research foundation established in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies was established in 1989 to help restore the principles of limited constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, produces the annual *Cato Supreme Court Review*, and files *amicus* briefs.

Cato's interest in this case arises from its mission to prevent government overreach and preserve the protection of constitutional rights. The First Amendment prohibits the government from abridging the freedom of speech, and the speech of retired servicemembers should enjoy the full scope of that protection.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Mark Kelly is a sitting U.S. Senator from Arizona and a retired captain in the U.S. Navy. Appellant Br. 13. As a retired servicemember, he receives retirement pay and other benefits for his 25 years of service in the Navy. *Id.* He serves on the Senate Armed Services Committee, and he has been publicly critical of the Trump

---

[1] All parties have consented to the filing of this brief. No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the brief's preparation or submission; and no person other than *amicus* contributed money intended to fund the brief's preparation or submission.

Administration's military policy. *Id.* In June 2025, Senator Kelly signed a letter urging President Trump to withdraw the National Guard from Los Angeles. *Id.* at 15. After the Trump Administration initiated a series of controversial strikes against alleged drug smugglers in the Caribbean, Senator Kelly publicly criticized the operations' legality in November 2025. *Id.* at 13. He also appeared in a video addressed to servicemembers that month, in which he was joined by other federal legislators, saying "Our laws are clear. You can refuse illegal orders." *Id.*

The Department of Defense ("DOD") responded to this video by announcing that Senator Kelly was under review for "serious allegations of misconduct." The DOD informed Senator Kelly that he was potentially subject to reduction of retirement pay, reduction in rank, and recall into active-duty service. J.A. 19–21. Furthermore, Secretary of Defense Pete Hegseth personally stated that Senator Kelly could be subject to "criminal prosecution." *Id.* at 20. On January 12, 2026, Senator Kelly filed suit alleging a violation of, *inter alia*, his First Amendment rights and asked for a preliminary injunction to halt the retirement grade proceedings. *Id.* at 21. The district court granted that injunction: It found that Senator Kelly was likely to succeed on the merits of his First Amendment retaliation claim. *Id.* at 44. The government appealed.

The government argues that military retirement benefits come with various obligations, including speech restrictions that mirror those of active-duty

2

servicemembers. Appellant Br. 6–7. But the government's theory is precluded by the unconstitutional conditions doctrine. For most of the last century, the Supreme Court has regularly stopped government from requiring people to give up their constitutional rights in order to receive government benefits. *See Speiser v. Randall*, 357 U.S. 513 (1958); *Perry v. Sindermann*, 408 U.S. 593 (1972). The government may frame its position as an agreed-upon "exchange," but that is a failed attempt at a cosmetic solution to a constitutional problem. Appellant Br. 7. The government cannot do indirectly what it is prohibited from doing directly. *Speiser*, 357 U.S. at 526. The government's stratagem—its attempt to revoke retirement benefits, with the goal of discouraging the exercise of First Amendment rights—is not fundamentally different than an attempt to impose a direct fine. *Id.* at 518. If the government's position prevails, it will do more than censor Senator Kelly: It will force millions of retired servicemembers, many of whom live under financial strain, to choose between their benefits and their First Amendment rights.

According to the government, Senator Kelly's retirement status allows the executive to determine which of Kelly's public statements receive First Amendment protection. Appellant Br. 21–23. But the Supreme Court has never held that status, as such, could result in a blanket forfeiture of First Amendment protection. Rather, when the Court has recognized status-based speech restrictions, it has provided a workable, replicable standard. *See, e.g., Pickering v. Bd. of Educ.*, 391 U.S. 563

(1968). The government claims it has the power to find Senator Kelly's speech "unprotected" because Kelly's speech counsels disobedience. *See Parker v. Levy*, 417 U.S. 733 (1974). But even if *Parker* applied here, the government may not unilaterally determine what speech falls under *Parker*'s exception. Appellant Br. 22. The government contends that these constitutional questions are outside the authority of the judicial branch. That contention mangles and diminishes the role of the judiciary in our constitutional system of checks and balances. The Secretary of Defense cannot be the lone arbiter of whether Senator Kelly's speech receives First Amendment protection. This Court should affirm the preliminary injunction.

## ARGUMENT

### I. THE GOVERNMENT CANNOT CONDITION RETIRED SERVICEMEMBER BENEFITS ON THE SURRENDER OF FIRST AMENDMENT RIGHTS.

Our nation and our Constitution embody a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270–71 (1964); U.S. CONST. amend. I. The First Amendment protects everyone—from retired sergeants to sitting U.S. Senators—from government censorship. The government may not use retired servicemember benefits as a lever to control retiree speech. This violation of the doctrine of unconstitutional conditions censors a sitting U.S. Senator and chills the speech of millions of retired servicemembers.

**A. The Government's Benefits and Obligations Theory Fails Under the Unconstitutional Conditions Doctrine.**

It is settled law that the government cannot do indirectly what it is barred from doing directly. *See NRA of Am. v. Vullo*, 602 U.S. 175, 190 (2024); *Speiser*, 357 U.S. at 526 (the Constitution "cannot be transgressed indirectly . . . any more than it can be violated by direct enactment."). The doctrine of unconstitutional conditions provides that "the government may not grant a benefit on the condition that the beneficiary surrender a constitutional right." Kathleen M. Sullivan, *Unconstitutional Conditions*, 102 HARV. L. REV. 1413, 1415 (1989). The government argues that retired servicemembers "receive various benefits" which they exchange for various obligations. Appellant Br. 7. Among those obligations, the government argues, is a restriction on speech like the one on active-duty servicemembers. *Id.* at 7, 28–29. But the government's theory is forbidden by the doctrine of unconstitutional conditions. The government cannot make retired servicemembers choose between their military benefits and their First Amendment rights.

The unconstitutional conditions doctrine prevents the government from denying "a benefit to a person on a basis that infringes his constitutionally protected interests," even if a person "has 'no right' to a valuable government benefit." *Perry*, 408 U.S. at 597; *see Regan v. Tax'n with Representation*, 461 U.S. 540, 545 (1983); *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (the doctrine applies "even if [an individual] has no entitlement to that benefit."). More

particularly, the doctrine prevents the denial of benefits in retaliation for past speech. *See Perry*, 408 U.S. at 597–98. "Ideologically driven attempts to suppress a particular point of view are presumptively unconstitutional," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995), including attempts that take the form of conditional benefits. When the government denies someone a benefit as punishment for past speech, "it both violates the unconstitutional conditions doctrine and the prohibition on First Amendment retaliation." *Nat'l Pub. Radio, Inc. v. Trump*, 2026 U.S. Dist. LEXIS 69898, at *71 (D.D.C. Mar. 31, 2026); *see Perry*, 408 U.S. at 597–98.

These principles have endured for decades. *See, e.g.*, *Perry*, 408 U.S. at 594 (nonrenewal of a public schoolteacher's contract because of his speech held unconstitutional); *Speiser*, 357 U.S. at 513 (conditioning veterans' tax exemptions on taking a loyalty oath held unconstitutional); *Sherbert v. Verner*, 374 U.S. 398 (1963) (conditioning unemployment benefits so as to infringe on a claimant's religion held unconstitutional); *Shapiro v. Thompson*, 394 U.S. 618 (1969) (denial of welfare benefits to short-term state residents held unconstitutional); *Wieman v. Updegraff*, 344 U.S. 183 (1952) (termination of state employees who decline to take a loyalty oath held unconstitutional). If the government could deny benefits based on the exercise of constitutional rights, "those freedoms would in effect be penalized and inhibited." *Perry*, 408 U.S. at 597.

Such government actions would infringe upon many constitutionally protected interests, "especially" the "interest in freedom of speech." *Perry*, 408 U.S. at 597. In *Speiser v. Randall*, California denied honorably discharged World War II veterans a tax exemption solely because they refused to take a loyalty oath. *Speiser*, 357 U.S. at 514–15. The Supreme Court held that this scheme was a burden on the First Amendment disguised as a conditional benefit. *Id.* at 518. Conditioning a tax exemption upon an oath was no different from imposing a fine on veterans' speech. *Id.* The government argued that veterans "as a class occupy a position of special trust and influence," and so their status justified the speech restriction. *Id.* at 528. The Court rejected that argument, holding that the state can act against veterans only "as it can act against any other citizen." *Id.* First Amendment rights are so essential to a functioning society that suppression of speech must be "subjected to close analysis and critical judgment." *Id.* at 520. The Court ultimately held that the government was "plainly mistaken" that denial of a tax exemption "may not infringe speech." *Id.* at 518.

The government's contention—that it has the power to bestow or to deny retirement benefits as a kind of leverage against Senator Kelly's speech—is mistaken for much the same reasons. The government's position cannot be reconciled with the doctrine of unconstitutional conditions. Defendants-Appellants argue that they can restrict Senator Kelly's speech because retirees have an ongoing relationship with

the military. Appellant Br. 5–7. The benefits of that relationship include Senator Kelly's right to wear his uniform and to receive retirement pay "roughly synonymous with [his] rank." *Id.* at 7. The government therefore infers an authority to categorize Senator Kelly's speech as misconduct and to punish it accordingly. *Id.* at 24–25. But the government may not swap Senator Kelly's, or any retiree's, government benefits in exchange for the surrender of First Amendment rights. *Cf. Speiser*, 357 U.S. at 518. And it certainly may not retaliate against Senator Kelly by revoking his existing benefits. *See Perry*, 408 U.S. at 597–98; *Nat'l Pub. Radio*, 2026 U.S. Dist. LEXIS 69898, at *71 (the government may not "single[] out private speakers for disfavored treatment" and revoke obligated government funds). Here, the government tries to dress up its actions as routine military discipline; in reality, it exacts a fine from those who exercise their constitutional rights. *See Speiser*, 357 U.S. at 518.

The government cannot rescue its case by characterizing its censorship as a benefits-for-obligations exchange. Retired servicemembers are subject to potential recall into active duty, UMCJ jurisdiction, and—the government extrapolates—speech restrictions mirroring those of active-duty servicemembers. Appellant Br. 7. In the government's view, retirees have accepted the same speech restrictions that were found constitutional as applied in *Parker v. Levy*, 417 U.S. 733 (1974). But that characterization cannot evade the underlying constitutional problem: the government's attempt to deny servicemembers their rights. *See Speiser*, 357 U.S. at

518 (portraying a conditional benefit as a "privilege" or "bounty" does not make it constitutional); *see also NAACP v. Button*, 371 U.S. 415, 429 (1963) ("a State cannot foreclose the exercise of constitutional rights by mere labels"); *Colo. Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604, 627 (1996) ("we cannot allow the Government's suggested labels to control our First Amendment analysis"). The government's suggestion that retirees must permanently accept diminished First Amendment rights that the executive branch may switch on or off as part of an ongoing obligation to the military is insupportable.

Denying a servicemember "the full protections guaranteed under the Constitution" upon retirement "is the height of cruel irony." Tyler R. Smotherman, *Unnecessary and Improper: Why It Is Time for UCMJ Jurisdiction over Retirees to ETS*, 35 REGENT U.L. REV. 207, 228 (2022) ("why should a soldier who already gave up many of his natural and constitutional liberties for twenty years to serve his country be forced to continue doing so until he dies?"). The government cannot require retirees to relinquish their constitutional rights just to keep the benefits they have earned through decades of service any more than it can impose a direct fine on those rights' exercise. *See Perry*, 408 U.S. at 597.

**B.    The Government's Theory Would Weaponize Military Benefits to Silence Millions of Retired Servicemembers.**

The First Amendment needs "breathing space to survive," so the government may only regulate "with narrow specificity." *Button*, 371 U.S. at 433; *see Speiser*,

357 U.S. at 525 (the line between regulated speech and unconditionally guaranteed speech must be "finely drawn"). When speech regulation is imprecise, it induces self-censorship; that is because the public cannot know what speech is prohibited. Conditioning military benefits on avoiding speech that the government deems "disobedient" has the same chilling effect. *See* J.A. 43. A choice between constitutional rights and earned benefits is not a choice at all. *See Perry*, 408 U.S. at 597. A retiree who knows his benefits are contingent on not criticizing military policy will be discouraged into silence. This is worse than coercion—it is disguised coercion, and it is precisely the evil that the unconstitutional conditions doctrine was designed to prevent.

This doctrine becomes increasingly necessary as the size of government grows, because the government's ability to grant and withhold benefits then grows in tandem. The unconstitutional conditions doctrine "prevents the modern administrative state from leveraging its prodigious spending power to essentially purchase the waiver of individual rights." Louis W. Fisher, *Contracting Around the Constitution: An Anticommodificationist Perspective on Unconstitutional Conditions*, 21 U. PA. J. CONST. L. 1167, 1170 (2019). Such offers are "harder to resist for poorer rightsholders," and they would animate "a constitutional system that offers differential protection of fundamental rights depending on one's socioeconomic status." *Id.* at 1172. Such dangers come into sharp focus when the

government argues that its grant of benefits allows it to control the speech of millions of retirees.

The government's theory is not limited to Senator Kelly. It is a blueprint for the mass denial of constitutional rights. Its framework would subject any military retiree to revocation of benefits as punishment for speech the government dislikes. Perhaps Senator Kelly will not feel the financial pressure that a revocation of retirement pay would create for the average military retiree. But retirees, who number more than two million, will be pressured to "relinquish their voice in society." Philip Hamburger, *Unconstitutional Conditions: The Irrelevance of Consent*, 98 VA. L. REV. 479, 492 (2012); OFF. OF THE ACTUARY, U.S. DEP'T OF DEF., STATISTICAL REPORT ON THE MILITARY RETIREMENT SYSTEM (2022).[2] In practice, the government's theory would put a price tag on the First Amendment: It would create a world in which only those who can afford to surrender their benefits may speak freely. *See Speiser*, 357 U.S. at 518. When military benefits are held hostage unless fundamental rights are waived, it deprives the people "of essential constraints on government." *Id.* at 493.

The coercive effect of conditional benefits is going to be felt most strongly by individuals and families already living under financial strain. Nearly 40 percent of

---

[2] Available at https://tinyurl.com/yc6enc9m.

veterans' families have less than $500 in emergency savings. Gabby L'Esperance et al., *Military Family Support Programming Survey*, MIL. FAM. ADVISORY NETWORK, at 83 (2023).[3] As compared to active-duty servicemembers, veterans are more likely to have no emergency savings at all. *Id.* To compound that financial stress, 91 percent of servicemembers carry at least one type of debt, and nearly 20 percent carry four or more. *Financial Capability in the United States: 2012 Report of Military Findings*, FINRA, at 20 (2012).[4] Veterans are also more at risk for homelessness than nonveterans. *VA Research on Homelessness*, U.S. DEP'T OF VETERAN AFFS. (Jan. 15, 2021).[5] Beyond facing the same major homelessness risk factors as the general population—substance abuse, mental illness, and low income—veterans face unique risk factors such as "problematic discharges, low military pay grade, and social isolation." *Id*; *see* Jack Tsai & Robert A. Rosenheck, *Risk Factors for Homelessness Among US Veterans*, 37 EPIDEMIOLOGIC REVS. 177 (2015).[6] Retired servicemembers living under this kind of strain cannot afford to exercise their First Amendment rights when doing so may cost them housing or their next meal.

---

[3] Available at https://tinyurl.com/53akxfxm.

[4] Available at https://tinyurl.com/56sn2cke.

[5] Available at https://tinyurl.com/9byp48uy.

[6] Available at https://tinyurl.com/3k2x5tpt.

The government has provided no principled explanation why its justification for speech limitations would not extend far beyond retirees. Its own logic—that benefits and obligations together justify speech restrictions—extends to anyone who receives a military benefit and maintains a "relationship with the military." Appellant Br. 4. The universe of such beneficiaries extends far beyond individual retirees. Inactive National Guard members receive veterans' group life insurance. *National Guard and Reserve, Life Insurance*, U.S. DEP'T OF VETERANS AFFS. (Jun. 21, 2025).[7] Family members of retired servicemembers receive TRICARE benefits. *Retired Service Members and Families*, DEF. HEALTH AGENCY (Sept. 23, 2025).[8] Spouses of deceased veterans receive monthly pension plan payments. *Survivors Pension*, U.S. DEP'T OF VETERANS AFFS. (Jan. 14, 2026).[9] These benefits aren't bait on a fishing hook; they must not be used to capture and regulate the speech of millions of Americans. Under the First Amendment, speech restrictions must be narrow and precise. *See Button*, 371 U.S. at 433. The government's scheme flunks that test.

In this case, the government demands a "perpetual infringement of the civil liberties of those who have sacrificed the most to defend those liberties for the rest of the population." Smotherman, *supra*, at 232. Retired servicemembers and their

---

[7] Available at https://tinyurl.com/mw2kasj3.

[8] Available at https://tinyurl.com/8c48p7rm.

[9] Available at https://tinyurl.com/543ufcyx.

families make many sacrifices to serve the country. But the government demands that they sacrifice more: Beneficiaries must either give up the protection of the First Amendment or risk losing their benefits. That is asking too much. This Court should affirm the preliminary injunction.

## II. THE GOVERNMENT'S STATUS-BASED SPEECH THEORY WOULD CONCENTRATE UNREVIEWABLE POWER IN THE EXECUTIVE.

Military retirees, like all Americans, enjoy the "prized American privilege to speak one's mind . . . on all public institutions." *Bridges v. California*, 314 U.S. 252, 270 (1941). The government, in contrast, argues that one of the consequences of retirement from the military is the complete and permanent forfeiture of the right to criticize military policy. Appellant Br. 22 (arguing that Senator Kelly's speech "is not entitled to First Amendment protection."). The Supreme Court has never held that an individual's status alone—whether as student, public employee, prisoner, or member of the military—results in a complete forfeiture of First Amendment protection. Instead, it has required independent judicial review to determine if some particular speech restriction is justified. *See, e.g.*, *Pickering*, 391 U.S. at 568. The government asks this Court to defer all questions involving the scope of Senator Kelly's First Amendment protections to the executive branch entirely. Doing so would grant the executive branch unreviewable authority over the First Amendment rights of millions of retired servicemembers.

Of course, our First Amendment protections are limited in a variety of contexts. The government has the power to "prescribe and control conduct in the schools." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969). But in such cases, a court must determine that specific student speech causes "substantial disruption" of school activity in order to justify limiting student expression. *Id.* at 514; *see Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 188 (2021). Likewise, the state has an interest "as employer in regulating the speech of its employees." *Pickering*, 391 U.S. at 568. But again: In such cases, a court must independently weigh an employee's speech against the state's need for efficient public services. *Id.* Similarly, prisoners are subject to certain kinds of censorship due to the "inordinately difficult" nature of prison administration. *Turner v. Safley*, 482 U.S. 78, 85 (1987). But again: A court must review individual regulations to ensure that they are "reasonably related to legitimate penological interests." *Id.* at 89; *Thornburgh v. Abbott*, 490 U.S. 401, 409 (1989). In each of these realms, status sometimes results in reduced speech protection, but status certainly does not render speech unprotected *per se*. Instead, when the Court recognizes that a class of persons has reduced speech protection, it provides a governing—and reviewable—standard that provides speech protections in such contexts.

Active-duty servicemembers may also face speech restrictions, but "members of the military" are not categorically "excluded from the protection granted by the

15

First Amendment." *Parker*, 417 U.S. at 758. In *Parker*, an active-duty captain was convicted by a general court martial for "conduct unbecoming an officer" after he urged subordinates to refuse orders to deploy to Vietnam. *Id.* at 736–37. Parker challenged Article 134 of the Uniform Code of Military Justice ("UCMJ") as unconstitutionally vague and overbroad. *Id.* Due to the need for discipline, the Court noted that the First Amendment may have "a different application" for active-duty members. *Id.* at 758. The Court ultimately rejected Parker's challenge, but it was careful to confine the decision to the facts before it. *Id. Parker* did not address retirees at all. Even with respect to active-duty servicemembers, the decision did not define the boundary of First Amendment protection. *Id.* The Supreme Court did not hold that active-duty servicemembers' speech was categorically unprotected by virtue of status alone. *Id.* at 760–61. In fact, the Court acknowledged that some conduct prohibited under Article 134 would "be ultimately held to be protected under the First Amendment." *Id.* at 761.

Neither *Parker*, nor cases applying those principles, provide an operationalizable standard that can be used to adjudicate the future First Amendment claims of retired servicemembers. *Id.*; *see Priest v. Sec. of Navy*, 570 F.2d 1013, 1017 (D.C. Cir. 1977) (withholding First Amendment protection to speech of active-duty servicemembers that "interferes with responsiveness to command."). That opinion certainly did not contain the bright-line rule the government suggests that it has

found there. The government describes, in some detail, Senator Kelly's status and relationship with the military—his retired grade, recall obligation, and receipt of retirement benefits. Appellant Br. 4–5. After confirming his retiree status, the government invokes *Parker* and assumes the constitutional question is answered. J.A. 33 (the government "boldly argue[s] that [his] speech was *unprotected*."). This argument fails. The government's recitation of the details of Senator Kelly's status is insufficient to show that his speech is unprotected. The government never explains how it gets from the premise of Senator Kelly's status to the conclusion that his First Amendment rights do not apply. The absence of such an explanation highlights that retirees—like students, state employees, and prisoners—retain some First Amendment rights even when the government seeks to suppress them. And when that suppression occurs, it necessarily calls for the application of a standard of review—not the assumption that such a standard has been met.

Because *Parker* contains no explicit standard of review, the government instead asks this Court to defer to the executive branch's own unilateral judgment. The government argues that because *Parker* held *some* speech that "undermined the effectiveness of command" to be constitutionally unprotected, the executive branch is now in practice free to deem retiree speech *generally* unprotected. Appellant Br. 21; *Parker*, 417 U.S. at 759. The Secretary "determined" that Kelly's speech is analogous to the speech at issue in *Parker:* according to the government, the

constitutional inquiry has therefore ended. Appellant Br. 34–35. But an executive official may not unilaterally determine the nature of First Amendment protections. Deference to the executive's own categorization of protected speech would be abandonment of the judicial role.

Courts are obliged to answer constitutional questions before them. *See Marbury v. Madison*, 5 U.S (1 Cranch) 137, 177–78 (1803); U.S. CONST. art. III, § 2. Instead, the government asks this Court to outsource that responsibility to the Secretary of Defense. But "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). This Court would not defer to a school district's determination of whether student or teacher speech is protected. *See Pickering*, 391 U.S. at 568–69; *Tinker*, 393 U.S. at 513, *Mahanoy*, 594 U.S. at 187– 88. For the same reasons, the Secretary of Defense cannot be the final and unreviewable arbiter of a sitting Senator's speech on military policy. Of course there are sometimes special considerations for the military, *Parker*, 417 U.S. at 743, but ultimately the First Amendment "is a limitation on the power" of the political branches, not the other way around. *NLRB v. Cath. Bishop of Chi.*, 440 U.S. 490, 499 (1979); *see* J.A. 38.

The Constitution "is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, under all

circumstances." *Ex parte Milligan*, 71 U.S. (4 Wall) 2, 120–21 (1866). Members of our Nation's armed forces do not permanently and irrevocably jettison their First Amendment rights upon enlistment. The government pressures this Court to "reflexively bow[] before the shibboleth of military necessity." *Brown v. Glines*, 444 U.S. 348, 370 (1980) (Brennan, J., dissenting). That would be an abdication of this Court's "responsibility to safeguard free expression." *Id.* The government invites this Court to abandon its post and its constitutional role, and this Court should decline the government's invitation. This Court should affirm the preliminary injunction.

## CONCLUSION

The most commercially successful film of 1980 contains a vignette about the dangers of unconstitutional conditions. In that film, after a mining engineer strikes a deal with a public official, the engineer discovers that the public official is in breach of it. The engineer's resultant objection is met with a notorious response: *"I am altering the deal. Pray I do not alter it any further."* THE EMPIRE STRIKES BACK, Disney Plus, at 1:38:09 (Lucasfilm Ltd. 1980). That statement illuminates the disastrous possibilities that can ensue when a contracting party exploits the power of sovereignty to write new terms into an agreement *ex post.* It is no wonder that courts find such behavior unconstitutional, and it is no coincidence that the sovereign who alters the deal in *The Empire Strikes Back* is the villainous Darth Vader. Here, the doctrine of unconstitutional conditions prevents the government from excluding

military retirees from the broad protection offered by the First Amendment. For the reasons in this brief and those described by Plaintiff-Appellee, this court should affirm the preliminary injunction.

Respectfully submitted,
/s/ Thomas A. Berry
Thomas A. Berry
   *Counsel of Record*
Daniel Greenberg
Harrison Prestwich
CATO INSTITUTE
1000 Massachusetts Avenue, N.W.
Washington, D.C. 20001
(443) 254-6330

Dated: April 22, 2026     tberry@cato.org

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limits of Fed. R. App. P. 32(a)(7) and Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,501 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

/s/Thomas A. Berry
Thomas A. Berry
*Counsel for Amicus Curiae*

Dated: April 22, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that on April 22, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by CM/ECF.

/s/Thomas A. Berry
Thomas A. Berry
*Counsel for Amicus Curiae*

Dated: April 22, 2026

22