No. 26-5070

# In the United States Court of Appeals
## For the District of Columbia Circuit

MARK KELLY,
*Plaintiff-Appellee*

v.

PETE HEGSETH, *in his official capacity as Secretary of Defense, et al.*,
*Defendants-Appellants*

_____

On Appeal from the United States District Court
For the District of Columbia
(The Honorable Richard J. Leon)

_____

**BRIEF OF *AMICUS CURIAE* NATIONAL INSTITUTE OF
MILITARY JUSTICE IN SUPPORT OF PLAINTIFF-APPELLEE
AND AFFIRMANCE OF DECISION BELOW**

> Gregg P. Leslie
>     *Counsel of Record*
> James Weinstein
> First Amendment Clinic
> Arizona State University
>     Sandra Day O'Connor College of Law*
> 111 E. Taylor St., Mail Code 8820
> Phoenix, AZ 85004
>
> *Of counsel:*
> Robert P. LoBue
> Patterson Belknap Webb & Tyler LLP
> 1133 Ave. Americas
> New York, NY 10036
> 212-336-2000

*\* Counsel would like to acknowledge the assistance of two First Amendment Clinic
students in the preparation of this brief, Christina Ge and Anne Weiler.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, *amicus curiae* National Institute of Military Justice ("NIMJ") is a private non-profit organization, founded in 1991, and dedicated to the fair administration of justice in the armed forces and improved public understanding of military justice. NIMJ certifies that it has not issued shares to the public, and has no parent company, subsidiary, or affiliate that has issued shares to the public.

## STATEMENT OF CONSENT OF PARTIES

NIMJ has the consent of all parties to appear as *amicus curiae*.

## CERTIFICATE OF NECESSITY OF SEPARATE BRIEF

Pursuant to D.C. Circuit Rule 29(d), counsel for amicus NIMJ state that they reviewed the amicus brief filed on April 17, 2026 by *amici curiae* Former Service Secretaries et al. with an eye toward the advisability of joining in that brief. Present counsel concluded that NIMJ can separately assist the Court by presenting analysis not made by that brief (or known to be asserted by any other potential amici) as to the proper application of First Amendment principles in the context of this case.

NIMJ has also demonstrated that it is deeply committed to helping service members decide when an order may be unlawful through its service dedicated to this issue, The Orders Project. The project "is led by a group of professionals, experienced in military justice, who are committed to connecting service members with experienced legal counsel to make informed decisions about their duties under the law as it relates to orders." *See* https://ordersproject.com/ . The project's web page notes, "There is a strong presumption of legality for orders under existing law, and following legal orders is critical to the good order and discipline of our military. However, when there is a question of legality, it is important that military personnel have a trusted resource to get their questions answered." *Id.*

April 22, 2026

/s/ Gregg P. Leslie
Gregg P. Leslie

ii

# TABLE OF CONTENTS

Corporate Disclosure Statement ...................................................................................i

Statement of Consent of Parties...................................................................................i

Certificate of Necessity of Separate Brief ................................................................. ii

Table of Authorities ...................................................................................................iv

Statement of Identity and Interest of Amicus and Source of Authority to File...... vii

Statement of Authorship and Financial Contributions ........................................... vii

Argument.....................................................................................................................1

     The Government Impermissibly Seeks to Punish Speech by Senator Kelly
     that is Protected by the First Amendment .......................................................1

Conclusion .................................................................................................................16

Certificate of Compliance .........................................................................................17

Certificate of Service ................................................................................................18

# TABLE OF AUTHORITIES

## Cases

*Brandenburg v. Ohio*, 395 U.S. 444 (1969)......................................................................4

*Chiles v. Salazar*, No. 24–539, slip. op. at 8, 23 (U.S. Mar. 31, 2026) ...................13

*Crown v. John Peter Zenger, 1735*, Hist. Soc'y of the N.Y. Cts.,
    https://history.nycourts.gov/case/crown-v-zenger/
    (last visited Apr. 19, 2026) ...........................................................................................5

*Falwell v. Hustler,* 485 U.S. 46, 53 (1988)...................................................................7

*Garrison v. Louisiana,* 379 U.S. 64 (1964) .................................................................6

*New Hampshire v. Burnham*, 9 N.H. 34, 42–43 (1837) .............................................6

*Parker v. Levy*, 417 U.S. 733 (1974) .....................................................................2, 13

*Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986) ...............................7

Rules of Courts-Martial, Rule 916.................................................................................10

*Tollett v. United States,* 485 F.2d 1087, 1098 n.27 (8th Cir. 1973) .........................5

U.C.M.J. Art. 90.................................................................................................................10

*United States v. Calley*, 48 C.M.R. 19, 25 (U.S. C.M.A. 1973).................................9

*United States v. Smith*, 85 M.J. 283, 288 (C.A.A.F. 2024).........................................3

*United States v. Wilcox*, 66 M.J. 442 (C.A.A.F. 2008)........................... 3, 4, 10, 13

*Whitney v. California,* 274 U.S. 357, 375–76 (1927) ...............................................15

## Other Authorities

Briceno, Leo, *GOP Lawmakers Rally Behind Trump's Venezuela
    Strikes as Critics Question Legality*, FOX NEWS (Nov. 5, 2025),
    https://perma.cc/SKQ2-7LRK ......................................................................................14

Burger, Virginia, *Military Oaths and Unlawful Orders*, Project on Gov't
    Oversight (Nov. 21, 2025), https://tinyurl.com/nimjamicus2 .............................11

De Luce, Dan, et al., *Members of Congress Growing Concerned Over Lack of Information from Administration About Venezuela Strikes, Sources Say*, NBC NEWS (Oct. 15, 2025), https://perma.cc/4TUZ-LHSK ...............................14

Hall, Richard and Schneid, Rebecca, "U.S. Military Kills 14 in Strikes Against Alleged Cartel Boats in Deadliest Day of Campaign," TIME Magazine (Oct. 28, 2025), https://time.com/7328921/cartel-boats-pete-hegseth-pacific/...................14

Hersh, Seymour M., *The Massacre at My Lai*, The New Yorker (Jan. 15, 1972), https://www.newyorker.com/magazine/1972/01/22/coverup-my-lai-vietnam-war-seymour-hersh.......................................................................10

Keeton, W. Page, et al*., Prosser & Keeton on the Law of Torts* § 116 (5th ed. 1984).......................................................................................5

King, Henry T., Jr., *The Legacy of Nuremberg*, 34 Case W. Res. J. Int'l L. 335, 340–41 (2002), https://scholarlycommons.law.case.edu/jil/vol34/iss3/4/ .............8

Lamothe, Dan, and Missy Ryan, *With Pentagon Purge, Trump Thrusts Military into Uncharted Territory*, THE WASHINGTON POST (Feb. 22, 2025), https://perma.cc/8HCB-3D8E ...............................................................13

Off. of the Actuary, Dep't of Def., *Statistical Report on the Military Retirement System* 18 (2022)..................................................................17

Ramriez Uribe, Maria, *Fact-Checking Trump's Claim that Each Boat Strike Off Venezuelan's Coast Saves 25,000 Lives*, PBS NEWS (Oct. 19. 2025), https://perma.cc/E25D-7DDR ...............................................................14

Rules of the Senate, Rule XXV, 1(c)(1), at https://www.armed-services.senate.gov/about/history.......................................................17

Sack, Robert D., *Sack on Defamation: Libel, Slander, and Related Problems* 3–4 (5th ed. 2017, upd. 2025).................................................................6

Savage, Charlie, *L.A. Ruling Complicates Trump's Threats to Send Troops to More Cities*, THE NEW YORK TIMES (Sept. 2, 2025), https://perma.cc/6U3H-9U5M.............................................................13

Schmitt, Eric, et al., *U.S. Strikes a 2nd Venezuela Boat, Killing 3, Trump Says*, THE NEW YORK TIMES (Sept. 15, 2025), https://perma.cc/E33D-6XBJ ..............14

Schwartz, Mattathias, *Appeals Court to Weigh Legality of Deploying Troops to Portland*, THE NEW YORK TIMES (Oct. 9, 2025), https://perma.cc/9Q3P-54EV ...............................................................13

Solis, Gary D., *The Law of Armed Conflict: International Humanitarian Law in War* 397–99 (2d ed, Cambridge Univ. Press 2016), https://perma.cc/R3DQ-TCTR ..........................................................11

U.N. Int'l L. Comm'n, *Report of the International Law Commission Covering its 2d. Session, 5 June-29 July 1950*, 12 (General Assembly, 5th Session Supplement No. 12, 1950), https://digitallibrary.un.org/record/704679?v=pdf#files.......................................9

## STATEMENT OF IDENTITY AND INTEREST OF AMICUS
## AND SOURCE OF AUTHORITY TO FILE

The National Institute of Military Justice (NIMJ) is a private, non-profit organization founded in 1991, dedicated to ensuring the fair administration of justice within the armed forces and to improving public understanding of military justice. NIMJ's leadership includes former judge advocates, private practitioners, and legal scholars.

Rule 29(a)(2) gives *amicus curiae* authority to file this brief because all parties have consented to the filing.

## STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS

No counsel for any party has authored the brief in whole or in part; no party or a party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person contributed money that was intended to fund preparing or submitting the brief.

## ARGUMENT

## THE GOVERNMENT IMPERMISSIBLY SEEKS TO PUNISH SPEECH BY SENATOR KELLY THAT IS PROTECTED BY THE FIRST AMENDMENT

The Government effectively concedes that Senator Kelly's speech is protected by the First Amendment:

> There is no doubt that Kelly, like other retired officers, enjoys substantial First Amendment freedoms. There is no dispute that he may criticize military policy, question the legality of military operations, advocate for legislative change, and participate vigorously in public debate on national security issues.

Appellant Br. at 50.

The Government in substance repeats this position more than once in the appellant's brief. *See id.* at 2, 24. What the Government appears not to recognize is that this concession should end this case, because the challenged speech of Senator Kelly falls within the matters that the Government concedes are protected from governmental punishment or retaliation. Senator Kelly's questioned statements allegedly concern the legality of military orders and promotion of "yes men" by military leadership. J.A. 99. These are nothing more than "question[ing] the legality of military operations" and "criti[cism of] military policy. Appellant Br. at 50. The preliminary injunction below can be affirmed simply based on this dispositive concession by the Government.

1

Given the potential *in terrorem* effect of the Government's efforts to vilify and punish the Senator for his speech, NIMJ believes it would be helpful for this Court to emphasize in its decision that retired military officers do indeed enjoy these rights.

The Government's candid concession is in any event mandated by the First Amendment, both as generally applied and as tailored to suit the unique conditions of military service. The Supreme Court's one foray into this area, in *Parker v. Levy*, 417 U.S. 733 (1974), recognized that those conditions, and particularly the military's legitimate need to ensure discipline within the ranks, justifies some dilution in the full panoply of free speech rights that civilians enjoy. *Parker,* however, did not directly address how the content of speech might permissibly be restricted in the context of speech by an active service member, apparently because it was uncontested that the utterances of the accused were unprotected. *Id*. at 760–61. The only holding of *Parker* is that the vagueness and overbreadth doctrines— by which a speaker of unprotected utterances might escape punishment because others making different and protected statements might be caught by the regulation in question—did not apply with full vigor in the military content. *Id.* at 734–35. That holding, with which NIMJ does not quarrel, has no application here. *Parker* left unanswered the question of whether and to what extent military necessity might justify substantive alteration of the scope of protected speech under the First

2

Amendment by an active service member, much less by a retired service member (which was not involved in the case).

The most instructive precedent in the implementation of *Parker* in a case involving speech by an accused service member is *United States v. Wilcox*, 66 M.J. 442 (C.A.A.F. 2008). Although decisions by the Court of Appeals for the Armed Forces are not binding on this Court, *Wilcox* can usefully be consulted as it offers an analytical framework for assessing whether speech by a service member—in that case as in *Parker* an active service member—can be punished consistent with the First Amendment. Under the *Wilcox* approach, three questions must be addressed: first, whether the speech in question falls within one of the recognized narrow categories of speech unprotected by the First Amendment, such as obscenity and fighting words. *Id.* at 447. Second, whether there is a "direct and palpable connection between the speech and the military mission." *Id.* at 448–49. Third, even if such an effect could be shown, whether punishment of the speech by military discipline "is justified despite First Amendment concerns." *Id.* at 449; *see also United States v. Smith*, 85 M.J. 283, 288 (C.A.A.F. 2024) (involving government conceding that serviceman's speech did not burden military mission and should "be governed by the same First Amendment standards that apply in civilian courts").

3

Tested under the *Wilcox* analysis, Senator Kelly's disputed speech is not subject to punishment by military discipline of any sort because to do so would offend the First Amendment. First, none of the Senator's contested utterances falls within the narrow categories of unprotected speech—none is claimed to be incitement to imminent lawless action within the meaning of *Brandenburg v. Ohio*, 395 U.S. 444 (1969), or libel, obscenity, or "fighting words." *See Wilcox*, 66 M.J. at 447. Second, while the Government might contend that the Senator's comments were intended to have a "palpable effect" on service members, there is no evidence in the record that they did have such an effect. In any case, this prong of the test may be of little utility in this unusual case where the admonition that troops can refuse illegal orders would likely have had a *salutary* effect in alerting service members to the well-established rule forbidding adherence to illegal orders. The Court need not, however, resolve that question because the third prong of *Wilcox* is dispositive: under any fair balancing of military necessity against the fundamental right of free speech, Senator Kelly's speech should be protected.

The first and most important reason why the Senator's speech should be protected is that it constitutes truthful speech on a matter of public concern. Although the Secretary's letter of censure alludes vaguely to a number of statements by Senator Kelly, the thrust of the Secretary's claim arises from the public statement by the Senator and other legislators that service members can

refuse to follow illegal orders. That, however, is an unquestionably truthful statement of the law governing service members, and as such is absolutely protected by the First Amendment.

Much of the history of the First Amendment is the history of establishing that the government cannot punish truthful speech. While we may take that as uncontroversial today, it was not always so. Particularly in the field of libel, English common law not only did not afford a defense of truth but held that "the greater the truth, the greater the libel." *Tollett v. United States,* 485 F.2d 1087, 1098 n.27 (8th Cir. 1973); *see also* W. Page Keeton et al*., Prosser & Keeton on the Law of Torts* § 116 (5th ed. 1984). That rule was weaponized against the colonists by their British masters in the years before the Revolution most prominently in the famous case of John Peter Zenger, who was charged in 1734 with criminal libel for criticizing the actions of the Royal Governor of New York. Although the jury was instructed that truth was not a defense, Zenger's counsel successfully secured a not guilty verdict by arguing precisely that the criticisms Zenger had published about the governor were true—an early example of jury nullification but, more importantly, a landmark in the American conception of freedom of speech.[1]

---

[1] *See, e.g.*, *Crown v. John Peter Zenger, 1735*, Hist. Soc'y of the N.Y. Cts., https://history.nycourts.gov/case/crown-v-zenger/ (last visited Apr. 19, 2026).

The principle that Americans are free to speak the truth when criticizing public officials still had a lengthy gestation. Many states by statute eventually provided for a truth defense, but only when the truth was spoken "with good motives and for justifiable ends." *See* Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* 3–4 (5th ed. 2017, upd. 2025) (collecting statutes and cases). It was not until *Garrison v. Louisiana,* 379 U.S. 64 (1964), that the Supreme Court held that "[t]ruth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned." *Id*. at 74. That protection is unqualified. Accordingly, the Louisiana criminal libel statute at issue in that case, which allowed for a truth defense only where the utterance was made "with good motives and for justifiable ends," could not pass muster under the First Amendment. *Id.* at 70-73. The Court adopted as constitutional law an old decision of a state court that:

> If[,] upon a lawful occasion for making a publication, he has published the truth, and no more, there is no sound principle which can make him liable, even if he was actuated by express malice. . . . It has been said that it is lawful to publish truth from good motives, and for justifiable ends. But this rule is too narrow. If there is a lawful occasion—a legal right to make a publication—and the matter true, the end is justifiable, and that, in such case, must be sufficient.

*Id.* at 73 (*quoting State v. Burnham*, 9 N.H. 34, 42–43 (1837)).

Since *Garrison,* the principle that the law may not impose punishment for truthful discourse has become firmly embedded in our constitutional law. *See*

*Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986). [2] In the present case the government recognizes, as it must, that Senator Kelly's admonition to servicemembers that they can refuse to obey illegal orders is a truthful statement of the law. It argues, however, that the utterance is not protected because it was not an "abstract" iteration of the law but, "in context," was intended to prompt service members to "refuse particular operations that [Kelly] characterized as illegal." J.A. 100. Yet, that is precisely the type of allegation that *Garrison* forecloses. It is tantamount to arguing that Kelly spoke the truth but with a bad motive and an unjustifiable end—a limitation that our First Amendment jurisprudence has labored for two centuries to eliminate. The defense of truth is absolute and unqualified and its application here precludes punishment of Senator Kelly for accurately stating the law.

Attempting to punish the Senator for truthful speech is especially misguided because the subject on which he spoke—the duty not to obey illegal orders—is fundamental to our Nation's military. The modern prohibition of the "superior orders" defense, otherwise known as the "just following orders" defense, was codified after the Nuremberg trials. *See* Henry T. King Jr., *The Legacy of*

---

[2] Although *Garrison* and *Hepps,* like many modern cases setting forth the scope of First Amendment protection, were defamation cases, their teaching extends generally to the domain of freedom of speech. *See, e.g.*, *Falwell v. Hustler,* 485 U.S. 46, 53 (1988) (favorably citing *Garrison* and *Hepps* in claim for intentional infliction of emotional distress governed by First Amendment principles) .

*Nuremberg*, 34 Case W. Res. J. Int'l L. 335, 340–41 (2002), https://scholarlycommons.law.case.edu/jil/vol34/iss3/4/. The Nuremberg Tribunal rejected the "superior orders" defense asserted by former prominent members of defeated Nazi Germany. *Id.* And the International Law Commission subsequently codified the Tribunal's reasoning as Nuremberg Principle IV: "The fact that a person acted pursuant to order of his Government or of a superior does not relieve him from responsibility under international law, provided a moral choice was in fact possible to him." U.N. Int'l L. Comm'n, *Report of the International Law Commission Covering its 2d. Session, 5 June-29 July 1950*, 12 (General Assembly, 5th Session Supplement No. 12, 1950), https://digitallibrary.un.org/record/704679?v=pdf#files.

The duty not to obey illegal orders has since been internalized in subsequent development in the law of armed conflict. In the United States, the tragedy of the My Lai massacre and ensuing trial and conviction of Lieutenant William L. Calley, Jr. is a clear example our military's respect and commitment to this principal as a binding obligation upon its personnel.

On the morning of March 16, 1968, Lieutenant Calley and the soldiers of Charlie Company under his command entered the hamlet of My Lai. Seymour M. Hersh, *The Massacre at My Lai*, The New Yorker (Jan. 15, 1972), https://www.newyorker.com/magazine/1972/01/22/coverup-my-lai-vietnam-war-

8

seymour-hersh. Upon finding no enemy combatants, Lieutenant Calley ordered the massacre of the present civilians, almost all women, children, and elderly men. *Id.*

At his court-martial hearing, Lieutenant Calley raised the defense that he was acting upon orders from his superior, Captain Ernest Medina. *United States v. Calley*, 48 C.M.R. 19, 25 (U.S. C.M.A. 1973). The trial judge instructed the jury, "if unresisting human beings were killed at My Lai while within the effective custody and control of our military forces, their deaths cannot be considered justified, and any order to kill such people would be, as a matter of law, an illegal order." *Id.* at 26. The jury convicted Calley for premeditated murder of twenty-two civilians. *Id.* at 21. On appeal, the United States Court of Military Appeals affirmed, adopting the standard a serviceman is to be held criminally liable should he obey an order that "a man of ordinary sense and understanding" would recognize as illegal. *Id.* at 30–31.

To this day, the My Lai Massacre and Lieutenant Calley's trial are among the materials utilized to train newly commissioned military officers. *See, e.g.*, Virginia Burger, *Military Oaths and Unlawful Orders*, Project on Gov't Oversight (Nov. 21, 2025), https://tinyurl.com/nimjamicus2; Gary D. Solis, *The Law of Armed Conflict: International Humanitarian Law in War* 397–99 (2d ed, Cambridge Univ. Press 2016), https://perma.cc/R3DQ-TCTR. They show incidents where officers failed to uphold their oath and facilitated the execution of unlawful

orders and actions and testify to the commitment embedded in the Uniform Code of Military Justice that obedience to orders "the accused knew ... to be unlawful or a person of ordinary sense and understanding would have known ... to be unlawful" will be punished no less than disobedience to lawful ones. *See* U.C.M.J. Art. 90; Rules of Courts-Martial, Rule 916(d).

To the extent the Government seeks to sustain its proposed discipline of Senator Kelly based on statements other than the admonition that they can choose not to follow illegal orders, its position likewise cannot be justified in light of the First Amendment. *Wilcox*, 66 M.J. at 449. The other statements, including the Senator's alleged critiques of the hiring of "yes men" and conducting of potentially illegal operations, are core First Amendment-protected utterances on matters of the highest moment to our nation at a time when we are at war and our military is being deployed in unprecedented ways. One need not agree with Senator Kelly's position on any issue—and NIMJ takes no position as to whether his critiques are warranted—to conclude that his right to voice his concerns must be protected. For that reason, the Government's insistence on this appeal that all of its "orders" are lawful is of no moment—the Senator nonetheless has the right to contest them.[3]

---

[3] As the Appellee's brief accurately points out, it is not even clear which orders the Secretary believes Senator Kelly was referencing when he admonished service members that they can choose not to follow illegal orders. *See* Appellee Br. at 26. By the very nature of his statement, the Senator must have been referring to future orders the identity and lawfulness of which cannot now be ascertained.

The issues on which the Senator commented and are now the premise for military discipline were the subject of intense public debate before the video was released. Various popular media outlets such as PBS, NBC, *The New York Times*, *The Washington Post*, and Fox News have widely covered a range of topics such as the attacks on boats for drug interdiction, President Trump's orders to send troops to U.S. cities, and the firing of senior Pentagon officials. The public debate on each of these topics existed prior to the Senator's comments. On February 22, 2025, *The Washington Post* reported on Trump's "Pentagon purge," noting that it "thrust the military into uncharted territory."[4] On September 2, 2025, *The New York Times* reported on the Los Angeles federal court ruling that barred the federal government from using troops in California to engage in certain activities.[5] Finally, throughout the month of September and early October 2025, predating the Senator's comments, PBS,[6] NBC,[7] Fox News,[8] and *The New York Times*,[9] each separately reported on the U.S. military strikes against Venezuelan boats suspected of

---

[4] Dan Lamothe and Missy Ryan, *With Pentagon Purge, Trump Thrusts Military into Uncharted Territory*, THE WASHINGTON POST (Feb. 22, 2025), https://perma.cc/8HCB-3D8E.

[5] Charlie Savage, *L.A. Ruling Complicates Trump's Threats to Send Troops to More Cities*, THE NEW YORK TIMES (Sept. 2, 2025), https://perma.cc/6U3H-9U5M; *see also* Mattathias Schwartz, *Appeals Court to Weigh Legality of Deploying Troops to Portland*, THE NEW YORK TIMES (Oct. 9, 2025), https://perma.cc/9Q3P-54EV (discussing a similar decision applying to Portland.)

[6] Maria Ramriez Uribe, *Fact-Checking Trump's Claim that Each Boat Strike Off Venezuelan's Coast Saves 25,000 Lives*, PBS NEWS (Oct. 19. 2025), https://perma.cc/E25D-7DDR.

[7] Dan De Luce et al., *Members of Congress Growing Concerned Over Lack of Information from Administration About Venezuela Strikes, Sources Say*, NBC NEWS (Oct. 15, 2025), https://perma.cc/4TUZ-LHSK.

[8] Leo Briceno, *GOP Lawmakers Rally Behind Trump's Venezuela Strikes as Critics Question Legality*, FOX NEWS (Nov. 5, 2025), https://perma.cc/SKQ2-7LRK.

[9] Eric Schmitt et al., *U.S. Strikes a 2nd Venezuela Boat, Killing 3, Trump Says*, THE NEW YORK TIMES (Sept. 15, 2025), https://perma.cc/E33D-6XBJ.

transporting illicit drugs. Some accounts specifically discussed whether the strikes were illegal. *See* Hall, Richard and Schneid, Rebecca, "U.S. Military Kills 14 in Strikes Against Alleged Cartel Boats in Deadliest Day of Campaign," TIME Magazine (Oct. 28, 2025), *available at* https://time.com/7328921/cartel-boats-pete-hegseth-pacific/ ("Legal experts have questioned the legality of Trump's bombing of suspected civilian cartel members without any attempt to intercept or capture the offenders, and without approval from Congress.")

The Senator thus was not seeking to foment a dispute on any of these issues, but was merely commenting on debates already in the public sphere. As the Supreme Court emphasized in *New York Times v. Sullivan*, 376 U.S. 254, 271 (1964), any attempt to use the law to suppress debate on matters of public concern must be decided against the background of a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open, and that it may include vehement, caustic and sometimes unpleasantly sharp attacks on government and public officials." This understanding of the "central meaning of the First Amendment," i*d.* at 273, was recently reiterated:

> In this Nation, no official—"high or petty"—may command our tongues or silence our voices.
> . . .
> The First Amendment stands as a shield against any effort to enforce orthodoxy in thought or speech in this country. It reflects instead a judgment that every American possesses an inalienable right to think and speak freely, and a faith in the free marketplace of ideas as the best means for discovering truth.

12

*Chiles v. Salazar*, No. 24–539, slip. op. at 8, 23 (U.S. Mar. 31, 2026).

Although the principles discussed above should suffice to decide this appeal in favor of Senator Kelly, there are at least two additional factors that further commend this result. First, Senator Kelly is a retired, not active, military officer, and there are many reasons to conclude that retirees in his position categorically are not subject to military discipline for their speech on public issues. Appellee Br. at 32–42. Yet, this Court need not reach the hypothetical question whether there is *any* utterance by a retired military officer that could, consistent with the First Amendment, become the subject of military discipline.[10] That hypothetical is not presented by this case. But the fact that the accused speaker here is a retiree should be seen as a significant weight on the scale in any balancing test the Court engages in under *Parker* and *Wilcox.*

That is so for several reasons. First, like any retiree Senator Kelly is not in the chain of command and cannot exact obedience or discipline service members who ignore or reject his counsel. Second, service members who hear his speech would understand that, as a retiree who leads a civilian life, he is not speaking *ex cathedra* as a government spokesperson. Third, there are over seven hundred-

---

[10] Similarly, this case does not present the question whether the same statements uttered by Senator Kelly, if uttered by an active-duty service member, would be protected. As with the hypothetical mentioned in text, NIMJ takes no position on this question.

thousand retired military officers,[11] and a ruling against Kelly would silence an inordinate number of persons who may have relevant facts and opinions to share. Disenfranchising such a large group of persons who have served our nation of their free speech rights seems extraordinarily misguided.

The other factor counseling protection for Senator Kelly's speech is that he is a legislator, and indeed sits on the Senate Armed Service Committee which has formal oversight authority of the military, and to which is referred:

> all proposed legislation, messages, petitions, memorials, and other matters relating to the following subjects: …
>> 3. Department of Defense, the Department of the Army, the Department of the Navy, and the Department of the Air Force, generally.

Rules of the Senate, Rule XXV, 1(c)(1), at https://www.armed-services.senate.gov/about/history. In addition, the committee "shall also study and review, on a comprehensive basis, matters relating to the common defense policy of the United States, and report thereon from time to time." *Id.* at 1(c)(2).

Sen. Kelly would be remiss in his obligations as a senator and member of the Armed Services Committee were he not to express himself publicly on current questions of intense public interest and debate concerning the lawfulness of military operations. The view expressed by Justice Brandeis as to the "political duty" of all citizens to engage in debate on the issues of the day applies *a fortiori*

---

[11] Off. of the Actuary, Dep't of Def., *Statistical Report on the Military Retirement System* 18 (2022).

to someone in the position of Senator Kelly:

> Those who won our independence believed . . . that public discussion is a political duty, and that this should be a fundamental principle of the American government. They recognized the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies, and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law—the argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed.

*Whitney v. California,* 274 U.S. 357, 375–76 (1927) (Brandeis, J., concurring).

15

# CONCLUSION

The Court should affirm the decision below.

/s/ Gregg P. Leslie
Gregg P. Leslie, *Counsel of Record*
James Weinstein
ASU Sandra Day O'Connor College of Law*
First Amendment Clinic
111 E. Taylor St., Mail Code 8820
Phoenix, AZ 85004

*Of counsel:*
Robert P. LoBue
Patterson Belknap Webb & Tyler LLP
1133 Ave. Americas
New York, NY 10036
212-336-2000

*\* Counsel would like to acknowledge the assistance of two clinical students in the preparation of this brief, Christina Ge and Anne Weiler.*

## CERTIFICATE OF COMPLIANCE

I certify that this brief contains 3,736 words, with the exception of the portions not required to be counted, and complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Times New Roman font.

April 22, 2026

/s/ Gregg P. Leslie
Gregg P. Leslie

17

## CERTIFICATE OF SERVICE

Filing of this brief and service on all parties was conducted through the

Court's ECF system, consistent with F.R.A.P. 25 and Circuit Rule 25.


April 22, 2026

/s/ Gregg P. Leslie
Gregg P. Leslie