# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

MARK KELLY, United States Senator Representing the State of Arizona,

*Plaintiff-Appellee,*

v.

PETE HEGSETH, in his Official Capacity as Secretary of Defense; U.S. DEPARTMENT OF DEFENSE; JOHN C. PHELAN, in his Official Capacity as Secretary of the Navy; U.S. DEPARTMENT OF THE NAVY,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia, No. 1:26-cv-00081-RJL

## BRIEF OF *AMICUS CURIAE*
## FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
## IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE

Zachary T. Silver
Jacob N. Gaba
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
(215) 717-3473
zach.silver@fire.org
jacob.gaba@fire.org

Ronald G. London
  *Counsel of Record*
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
(215) 717-3473
ronnie.london@fire.org

*Counsel for* Amicus Curiae

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES AND CORPORATE DISCLOSURE STATEMENT

All parties, intervenors, and *amici* appearing before the district court and in this Court; references to the rulings at issue; and any related cases are listed in the parties' briefs.

The Foundation for Individual Rights and Expression was not *amicus* in the district court but is *amicus* in this Court.

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amicus curiae* certifies that (1) *amicus* does not have any parent corporations, and (2) no publicly held companies hold 10% or more of the stock or ownership interest in any *amicus*. *Amicus* is a nonprofit corporation exempt from income tax under the Internal Revenue Code, 26 U.S.C. § 501(c)(3).

Dated: April 22, 2026

/s/ *Ronald G. London*
Ronald G. London
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION

*Counsel for* Amicus Curiae

## STATEMENT REGARDING CONSENT TO FILE AND CERTIFICATE REGARDING SEPARATE BRIEFING

All parties consent to this brief's filing. No counsel for a party authored this brief and no person, other than *amicus*, its members, or their counsel contributed money intended to fund this brief's preparation or submission.

Pursuant to D.C. Circuit Rule 29(d), counsel for *amicus* certifies that a separate brief is necessary. *Amicus* is a nonpartisan nonprofit that defends expressive rights nationwide. *Amicus*'s brief offers a unique perspective, grounded in this expertise, about the significant threats to freedom of speech at stake in this action. Counsel for *amicus* conferred with counsel for other prospective *amici* whose briefs might overlap and, after doing so, determined its brief would not materially overlap with other *amicus* briefs.

Dated: April 22, 2026

/s/ *Ronald G. London*

Ronald G. London
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION

*Counsel for* Amicus Curiae

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES AND CORPORATE DISCLOSURE STATEMENT ...................... i

STATEMENT REGARDING CONSENT TO FILE AND CERTIFICATE REGARDING SEPARATE BRIEFING ........................ ii

TABLE OF AUTHORITIES .................................................................v

INTEREST OF *AMICUS CURIAE*............................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................... 2

ARGUMENT......................................................................... 7

I.   The Government's Retaliation Against Senator Kelly for Criticizing Military Policy and Officials Is Unconstitutional Under Ordinary First Amendment Principles. .................................................................. 7

II.  Extending *Parker v. Levy* to Retired Servicemembers Would Contravene Settled First Amendment Doctrine by Creating a Novel, Status-Based Exception............................10

    A.   *Parker* established a contextual rule tied to active-duty service in the chain of command. ................................11

    B.   Military jurisdiction over retirees does not resolve the First Amendment question...............................................15

    C.   The government improperly seeks to extend *Parker* to create a new category of unprotected speech................................................................18

    D.   There is no deep-rooted understanding of diminished First Amendment protection for retirees who criticize military policy. ..................................21

III. Applying *Parker* to Senator Kelly Would Chill Protected Speech, Imperil Public Debate, and Distort First Amendment Doctrine................................................................24

A.      The government's retaliation against Senator Kelly shows how its proposed rule would silence other retirees and deprive the public of informed debate. ..............................................25

B.      The government's status-based theory has no limiting principle and threatens spillover beyond the military context. ...........................................28

CONCLUSION..............................................................................32

# TABLE OF AUTHORITIES

**Cases**

*Bond v. Floyd,*
  385 U.S. 116 (1966) ..................................................................... 8

*Brown v. Ent. Merchs. Ass'n,*
  564 U.S. 786 (2011) ...............................................................19, 20, 21

*Chaplinsky v. New Hampshire,*
  315 U.S. 568 (1942) ..................................................................... 5

*Chiles v. Salazar,*
  146 S. Ct. 1010 (2026) ..................................... 5, 9, 18, 19, 24

*Cohen v. California,*
  403 U.S. 15 (1971) ..................................................................... 8

*Connick v. Myers,*
  461 U.S. 138 (1983) ...................................................................8, 30

*Elrod v. Burns,*
  427 U.S. 347, 373 (1976) ...................................................28

*Forsyth County v. Nationalist Movement,*
  505 U.S. 123 (1992) ...................................................................20

*Garcetti v. Ceballos,*
  547 U.S. 410 (2006) ...................................................................30

*Goldman v. Weinberger,*
  475 U.S. 503 (1986) ...................................................................12

*Iancu v. Brunetti,*
  588 U.S. 388 (2019) ..................................................................... 9

*Kelly v. Hegseth,*
  No. 1:26-cv-00081, 2026 WL 391777 (D.D.C. Feb. 12, 2026).........12, 13

*Larrabee v. Del Toro,*
  45 F.4th 81 (D.C. Cir. 2022).......................................................15, 16

*Millican v. United States,*
744 F. Supp. 2d 296 (D.D.C. 2010) ...................................13

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra,*
585 U.S. 755 (2018) .............................................................. 5

*Parker v. Levy,*
417 U.S. 733 (1974) ........................3, 4, 10, 11, 12, 16, 18, 29

*Pickering v. Bd. of Educ.,*
391 U.S. 563 (1968) ..............................................................30

*Priest v. Sec'y of the Navy,*
570 F.2d 1013 (D.C. Cir. 1977) ..........................................13

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015) .........................................................9, 10

*Reid v. Covert,*
354 U.S. 1 (1956) .................................................................16

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
592 U.S. 14 (2020) ...............................................................28

*Rosenberger v. Rectors & Visitors of Univ. of Va.,*
515 U.S. 819 (1996) ..........................................................6, 9

*Snyder v. Phelps,*
562 U.S. 443 (2011) .............................................................. 8

*Texas v. Johnson,*
491 U.S. 397 (1989) .............................................................. 9

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
393 U.S. 503 (1969) .............................................................. 8

*United States v. Alvarez,*
567 U.S. 709 (2012) ..........................................................5, 19

*United States v. Anderson,*
78 M.J. 727 (A. Ct. Crim. App. 2019)................................ 2

*United States v. Begani,*
81 M.J. 273 (C.A.A.F. 2021) ...............................................................17

*United States v. Bergdahl,*
80 M.J. 230 (C.A.A.F. 2020) ..............................................................17

*United States v. Hooper,*
26 C.M.R. 417 (C.M.A. 1958) .............................................................17

*United States v. Nat'l Treasury Emps. Union,*
513 U.S. 454 (1995) ...........................................................................30

*United States v. Playboy Ent. Grp., Inc.,*
529 U.S. 803 (2000) ...........................................................................10

*United States v. Priest,*
45 C.M.R. 338 (C.M.A. 1972) .............................................................29

*United States v. Smith,*
85 M.J. 283 (C.A.A.F. 2024) ..............................................................29

*United States v. Stevens,*
559 U.S. 460 (2010) ........................................................... 5, 18, 20, 21

*United States v. Wilcox,*
66 M.J. 442 (C.A.A.F. 2008) ..............................................................29

## Constitutional Provisions and Statutes

10 U.S.C. § 892 .................................................................................... 2

U.S. Const. art. I, § 8, cl. 14 ...............................................................15

## Other Authorities

*Comments on Monroe's* A View of the Conduct of the Executive of the United States*, March 1798*, Nat'l Archives: Founders Online ............27

*From Bunker Hill to Capitol Hill: Representative Henry Dearborn and the New Nation*, Whereas: Stories from the People's House (June 17, 2025) ..................................................................................................26

James Monroe, *A View of the Conduct of the Executive, in the Foreign Affairs of the United States, Connected with the Mission to the French Republic, During the Years 1794, 5, & 6* (Philadelphia, Benjamin Franklin Bache 1797) ........................................................................26

*Rediscovering Revolutionary War Veterans*, Whereas: Stories from the People's House (Jan. 22, 2026) ........................................................25

Sen. Elissa Slotkin (@SenatorSlotkin), X (Nov. 18, 2025, at 08:30 ET)..2

Smedley D. Butler, *War Is a Racket* (1935) (Feral House 2003) ............27

## INTEREST OF *AMICUS CURIAE*

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan nonprofit that defends the individual rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended First Amendment rights nation-wide without regard to speakers' views through public advocacy, targeted litigation, and *amicus curiae* filings in cases implicating expressive rights. *See, e.g.*, Br. *Amici Curiae* FIRE et al., *Anthropic PBC v. U.S. Dep't of War*, No. 26-1049 (D.C. Cir. filed Mar. 9, 2026); *Stanford Daily Publ'g Corp. v. Rubio*, No. 5:25-cv-06618 (N.D. Cal. filed Aug. 6, 2025); *Volokh v. James*, 148 F.4th 71 (2d Cir. 2025). This includes cases involving the free speech rights of public officials or employees, especially those whose roles grant them perspective invaluable to informed public debate. Br. *Amicus Curiae* FIRE, *Libby v. Fecteau*, No. 25-1384, 2025 WL 2932939 (1st Cir. July 22, 2025); Br. *Amicus Curiae* FIRE, *Damiano v. Grants Pass Sch. Dist. No. 7*, 140 F.4th 1117 (9th Cir. 2025); *Reges v. Cauce*, 162 F.4th 979 (9th Cir. 2025); *Nazarene v. Laux*, No. 1:25-cv-17770 (D.N.J. filed Nov. 20, 2025).

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case concerns speech at the heart of the First Amendment's protection: criticism of government officials and policy. Amid military strikes on boats allegedly smuggling drugs in the Caribbean and as President Trump weighed deploying troops domestically, Senator Mark Kelly joined five other members of Congress—all veterans of the military or intelligence community—in a video titled "Don't Give Up the Ship."[1] In that video and related public statements, Senator Kelly reiterated the settled principle that servicemembers "can refuse illegal orders,"[2] encouraged them to be "vigilan[t]" and to "stand up for … who we are as Americans," and criticized the Trump administration for "pitting our uniformed military" against the American public. JA116. Secretary of Defense Pete Hegseth responded by issuing a letter of censure to Senator

---

[1] Sen. Elissa Slotkin (@SenatorSlotkin), X (Nov. 18, 2025, at 08:30 ET), https://x.com/SenatorSlotkin/status/1990774492356902948 [https://perma.cc/6Z5F-922M].

[2] *United States v. Anderson*, 78 M.J. 727, 735 n.13 (A. Ct. Crim. App. 2019) ("Soldiers never have a duty to obey unlawful orders."), *set aside on other grounds*, 79 M.J. 299 (C.A.A.F. 2019), *aff'd and reiterated on remand*, 79 M.J. 762, 766 n.6 (A. Ct. Crim. App. 2020); *see also* 10 U.S.C. § 892 (UCMJ art. 92) (servicemember who "violates or fails to obey any *lawful* general order or regulation" is subject to punishment by court-martial (emphasis added)).

Kelly, initiating proceedings to reduce his retirement rank and pay, and threatening "criminal prosecution or further administrative action" if he continued to speak in similar terms. JA63–65, 127–32 [¶¶ 86–108].[3]

The government neither defends those actions under ordinary First Amendment rules nor contends Senator Kelly's speech falls within any recognized category of unprotected expression. Instead, it advances a far more sweeping claim: Because Senator Kelly retired from military service rather than receiving a discharge, he remains sufficiently connected to the armed forces that the Executive may punish his speech—expression that no doubt receives full constitutional protection coming from a civilian speaker. But that theory depends entirely on extending the Supreme Court's decision in *Parker v. Levy*, 417 U.S. 733 (1974), far beyond the operational demands of active-duty service that justified it.

The Court decided *Parker* in the context of active-duty military life—not retired veteran speech—involving an Army captain punished by a court-martial for publicly urging enlisted soldiers to disobey orders

---

[3] President Trump and Secretary Hegseth also publicly branded Senator Kelly's statements as "sedition" and "treason." JA103–05 [¶¶ 2–3, 7], 119–23 [¶¶ 64–66, 70, 72].

which might send them into combat. *Id.* at 736–37. The Court upheld that discipline because the captain spoke where the "fundamental necessity for obedience" in the "separate" and "specialized society" of the active-duty chain of command could justify different application of First Amendment principles. *Id.* at 743–44, 758. And notably for present purposes, *Parker* itself underscored it "would be constitutionally impermissible" to punish comparable speech by those who remain "outside" that society. *Id.* at 758.

*Parker* accordingly did not announce a permanent, speaker-based reduction in constitutional protection for anyone with some continuing tie to the armed forces. And it certainly did not authorize punishment of retirees speaking from civilian life on matters of public concern. Extending *Parker* here would sever it from its active-duty rationale and convert a contextual rule tied to present command relationships into a status-based exception untethered from actual military necessity. The government's theory is therefore remarkable not only because it misreads *Parker*, but because of what it would create in its place.

If accepted, the government's position would effectively establish a new category of unprotected expression: speech by retired

servicemembers which the Secretary of Defense unilaterally deems too dangerous, disruptive, or influential—contrary to the Supreme Court's repeated rejection of such doctrinal innovation. Outside a few "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem," the First Amendment does not authorize courts to strip speech of constitutional protection based on ad hoc balancing of value against asserted harm. *United States v. Stevens*, 559 U.S. 460, 468–70 (2010) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942)); *accord Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026) (citing *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (plurality opinion), and *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 767 (2018)).

Yet all the government offers here is its assertion that it may punish Senator Kelly's speech because Secretary Hegseth believes it "undermines trust in leadership; creates legal confusion; encourages insubordination; damages morale; and harms public confidence." JA64. It identifies no settled understanding of treating retirees' public criticism of military policy as a class of speech with diminished constitutional protection. Quite the opposite: Since the Republic's earliest years,

veterans have moved into civilian political life and criticized military and foreign policy in uncompromising terms. The response to that speech was political parrying and counter-speech—not censorship, not loss of benefits, and not the novel claim that prior military service reduced the speaker's First Amendment rights.

This case is thus straightforward under ordinary First Amendment principles. The government punished Senator Kelly because it didn't like what he had to say. The government also objects to his views about servicemembers' duties and the conduct of defense officials, and it deems the message too dangerous to tolerate. That is the particularly "egregious form of content discrimination" known as unconstitutional viewpoint discrimination. *Rosenberger v. Rectors & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1996).

The government cannot avoid that conclusion by invoking Senator Kelly's retiree status then citing *Parker*'s narrow context tied to active-duty service in the chain of command. Military jurisdiction over retirees does not answer the distinct First Amendment question presented here. A longstanding rule of jurisdiction cannot be repackaged as a longstanding rule of censorship.

Accepting the government's attempt to create a novel, status-based exception with no historical foundation and no limiting principle would have serious practical and doctrinal consequences. It would chill speech by retired servicemembers, deprive the public of insight necessary for informed debate on military affairs, and erode First Amendment protection wherever the government can point to some residual status relationship and claim the speech is too risky to tolerate. The record shows the government has not merely threatened Senator Kelly with future sanction—it has censured him, initiated proceedings affecting his rank and benefits, and warned that similar speech may prompt further punishment. Other retirees will undoubtedly take the hint. Because the government's theory fails on the merits and its adoption would broadly chill protected speech, the Court should affirm the preliminary injunction.

## ARGUMENT

I. **The Government's Retaliation Against Senator Kelly for Criticizing Military Policy and Officials Is Unconstitutional Under Ordinary First Amendment Principles.**

The government's actions here are a straightforward violation of the First Amendment. Speech about government policy and official conduct "occupies the highest rung of the hierarchy of First Amendment

7

values, and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)). Senator Kelly's statements fall squarely within that core protection. He opined in ways to which the government objects about military policy, the legality of military operations, servicemembers' duties as to unlawful orders, and senior defense officials' conduct—all matters of profound public concern. *See id.* at 454; *Bond v. Floyd*, 385 U.S. 116, 135–37 (1966); *see also Cohen v. California*, 403 U.S. 15, 18 (1971); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 510–11 (1969).

Whether one agrees with Senator Kelly's views is beside the point. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because [it] finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). But that is exactly what happened here.

The censure letter and retirement-grade proceedings rested not on the time, place, or manner of Senator Kelly's speech, but on what he said. JA63–64. The government does not deny that. Rather, it defends Secretary Hegseth's actions based on his determination that the message

"cross[ed] the line into unprotected speech" because it was "prejudicial to good order and discipline." Appellants' Br. 22, 27. That is quintessential content discrimination. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163–64 (2015) (government action "is content based if [it] applies to particular speech because of the topic discussed or the idea or message expressed"). And because the government punished Senator Kelly for expressing disfavored views about military leadership and servicemembers' obligations, it is also viewpoint discrimination that "draw[s] a line based on the 'ideology' of the speaker," *Chiles*, 146 S. Ct. at 1030 (Kagan, J., concurring) (quoting *Rosenberger*, 515 U.S. at 829), and operates as an "egregious form of content discrimination." *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019) (quoting *Rosenberger*, 515 U.S. at 829–30).

Such restrictions are presumptively unconstitutional and subject to the most demanding scrutiny, *Reed*, 576 U.S. at 163–64, a standard the government comes nowhere close to satisfying. It identifies no concrete, imminent disruption caused or threatened by Senator Kelly's speech, but relies only on the Secretary's prediction that Senator Kelly's words might create confusion or encourage insubordination. The First Amendment does not permit the Executive to punish speech because officials believe

it may be persuasive, unsettling, or influential. "It is through speech that our convictions and beliefs are influenced, expressed, and tested." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 817 (2000). That principle has special force where, as here, the speech concerns the lawfulness of government action and the conduct of those who wield state power.

## II. Extending *Parker v. Levy* to Retired Servicemembers Would Contravene Settled First Amendment Doctrine by Creating a Novel, Status-Based Exception.

The government errs in arguing ordinary First Amendment principles do not apply to Senator Kelly's speech under *Parker v. Levy*. In *Parker*, the Supreme Court upheld the discipline of an active-duty Army captain who publicly criticized the Vietnam War and urged enlisted personnel to refuse deployment orders to Vietnam. 417 U.S. at 744. In so doing, the Court stressed that he spoke from within the chain of command, where daily discipline and immediate obedience are essential. *Id.* at 758. Senator Kelly, however, spoke in a fundamentally different setting: as a civilian, outside any active-duty command structure.

The government cannot erase that difference by invoking Senator Kelly's retiree status. Even assuming retirees remain "in the armed forces" for some purposes, that does not answer the distinct

10

constitutional question presented here of what First Amendment standard governs military retiree speech on matters of public concern. The government asks this Court to recognize a novel, status-based exception with no limiting principle, no historical foundation, and no recognition by any court. Under its proposed rule, speech could lose constitutional protection not by falling within any settled First Amendment exception but based on the speaker's identity. This Court should reject that view.

### A. *Parker* established a contextual rule tied to active-duty service in the chain of command.

*Parker* did not announce a free-floating rule that military affiliation, however attenuated, always diminishes speech rights—far from it. There, the Supreme Court expressly recognized servicemembers "are not excluded from the protection granted by the First Amendment." 417 U.S. at 758. What justified a different application of First Amendment principles in *Parker* was the setting in which Levy spoke: active-duty military life, where the government's interest is shaped by present command relationships and the need for immediate obedience. *Id.* at 758–59. *Parker* accordingly emphasized the "different character of the military community," its status as a "specialized society separate

11

from civilian society," and the "fundamental necessity for obedience" inside the active-duty command structure. *Id.* at 744, 758. The rule *Parker* recognized was inseparable from that context.

Consistent with that rationale, the cases the government and the district court discussed overwhelmingly involve *active-duty* servicemembers, reserve personnel in *active* status, National Guard members *actively serving* in military roles, or speech on military bases. *See, e.g.*, *Goldman v. Weinberger*, 475 U.S. 503, 507–10 (1986) (upholding prohibition on wearing religious apparel while in uniform based on "military's perceived need for uniformity"), *cited in* Appellant's Br. 29, 31–32, *and Kelly v. Hegseth*, No. 1:26-cv-00081, 2026 WL 391777, at \*9 (D.D.C. Feb. 12, 2026); *Priest v. Sec'y of the Navy*, 570 F.2d 1013, 1016–18 (D.C. Cir. 1977) (upholding active-duty servicemember's conviction for distributing critical newsletter to active-duty personnel in the Pentagon), *cited in* Appellants' Br. 28–29, 31, 33, 35, 45; *Millican v. United States*, 744 F. Supp. 2d 296, 307–08 (D.D.C. 2010) (upholding active-duty servicemember's conviction for encouraging squadron members to disobey orders), *cited in* Appellants' Br. 21, 32, 36, *and Kelly*, 2026 WL 391777, at \*9). What unites those decisions is not simply the speaker's

formal military status, but the presence of conditions that justified *Parker* in the first place: current subordination to orders, immediate interaction with the chain of command, and realistic prospects that the speech would disrupt obedience within that structure.

Those conditions are absent here. Unrecalled retirees like Senator Kelly do not command units, carry out orders, train and supervise subordinates, or operate within the immediate command environment that underlies *Parker*'s rationale. Whatever formal military ties retirees may retain, they live and participate in civil society, not in the "separate" and "specialized society" of the active-duty command structure. The government's attempt to treat those two settings as constitutionally interchangeable ignores *Parker*'s logic.

The government's authorities do not reach this case. As Senator Kelly and the district court correctly observed, the government identified no case extending *Parker* to retirees speaking from civilian life.[4] And it has not remedied that deficiency on appeal. That absence underscores the obvious point that speech in the active-duty context, on which

---

[4] Appellee's Br. 32–35; JA33; *accord* Pl.'s Mem. Supp. Prelim. Inj. 24–25, *Kelly*, 2026 WL 391777, Dkt. No. 2-1; Pl.'s Reply Supp. Prelim. Inj. 11–13, *Kelly*, 2026 WL 391777, Dkt. No. 21.

*Parker*'s rationale is premised, is entirely different from speech in other settings.

Nor can the government solve that problem by conflating influence with command. A retired officer may speak with experience, credibility, and moral authority derived from prior service. He does not, by virtue of retired status alone, possess present authority to issue orders, demand obedience, or discipline personnel. And the First Amendment does not permit the government to punish speech simply because the speaker may be influential. What made Levy's speech constitutionally different in *Parker* was not that he might persuade servicemembers—it was that he spoke as an active-duty officer within a chain of command that depends on immediate obedience.

The government's contrary theory would untether *Parker* from its active-duty setting and transform it into something broader: a permanent, speaker-based reduction in constitutional protection keyed to residual military status alone. The Supreme Court did not create such a rule. This Court should not, either.

## B. Military jurisdiction over retirees does not resolve the First Amendment question.

Unable to show that the active-duty grounding of *Parker* exists here, the government shifts from context to status. It argues *Parker* is "equally applicable" to retirees simply because they "remain subject to military discipline for their words and actions that undermine military order." Appellants' Br. 23, 48. *See generally* U.S. Const. art. I, § 8, cl. 14. That is a non sequitur. Even if the military may have jurisdiction to discipline retirees because they remain in the armed forces for *some* purposes, that is entirely distinct from the First Amendment standard applicable to their speech on matters of public concern.

This Court's decision in *Larrabee v. Del Toro* is not to the contrary. *Larrabee* held Congress can constitutionally subject retirees to court-martial jurisdiction because their formal military status includes a general duty to obey orders. 45 F.4th 81, 83 (D.C. Cir. 2022), *cited in* Appellants' Br. 23, 39, 41–44. But *Larrabee* was a jurisdictional decision. It did not address the level of First Amendment protection applicable to a retiree's speech. Nor could it collapse those questions into one analysis

even if a First Amendment question had been presented.[5] *Parker* itself makes clear "the members of the military are not excluded from the protection granted by the First Amendment." 417 U.S. at 758. Moreover, the Supreme Court has repeatedly rejected any notion that Congress's military powers create zones "free from the restraints of the Constitution." *Reid v. Covert*, 354 U.S. 1, 16, 21–23, 39–40 (1957).

The government's reliance on retirees' eligibility for recall fares no better. A theoretical statutory possibility of recall is not a present command relationship. Retirees remain in civilian life unless and until they are recalled. Many never will be. A dormant duty to return if ordered may matter for some jurisdictional analyses, but it does not recreate the conditions on which *Parker* depended. Treating mere recallability as equivalent to ongoing active duty would sever *Parker* from its underlying rationale.

Reliance on the other cases the government cites is similarly unhelpful to its position. Cases like *United States v. Begani*, 81 M.J. 273, 279 (C.A.A.F. 2021), *cited in* Appellants' Br. 40, and *United States v.*

---

[5] *Larrabee* involved a member of the Fleet Marine Corps Reserve who collaterally challenged his punishment by court-martial for sexually assaulting a civilian. 45 F.4th at 83.

*Hooper*, 26 C.M.R. 417, 425 (C.M.A. 1958), *cited in* Appellants' Br. 23, 40, 44, 46, address military status and the scope of court-martial jurisdiction. They do not establish a First Amendment exception for retirees' public advocacy. And *United States v. Bergdahl*, 80 M.J. 230 (C.A.A.F. 2020), *cited in* Appellants' Br. 24, 47, 53, is further afield still. There, the court concluded Senator John McCain's status as a retired naval officer meant he was capable, as a jurisdictional matter, of violating a specific UCMJ prohibition on unlawful command influence in a pending court-martial. *Id.* at 234–35. That narrow proposition about protecting a live military adjudication's fairness says nothing about whether the First Amendment permits the government to punish retiree speech criticizing military policy, senior officials, or the legality of military operations.

The government's reasoning toward the constitutional answer is also circular. It argues *Parker* applies because retirees remain subject to military discipline, and retirees remain subject to military discipline notwithstanding the First Amendment because *Parker* applies. Again, *Parker* did not rest on status in the abstract, but on the concrete features of active-duty service, *i.e.*, the need for immediate obedience, the nature of command relationships, and the demands of ongoing military

17

operations. 417 U.S. at 744, 758. The government cannot replace that reasoning with the bare assertion that retirees retain some formal military obligations.

### C. The government improperly seeks to extend *Parker* to create a new category of unprotected speech.

Once *Parker* is viewed in its proper context, the dangerous novelty of the government's position becomes impossible to miss. The government is not asking this Court to apply some settled First Amendment exception—it is asking it to create a new one. Under the government's theory of *Parker*, the Executive may punish retired servicemembers for speech it believes threatens order and discipline in the active-duty ranks. The First Amendment does not permit that result.

Outside a few well-settled, narrow categories, the First Amendment protects speech even when officials believe it causes harm. *See Chiles*, 146 S. Ct. at 1021; *Stevens*, 559 U.S. at 468–70. The Supreme Court has repeatedly rejected attempts to create "new categories of unprotected speech" based on judicial balancing of value and social cost. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 791–92 (2011) (violent video games); *see also Chiles*, 146 S. Ct. at 1024 (professional speech); *Alvarez*, 567 U.S. at 717–22 (false claims of military honors). That rule is especially important

where, as here, the government's asserted harm turns on its fear that disfavored ideas may prove persuasive.

That is exactly the government's theory. It does not contend Senator Kelly's speech fell within a longstanding category of unprotected speech. Nor could it. Instead, the government claims it may punish his speech because, in the Secretary's judgment, the message risks undermining discipline in the ranks. Appellants' Br. 27, 46–49.

The government attempts to obscure the novelty of its rule that strips retiree speech of its constitutional protection whenever a military official deems its message too dangerous by invoking *Parker*. But as noted above, that simply begs the question. The constitutional issue is whether speech by a retiree living and speaking in civilian life may be treated as the equivalent of speech by an active-duty officer within the chain of command. To say *Parker* is "equally applicable" to "materially identical speech by retired officers," Appellants' Br. 48, just restates the government's conclusion.

Nor may the constitutional line-drawing be left to the whims of the Executive. The government's proposed rule would allow the Secretary to decide, in the first instance, when a retiree's speech has "cross[ed] the

line" and become too disruptive, Appellants' Br. 27—the sort of "unbridled discretion" the First Amendment does not tolerate. *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 133 (1992); *see also Brown*, 564 U.S.at 792; *Stevens*, 559 U.S. at 470.

Once divorced from *Parker*'s active-duty context, the danger of the government's theory becomes clear: It has no stopping point. If residual military status alone can diminish First Amendment protection, any retired officer who speaks forcefully on issues of war, military policy, or official misconduct could be accused of sowing "confusion," encouraging "insubordination," or undermining "discipline." That is precisely the sort of boundless, discretionary censorship the First Amendment forbids. Under the government's approach, the more knowledgeable and influential the speaker, the less protection he receives. That is not a principled application of First Amendment law—it is suppression of disfavored speech by a class of speakers the government may wish to silence when they do not agree with it.

**D. There is no deep-rooted understanding of diminished First Amendment protection for retirees who criticize military policy.**

Historical examples cut strongly against the government's reading of *Parker*. When the government asks a court to recognize a new category of unprotected speech, it bears the burden of identifying a longstanding custom of treating that speech as outside First Amendment protection. *See Brown*, 564 U.S. at 791–92; *Stevens*, 559 U.S. at 468–70. The government cannot do so here. Though the government cites statutes and cases describing retirees as members of the armed forces for certain legal purposes, none identifies any established practice of punishing military retirees *qua* retirees for publicly criticizing military policy once they have left active service.

The broader view runs to the contrary, in fact. From the earliest years of the Republic, veterans moved into civilian political life and sharply criticized military and foreign policy without being treated as a class with diminished speech rights. Two hundred seventy-four veterans of the Revolutionary War later served in the House of Representatives,

and five of the first six Speakers of the House were veterans.[6] Those members did not serve in silence.

Representative Henry Dearborn of Massachusetts, a former Continental Army officer on George Washington's Virginia staff who was present for the British surrender at Yorktown, later criticized the Washington Administration's military and foreign policy; opposed military appropriations; proposed reducing the standing Army; and resisted measures to expand the Navy, including construction of ships and a navy yard.[7] Dearborn's advocacy was not met with punishment by a military tribunal, but with electoral defeat.[8]

Future President James Monroe provides a similar example. Also a Revolutionary War veteran, Monroe joined Dearborn by publishing a lengthy criticism of Washington's military and foreign policies, including

---

[6] *Rediscovering Revolutionary War Veterans*, Whereas: Stories from the People's House (Jan. 22, 2026), https://history.house.gov/Blog/2026/January/1-22-RevolutionaryWarAnnouncement/ [https://perma.cc/Q4ML-EBMJ].

[7] *From Bunker Hill to Capitol Hill: Representative Henry Dearborn and the New Nation*, Whereas: Stories from the People's House (June 17, 2025), https://history.house.gov/Blog/2025/June/6-17-Dearborn-Bunker-Hill/ [https://perma.cc/Y9KX-22JN].

[8] *Id.*

opposing military hostilities with France and condemning Washington's "general derangement of our affairs" which ultimately led to war.[9] Washington answered Monroe's attacks not by dragging him before a court-martial, but by autographing and annotating a copy of Monroe's book with "taunts and jibes, sarcasm, and scathing criticism."[10] The response was counter-speech, not a claim that Monroe's military service had stripped him of expressive liberty.

Later examples likewise undercut the government's position. For instance, following his retirement in 1931, war hero Marine Corps Major General Smedley Butler traveled the country to give speeches, radio addresses, and interviews railing against American military intervention, eventually publishing his views in his 1935 book, *War Is a Racket*.[11] Whatever one thinks of Butler's views, his free expression of

---

[9] *See* James Monroe, *A View of the Conduct of the Executive, in the Foreign Affairs of the United States, Connected with the Mission to the French Republic, During the Years 1794, 5, & 6*, at ix (Philadelphia, Benjamin Franklin Bache 1797).

[10] Editorial Note, *Comments on Monroe's* A View of the Conduct of the Executive of the United States*, March 1798*, Nat'l Archives: Founders Online, https://founders.archives.gov/documents/Washington/06-02-02-0146 [https://perma.cc/LED7-64A4] (last visited Mar. 26, 2026).

[11] Smedley D. Butler, *War Is a Racket* (Feral House 2003) (1935).

them shows that retired military leaders have long engaged in vehement public criticism of military policy. The government identifies no practice—settled or otherwise—of treating such speech as categorically outside the First Amendment because speakers continued to receive retirement pay or other military benefits.

The government relies heavily on the proposition that retirees have long remained part of the armed forces for some purposes, and the military has retained jurisdiction over them to that degree. Appellants' Br. 38–43. Even so, that hardly establishes a "well-recognized" practice of reducing speech rights for those who served and fought for their country. *See Chiles*, 146 S. Ct. at 1021. A longstanding rule of jurisdiction is far from a longstanding rule of censorship. This Court should not let the former be repackaged as the latter.

## III. Applying *Parker* to Senator Kelly Would Chill Protected Speech, Imperil Public Debate, and Distort First Amendment Doctrine.

The government's position, if accepted, would impose immediate and broad costs on public discourse. The government claims authority to punish a retired servicemember for his speech based solely on the Executive's unilateral conclusion that the speech is too dangerous to

tolerate. That theory would not stop with Senator Kelly. It would predictably chill speech by other retirees across the country and deprive the public of informed views on some of the most consequential issues in American life. And once the Court accepts the government's attempt to reduce First Amendment protection based on residual status rather than present operational need, there is no clear limiting principle to keep that theory confined to cases like this one.

### A. The government's retaliation against Senator Kelly shows how its proposed rule would silence other retirees and deprive the public of informed debate.

The chilling effect of the government's theory is neither abstract nor speculative. The government has already shown exactly how it intends to use the rule it urges here. It has issued a formal censure to Senator Kelly for his speech. It has opened retirement-grade proceedings that threaten his rank, pay, and official status based on the same speech. And it has warned of "criminal prosecution or further administrative action" if he continues to speak in similar terms. JA65. This is not a case about some hypothetical future burden. It is a case about present punishment, ongoing proceedings, and an explicit threat of more to come.

That matters not only for Senator Kelly, but for every similarly situated military retiree. If the government may censure a retired officer, threaten his benefits, and hold out the prospect of further sanction because the Secretary believes the retiree's public criticism has become too disruptive, other military retirees will understand the message: They may continue to praise current military operations, policy, or leadership without consequence, but criticism will face retribution at steep personal cost. Many will remain silent rather than risk censure, financial penalties, or threatened prosecution.

The record confirms as much. *Amici* below and in this Court— former service secretaries, retired senior officers, and a veterans' organization—explained that veterans were already declining to participate in public debate for fear of official reprisal. They warned that punishing Senator Kelly would "chill public participation by veterans everywhere" and "depriv[e] the public of experienced and informed views on critical matters of national security."[12] The district court credited that showing and explained that allowing the government's actions to stand

---

[12] Br. *Amici Curiae* Former Serv. Sec'ys et al. for Appellee 6; *accord* Br. *Amici Curiae* Former Serv. Sec'ys et al. Supp. Pl.'s Mot. Prelim. Inj. 4, *Kelly*, 2026 WL 391777, Dkt. No. 13-1.

would "further chill the speech of these retired servicemembers and thereby impoverish the public debate on critical issues relating to our military and its role in domestic and foreign affairs." JA43 (cleaned up).

That assessment is exactly right. Retired servicemembers occupy a distinctive place in public discourse. They often speak with expertise born of experience yet outside the active-duty chain of command. Their perspectives can illuminate questions of war powers, military law, readiness, procurement, veterans' affairs, and the conduct of current operations, among other topics. The public benefits precisely because those speakers combine experience with independence. If the price of speaking candidly is censure, threatened loss of benefits, or the prospect of further punishment, the public will hear less from one of the constituencies best equipped to inform debate on matters of national consequence.

The government's proposed rule would therefore do much more than burden one speaker. It would impoverish public debate. And that danger is especially grave in a case involving speech about the legality of military operations and the conduct of senior defense officials. Those are questions on which democratic accountability greatly depends. The

27

government's answer cannot be that such speech becomes less protected when it comes from those most qualified to offer it.

These consequences also underscore why preliminary relief is proper here. The Supreme Court has long recognized that "loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). But even apart from that settled rule, the government's conduct here demonstrates a concrete and ongoing chill that reaches far beyond Senator Kelly himself. Affirming the injunction is necessary to prevent that chill from hardening into a broader regime of censorship by deterrence.

### B. The government's status-based theory has no limiting principle and threatens spillover beyond the military context.

The danger of the government's position is not limited to the chilling effect it would impose on retired servicemembers. Its theory also threatens to distort First Amendment doctrine more broadly. The government maintains that reduced constitutional protection may follow from a passive but continuing relationship with the government, even

when the speaker no longer operates within the institution's command structure. That proposition is not confined by any workable limiting principle.

The law ordinarily demands a far tighter fit between diminished speech protection and actual institutional necessity. In the military context, *Parker rests* on the "specialized" character of the armed forces and the "fundamental necessity for obedience" within the active-duty chain of command. 417 U.S. at 743–44, 758. Even there, the First Amendment remains in force, and military courts have insisted the speech at issue have a "reasonably direct and palpable connection" to the military mission or environment. *United States v. Wilcox*, 66 M.J. 442, 449 (C.A.A.F. 2008); *see, e.g., United States v. Smith*, 85 M.J. 283, 288 (C.A.A.F. 2024) (recognizing full protection for active-duty servicemember's speech "far off base in a civilian setting" with "no nexus to the military environment"); *see also United States v. Priest*, 45 C.M.R. 338, 344 (C.M.A. 1972) (explaining that even in military matters, courts "must be sensitive to protection of the principle of free thought" (cleaned up)). Likewise, in the civilian public-employment context, the government does not receive a general license to punish speech by those

with some affiliation to the government. It may overcome constitutional protection only by pointing to concrete interests in the effective provision of public services, workplace discipline, or speech made pursuant to official duties. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *Connick*, 461 U.S. at 150–54; *Garcetti v. Ceballos*, 547 U.S. 410, 424 (2006).

The government's proposed rule abandons that limiting principle. In its view, a military retiree's speech may receive less protection not because the speaker is acting in an official role, not because the speech occurs within an actual command structure, nor for any operational necessity, but because the government believes the speaker's continuing status makes the speech sufficiently risky. That is precisely the kind of untethered, status-based reduction in First Amendment protection that established doctrine rejects. *See United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 474 (1995) (invalidating sweeping restrictions on federal employees' speech where there was "no nexus to Government employment").

Once that move is accepted, the logic does not stop with military retirees. If a passive but continuing relationship with the government is

enough to reduce constitutional protection, it is not hard to envision that government would invoke the same reasoning in future cases involving retired civil servants, law-enforcement officials, intelligence personnel, or other speakers receiving pensions or with some other lingering government affiliation. The government could try to argue ordinary First Amendment scrutiny gives way whenever such speakers criticize the institutions to which they once belonged and officials assert some continuing institutional interest in their silence. That would mark a serious departure from both military and public-employee speech doctrines, each of which ties diminished protection to actual operational demands rather than mere identity.

At bottom, the government's theory is untenable because it cannot be confined to the facts that supposedly justify it. A rule untethered from present command, present duty, and present operational necessity is not a military-specific rule at all. Rather, it is a speaker-based exception masquerading as one. Because any such exception has no clear stopping point, this Court should reject it lest it distort First Amendment law well beyond the context of retired servicemembers.

**CONCLUSION**

The district court properly entered the preliminary injunction not only because the government's theory is wrong on the merits, but because adopting it would carry serious practical and doctrinal consequences. It would chill protected speech by retired servicemembers, deprive the public of informed debate on military affairs, and invite further erosion of ordinary First Amendment protection wherever the government can point to some residual status relationship and call speech too dangerous to tolerate. For these and all the foregoing reasons, this Court should affirm.

Dated: April 22, 2026

/s/ *Ronald G. London*

Ronald G. London
    *Counsel of Record*
Zachary T. Silver
Jacob N. Gaba
FOUNDATION FOR INDIVIDUAL
    RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
(215) 717-3473
ronnie.london@fire.org

*Counsel for* Amicus Curiae

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,990 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

Dated: April 22, 2026

/s/ *Ronald G. London*
Ronald G. London
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
(215) 717-3473
ronnie.london@fire.org

*Counsel for* Amicus Curiae

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 22, 2026, an electronic copy

of the foregoing was filed with the Clerk of this Court using the CM/ECF

system, and that all parties will be served through that system.

s/ *Ronald G. London*

Ronald G. London
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
(215) 717-3473
ronnie.london@fire.org

*Counsel for* Amicus Curiae