**[ORAL ARGUMENT SCHEDULED FOR MAY 7, 2026]**
**No. 26-5070**

# In the United States Court of Appeals
# for the District of Columbia Circuit

MARK KELLY,
United States Senator Representing the State of Arizona,

*Plaintiff-Appellee,*

*v.*

PETE HEGSETH,
in his Official Capacity as Secretary of Defense, *et al.,*

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia
No. 1:26-cv-81 (Hon. Richard J. Leon)

**BRIEF FOR *AMICI CURIAE* REPRESENTATIVE MAGGIE
GOODLANDER, REPRESENTATIVE JASON CROW,
REPRESENTATIVE CHRIS DELUZIO, REPRESENTATIVE
CHRISSY HOULAHAN, AND SENATOR ELISSA SLOTKIN**

JONATHAN KRAVIS
LIU SHUR KRAVIS LLP
607 Fourteenth Street, NW
Suite 625
Washington, DC 20005
(202) 240-7100

EPHRAIM A. MCDOWELL
ANDREW D. GOLDSTEIN
RAYMOND P. TOLENTINO
ANNA O. MOHAN
ELIAS S. KIM
COOLEY LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004
(202) 842-7800
emcdowell@cooley.com

*Counsel for Amicus Curiae
Representative Maggie Goodlander*

(*List of Counsel continued on inside cover*)

(*List of Counsel continued*)

PREET BHARARA
WILMERHALE
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
preet.bharara@wilmerhale.com

*Counsel for Amicus Curiae
Senator Elissa Slotkin*

AMY JEFFRESS
JACOB STEINER
HECKER FINK LLP
1050 K Street, NW
10th Floor
Washington, DC 20001
(212) 763-0883
ajeffress@heckerfink.com

*Counsel for Amicus Curiae
Representative Chrissy Houlahan*

ABBE DAVID LOWELL
LOWELL & ASSOCIATES, PLLC
1250 H Street NW, 2nd Floor
Washington, DC 20005
(202) 964-6110
alowellpublicoutreach@
lowellandassociates.com

NORMAN L. EISEN
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Ave. SE
Washington, DC 20003
(202) 601-8678

*Counsel for Amicus Curiae
Representative Jason Crow*

ZACHARY K. WARREN
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
(202) 434-5000
zwarren@wc.com

*Counsel for Amicus Curiae
Representative Chris Deluzio*

*Counsel for Amici Curiae*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), *amici curiae* certify as follows:

## A.    Parties and *Amici*

Except for *amici curiae*, all parties and *amici* appearing before the district court and in this Court are listed in the briefs for the parties and for other *amici*.

## B.    Rulings Under Review

References to the rulings at issue appear in Appellants' certificate.

## C.    Related Cases

*Amici* are unaware of any related cases pending before this Court or any other court.

Respectfully submitted,

*/s/ Ephraim A. McDowell*
Ephraim A. McDowell

i

## STATEMENT REGARDING CONSENT TO FILE AND SEPARATE BRIEFING

All parties consent to the filing of this *amicus* brief.  *See* Fed. R. App. P. 29(a)(2); Cir. R. 29(b).

Pursuant to Circuit Rule 29(d), undersigned counsel for *amici curiae* certifies that a separate brief is necessary.  *Amici* are Members of Congress who, like Senator Kelly, serve on congressional committees responsible for oversight of the armed forces and have faced retribution for reminding servicemembers of their duty to refuse unlawful orders. *Amici* offer a unique perspective on the general importance of legislators' speech, the origin of the duty to refuse unlawful orders, and the history of Members of Congress making statements regarding the military's compliance with the law of war.

## TABLE OF CONTENTS

**Page**

IDENTITY AND INTEREST OF *AMICI CURIAE* ................................ 1

INTRODUCTION ................................................................ 3

BACKGROUND ................................................................. 5

ARGUMENT ................................................................... 8

I.    The First Amendment Protects Legislators From Reprisal
      For Their Speech On Issues Of Public Importance ........................ 8

      A.    The First Amendment Bars the Government from
            Retaliating Against Individuals Based on Their Speech ....... 8

      B.    The First Amendment Bars the Executive Branch from
            Retaliating Against Legislators Based on Their
            Criticism of Executive Branch Policy ................................. 10

II.   This Administration Has Engaged In An Unprecedented
      Effort To Punish Members Of Congress For Speaking About
      Matters Of National Importance ................................................. 19

      A.    The Administration Has Unconstitutionally Retaliated
            Against the Members Who Posted the Video and
            Recited Black-Letter Military Law .................................... 19

      B.    The Government Does Not Have Broader Leeway to
            Punish the Speech of Legislators Who Are Retired
            Servicemembers ............................................................. 25

CONCLUSION .............................................................. 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bantam Books, Inc. v. Sullivan,*
372 U.S. 58 (1963) ............................................................................ 9

*Bond v. Floyd,*
385 U.S. 116 (1966) ............................................................. 10-12, 21

*Connick v. Myers,*
461 U.S. 138 (1983) ........................................................................ 8

*Cooperrider v. Woods,*
127 F.4th 1019 (6th Cir. 2025) ..................................................... 10

*Crawford–El v. Britton,*
523 U.S. 574 (1998) ...................................................................... 18

*Dombrowski v. Pfister,*
380 U.S. 479 (1965) ...................................................................... 18

*Garrison v. Louisiana,*
379 U.S. 64 (1964) .......................................................................... 9

*Hartman v. Moore,*
547 U.S. 250 (2006) .................................................................. 10, 18

*Lozman v. City of Riviera Beach,*
585 U.S. 87 (2018) .......................................................................... 9

*McGrain v. Daugherty,*
273 U.S. 135 (1927) ...................................................................... 13

*Mills v. Alabama,*
384 U.S. 214 (1966) ........................................................................ 9

*Mitchell v. Harmony,*
54 U.S. 115 (1851) ..................................................................... 6, 24

*N.Y. Times Co. v. Sullivan,*
376 U.S. 254 (1964) ................................................................ 3, 9, 22

*Nat'l Rifle Ass'n v. Vullo,*
602 U.S. 175 (2024) ........................................................................ 9

*Parker v. Levy,*
417 U.S. 733 (1974) ...................................................................... 25

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205,*
   391 U.S. 563 (1968)...............................................................................9

*Snyder v. Phelps,*
   562 U.S. 443 (2011)...........................................................................3, 9

*Terminiello v. City of Chicago,*
   337 U.S. 1 (1949).................................................................................11

*Trump v. Mazars USA, LLP,*
   591 U.S. 848 (2020).............................................................. 12, 18, 19

*United States v. Calley,*
   48 C.M.R. 19 (1973) ........................................................................6, 24

*United States v. Jones,*
   26 F. Cas. 653 (C.C.D. Pa. 1813) .......................................................23

*Watkins v. United States,*
   354 U.S. 178 (1957)..............................................................................13

*Wood v. Georgia,*
   370 U.S. 376 (1962)....................................................................... 11, 18

*Yates v. United States,*
   354 U.S. 298 (1957)..............................................................................11

**Statutes**

Legislative Reorganization Act of 1946,
   Pub. L. No. 79-601, § 136, 60 Stat. 812 ............................................14

10 U.S.C.
   § 890 ......................................................................................................23
   § 892 ......................................................................................................23

**Miscellaneous**

*Congress Probes Alleged U.S. Massacre in Vietnam, in*
   Congressional Quarterly Almanac 1969 (25th ed. 1970)..................15

Alan Feuer, Glenn Thrush & Michael S. Schmidt, *Grand*
   *Jury Rebuffs Justice Dept. Attempt to Indict 6 Democrats*
   *in Congress,* N.Y. Times (Feb. 10, 2026) ...........................................8

v

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Oona Hathaway, *Congressional Oversight of Modern Warfare: History, Pathologies, and Proposals for Reform*, 63 Wm. & Mary L. Rev. 137 (2021) ................................... 14

House Armed Services Committee, *Jurisdiction & Rules* ....................... 5

Greg Jaffe, *Democrats Say F.B.I. Is Investigating Them Over Illegal Orders Video*, N.Y. Times (Nov. 25, 2025) .............................. 7

James M. Landis, *Constitutional Limitations on the Congressional Power of Investigation*, 40 Harv. L. Rev. 153 (1926) .......................... 13

Joint Service Committee on Military Justice, DoD, The Manual for Courts Martial (2024 ed.) ................................. 22, 23

Jon Letman, *Cost of War: An Interview with Tulsi Gabbard*, Institute for Policy Studies (Nov. 12, 2012) ....................................... 17

Office of General Counsel, DoD, Law of War Manual (July 2023) .... 6, 22

Ashley Parker, *Rand Paul Leads Filibuster of Brennan Nomination*, N.Y. Times (Mar. 6, 2013) ............................................ 17

Press Release, *Opening Statement for Detainee & Interrogation Hearing*, Senate Armed Services Committee Hearing (June 17, 2008) ..................................................................... 16

Ryan J. Reilly, *Jeanine Pirro's Office Shelves Pursuit of Democrats Over Social Video, Sources Say*, NBC News (Feb. 23, 2026) .............. 8

Rules of the House of Representatives, 119th Cong. (2025) .................. 14

Rules of the Senate, 119th Cong. (2025) .............................................. 14

Sen. John McCain, Statement on Amendment No. 1977, 151 Cong. Rec. S11063 (daily ed. Oct. 5, 2005) ................................. 16

U.S. Senate Committee on Armed Services, *About: History & Jurisdiction* ........................................................ 5

Woodrow Wilson, *Congressional Government: A Study in American Politics* 297 (1885 ed.) ........................................................ 13

## IDENTITY AND INTEREST OF *AMICI CURIAE*

*Amici* are Members of Congress, each of whom previously served in the armed forces.  *Amici* are currently members of the congressional committees responsible for oversight of the armed forces.[1]

Congresswoman Maggie Goodlander represents New Hampshire's Second District.  Before her election to Congress, Representative Goodlander served for more than a decade as an intelligence officer in the United States Navy Reserve.  She is currently a member of the House Armed Services Committee.

Congressman Jason Crow represents Colorado's Sixth District.  Representative Crow is a former paratrooper and Army Ranger, who completed three tours of duty in Iraq and Afghanistan.  He was awarded a Bronze Star for his service.  He is currently a member of the House Armed Services Committee and the House Intelligence Committee.

Congressman Chris Deluzio represents Pennsylvania's Seventeenth District.  Representative Deluzio served as a naval officer

---

[1] No counsel for any party authored this brief in whole or in part.  No party or their counsel, or any person other than *amici* or their counsel, contributed money that was intended to fund this brief.

for six years.  He is currently a member of the House Armed Services Committee.

Congresswoman Chrissy Houlahan represents Pennsylvania's Sixth District.  Representative Houlahan is a former United States Air Force officer who served three years on United States Air Force active duty and more than a decade in the Air Force Reserve.  She is currently a member of the House Armed Services Committee and the Permanent Select Committee on Intelligence.

Senator Elissa Slotkin represents the State of Michigan.  Senator Slotkin served as a CIA Central Intelligence Agency (CIA) officer and a Defense Department official for more than a decade.  She is currently a member of the Senate Committee on Armed Services.

Along with Appellee Senator Mark Kelly, *amici* spoke in an online video called "Don't Give Up the Ship" posted on November 18, 2025.  In the video, the Members recite the fundamental legal principle that military servicemembers must not carry out illegal orders, and they encouraged servicemembers to adhere to that principle.  Two days later, President Trump called for the Members to be arrested, to be tried for sedition, and to face the death penalty.  During the ensuing months, the

2

Members were contacted by the Federal Bureau of Investigation (FBI) and Department of Justice (DOJ) regarding their participation in the video. And on February 10, 2026, DOJ reportedly sought a grand jury indictment of all six Members who appeared in the video—which the grand jury rejected. *Amici* submit this brief to explain why the government's attempted retaliation against Senator Kelly and the other Members in the video violates bedrock constitutional and separation of powers principles and risks chilling legislators' speech.

## INTRODUCTION

"The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). That principle protects the speech of Members of Congress and private citizens alike. And when Members of Congress speak out against Executive Branch policy and conduct, they reinforce another foundational constitutional principle: the separation of powers.

In this case, Senator Kelly and five other Members of Congress made public statements urging military servicemembers to refrain from

following unlawful orders. By advising servicemembers on these settled legal principles, the Members effectuated their role in overseeing the armed services. And the statements were made in the context of a broader public and legislative debate about the Administration's military policy judgments.

The Administration swiftly retaliated against the Members for their speech. As to Senator Kelly, the Secretary of Defense initiated disciplinary proceedings to reduce his retired grade and pay. And as to all six Members, DOJ launched a criminal investigation and then reportedly sought—and failed to secure—a grand jury indictment.

The Administration's unprecedented actions contravene the First Amendment and separation of powers. If the Executive Branch could chill the speech of legislators by bringing enforcement actions or criminal prosecutions against them based on their criticism of Administration policy, then our constitutional system would be radically transformed. Citizens would no longer hear the uninhibited views of their elected representatives. And the Executive Branch could suppress—through threats and intimidation—the legislative oversight upon which our constitutional structure depends. The result would be an unaccountable

Executive Branch that could abuse its power without facing opposition or criticism from the Legislative Branch.

## BACKGROUND

The Members of Congress who have been targeted by the Administration based on their speech are responsible for overseeing the U.S. military's compliance with the law of war.  Representatives Crow, Deluzio, Goodlander, and Houlahan sit on the House Armed Services Committee, which has jurisdiction over "ongoing military operations." House Armed Services Committee, *Jurisdiction & Rules*, https://perma.cc/L9E7-R3EZ.  Senator Kelly and Senator Slotkin sit on the Senate Committee on Armed Services, which has jurisdiction over the "common defense."  U.S. Senate Committee on Armed Services, *About: History & Jurisdiction*, https://perma.cc/T56T-FQ2L.

On November 18, 2025, those six Members appeared in a video entitled "Don't Give Up The Ship."  JA 79.  After introducing themselves, they stated: "Like us, you all swore an oath to protect and defend this Constitution."  *See* Sen. Elissa Slotkin (@SenatorSlotkin), X (Nov. 18, 2025, at 08:30 ET), https://bit.ly/4sS84nD.  And "right now," they observed, "the threats to our Constitution aren't just coming from abroad,

but from right here at home." *Id.* They then reminded servicemembers of the basic duty to refrain from executing unlawful orders, explaining that "you can refuse illegal orders"; "you must refuse illegal orders"; and "no one has to carry out orders that violate the law or our Constitution." *Id.* Those statements reflect a core tenet of U.S. military law—that servicemembers "must refuse to comply with clearly illegal orders"—that has been recognized in the Department of Defense's (DoD) own guidance and repeatedly reaffirmed by the Supreme Court and military courts. Office of General Counsel, DoD, Law of War Manual § 18.3.2 (July 2023); *see Mitchell v. Harmony*, 54 U.S. 115, 137 (1851); *United States v. Calley*, 48 C.M.R. 19, 25 (1973).

Shortly after the video was posted, President Trump and his senior staff launched a series of vitriolic threats and attacks against the Members who appeared in the video. On November 19, White House Deputy Chief of Staff Stephen Miller stated that the video was "insurrection—plainly, directly, without question." JA 80. The next day, President Trump called the video "SEDITIOUS BEHAVIOR, punishable by DEATH!" and ordered that the Members in the video "be ARRESTED AND PUT ON TRIAL." JA 81-82. He then reposted a Truth Social post

6

that read: "HANG THEM GEORGE WASHINGTON WOULD !!"  JA 82.

He subsequently called for them to be prosecuted and referred to them as "traitors," "domestic terrorists," "traitorous sons of bitches," and "pompous traitorous communists."  JA 83-86.

Since then, Executive Branch officials have engaged in an unprecedented campaign to silence the Members' speech about the military's duty to comply with the law of war.  On November 24, DoD asserted that it had "received serious allegations of misconduct against Captain Mark Kelly" and that a "thorough review of these allegations has been initiated to determine further actions, which may include recall to active duty for court-martial proceedings or administrative measures." JA 87.  A day later, the FBI's counterterrorism division contacted the House and Senate sergeants-at-arms, requesting interviews with all Members who appeared in the video—thereby signaling that a criminal investigation was underway.  Greg Jaffe, *Democrats Say F.B.I. Is Investigating Them Over Illegal Orders Video*, N.Y. Times (Nov. 25, 2025), https://perma.cc/U7E9-TS2A.  Prosecutors from the U.S. Attorney's Office for the District of Columbia subsequently contacted the Members, seeking information to support a purported criminal

7

investigation—yet they were unable to articulate the specific crime they were investigating.  Ryan J. Reilly, *Jeanine Pirro's Office Shelves Pursuit of Democrats Over Social Video, Sources Say*, NBC News (Feb. 23, 2026), https://perma.cc/AQV8-3KC8.

On February 10, 2026, DOJ reportedly sought a grand jury indictment of all six Members.  Alan Feuer, Glenn Thrush & Michael S. Schmidt, *Grand Jury Rebuffs Justice Dept. Attempt to Indict 6 Democrats in Congress*, N.Y. Times (Feb. 10, 2026), https://perma.cc/ZMP2-UTQX.  But the grand jury—apparently by a unanimous vote—rejected the indictment.  *See* Reilly, *supra*.

## ARGUMENT

### I.    THE FIRST AMENDMENT PROTECTS LEGISLATORS FROM REPRISAL FOR THEIR SPEECH ON ISSUES OF PUBLIC IMPORTANCE

#### A.    The First Amendment Bars the Government from Retaliating Against Individuals Based on Their Speech

"[S]peech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection."  *Connick v. Myers*, 461 U.S. 138, 145 (1983) (citation omitted).  "That is because 'speech concerning public affairs is more than self-expression; it is the essence of self-government.'"  *Snyder v. Phelps*,

562 U.S. 443, 452 (2011) (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964)). Thus, "[w]hatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs," including "the manner in which government is operated or should be operated." *Mills v. Alabama*, 384 U.S. 214, 218 (1966); *see Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 573 (1968) (describing "[t]he public interest in having free and unhindered debate on matters of public importance" as "the core value of the Free Speech Clause of the First Amendment").

It is similarly settled that "the First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018). Government officials may neither directly punish protected speech, nor "rely[] on the '*threat* of invoking legal sanctions and other means of coercion . . . to achieve the suppression' of disfavored speech." *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 176 (2024) (emphasis added) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)). Those prohibitions apply equally to administrative enforcement actions and

9

criminal prosecutions.  *See, e.g.*, *Cooperrider v. Woods*, 127 F.4th 1019, 1037 (6th Cir. 2025) (administrative enforcement action); *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (criminal prosecution).

**B.    The First Amendment Bars the Executive Branch from Retaliating Against Legislators Based on Their Criticism of Executive Branch Policy**

The foregoing principles apply with full force to speech by legislators in their official capacities.  In *Bond v. Floyd*, 385 U.S. 116 (1966), the Supreme Court held unconstitutional the Georgia legislature's effort to exclude an elected Representative "because of his statements, and statements to which he subscribed, criticizing the policy of the Federal Government in Vietnam and the operation of the Selective Service laws."  *Id.* at 118.  Representative-Elect Julian Bond had endorsed a statement by the Student Nonviolent Coordinating Committee that expressed support for "the men in this country who are unwilling to respond to a military draft" and "urge[d] all Americans to seek" to "work in the civil rights movement and with other human relations organizations" as an "alternative to the draft."  *Id.* at 120-21.  Bond later added in an interview that he was "against [the Vietnam] war" and the draft and that he did not "think people ought to participate in it."

10

*Id.* at 122. Because of Bond's statements, the legislature refused to allow him to take the oath of office, arguing that his speech "went beyond expressions of opposition" to the war and "counseled violations of the Selective Service laws." *Id.* at 132.

The Court unanimously rejected the state legislature's action, holding that "the disqualification of Bond from membership in the Georgia House because of his statements violated Bond's right of free expression under the First Amendment." *Bond*, 385 U.S. at 137. "[T]here can be no question," the Court explained, "that the First Amendment protects expressions in opposition to national foreign policy in Vietnam and to the Selective Service system." *Id.* at 132. And Bond's statements—which critics claimed would incite violations of the Selective Service laws—"were at worst unclear on the question of the means to be adopted to avoid the draft." *Id.* at 133. There was thus no doubt under "many decisions of th[e] Court" that Bond could not be punished "for th[ose] statements consistently with the First Amendment." *Id.* at 134 (citing *Wood v. Georgia*, 370 U.S. 376 (1962); *Yates v. United States*, 354 U.S. 298 (1957); *Terminiello v. City of Chicago*, 337 U.S. 1 (1949)).

11

The Court further rejected the state legislature's argument that ordinary First Amendment protections "should not be extended to statements by a legislator," finding "no support for this distinction in . . . [any] decision of this Court." *Bond*, 385 U.S. at 136. To the contrary, the Court emphasized, "[t]he manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy." *Id.* at 135-36. After all, "[l]egislators have an obligation to take positions on controversial political questions so that their [constituents] can be fully informed by them, and be better able to assess their qualifications for office." *Id.* at 136.

Embracing these principles does not "make Members of Congress super-citizens," Gov't Br. 51 (citation omitted); instead, it appropriately recognizes that Members of Congress have a special need to speak—to their constituents and the Nation—about matters of public concern. And it accounts for the fact that "Congress and the President have an ongoing institutional relationship as the 'opposite and rival' political branches established by the Constitution." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 866 (2020). That relationship means that the Legislative Branch

officials specifically charged with overseeing Executive Branch policy and conduct must be able to discuss those matters freely.

Indeed, "[i]n modern constitutional government," legislatures "have a three-fold purpose: they legislate, they control expenditure, and they supervise administration." James M. Landis, *Constitutional Limitations on the Congressional Power of Investigation*, 40 Harv. L. Rev. 153, 221 n.227 (1926) (citation omitted). As then-professor Woodrow Wilson explained in his treatise on congressional power, "vigilant oversight of administration" is one of Congress's core responsibilities. Woodrow Wilson, *Congressional Government: A Study in American Politics* 297 (1885 ed.). That oversight power is "an essential and appropriate auxiliary to the legislative function." *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927). And it "encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes." *Watkins v. United States*, 354 U.S. 178, 187 (1957).

To discharge this critical oversight function, Congress has established a system of standing committees with jurisdiction over particular Executive Branch functions. As relevant here, the House and Senate Armed Services Committees were created following World War II

13

to "exercis[e] continuous watchfulness" over the newly constituted DoD. Legislative Reorganization Act of 1946, Pub. L. No. 79-601, § 136, 60 Stat. 812, 832. Today, those Committees exercise jurisdiction over "ongoing military operations"; the "[c]ommon defense generally"; and "[t]he Department of Defense, including the Departments of the Army, Navy, and Air Force, generally," Rules of the House of Representatives, 119th Cong., R. X(1)(c)(2), (4) (2025); *see* Rules of the Senate, 119th Cong., R. XXV(1)(c)(1)(2), (3) (2025). Congressional oversight in this domain "is essential to calibrating national decision-making to political and policy concerns; preventing waste, fraud, and abuse; and ensuring government programs respect civil liberties and comply with the law." Oona Hathaway, *Congressional Oversight of Modern Warfare: History, Pathologies, and Proposals for Reform*, 63 Wm. & Mary L. Rev. 137, 143, 155 (2021).

The government erroneously contends that membership in these Committees weighs *against* First Amendment protection because committee members are "uniquely positioned . . . to influence the military," Gov't Br. 53, and "undermine military discipline," *id.* at 48. If that were true, it would mean that the Executive Branch could have

14

lawfully punished countless other Members who served on the Armed Services Committees and who, as part of that role, criticized military judgments and conduct that they believed exceeded the limits on executive power or otherwise violated the law.

For example, the Executive Branch could have sought to punish the members of the Armed Services Committees who played a central role in investigating and exposing the massacre of more than 100 civilians at My Lai during the Vietnam War. While doing so, the Members heavily criticized the Army's investigation into the massacre—even though the war was ongoing. Senator George McGovern, a former Air Force pilot, stated that "we have stumbled into a conflict where we not only, of necessity, commit atrocities against the people of Vietnam, but where in a sense we brutalize our own people and our own nation." *Congress Probes Alleged U.S. Massacre in Vietnam, in* Congressional Quarterly Almanac 1969, at 853-56 (25th ed. 1970), https://perma.cc/6EW6-GVP2.

The Executive Branch also could have punished the members of the Armed Services Committees—many of whom were retired servicemembers—who played a similar role in investigating and exposing the enhanced interrogation techniques used during the War on

15

Terror.  Senator John McCain, for example, was a vocal critic of the military's use of those techniques, arguing that they violated the "longstanding" "prohibition against cruel, inhuman, and degrading treatment."  Sen. John McCain, Statement on Amendment No. 1977, 151 Cong. Rec. S11063 (daily ed. Oct. 5, 2005).  Senator Lindsey Graham, who has served on both the House and Senate Armed Services Committees, similarly criticized the Bush Administration for "us[ing] bizarre legal theories to justify harsh interrogation techniques" and stated that waterboarding "is clearly prohibited under the [Uniform Code of Military Justice]."  Press Release, *Opening Statement for Detainee & Interrogation Hearing*, Senate Committee on Armed Services Hearing (June 17, 2008), https://perma.cc/F5KT-BXN5.  Those criticisms spurred important reforms enacted via the McCain Amendment, the Detainee Treatment Act, and the Military Commissions Act.

Members of the Armed Services Committees also frequently criticized the use of drone strikes during the Obama Administration.  For instance, Tulsi Gabbard, an Iraq War veteran who would later become a member of the House Armed Services Committee (and who still serves in the Army Reserve today), stated that there was "[n]o question that the

16

use of drones in civilian casualties is absolutely wrong, as well as the use of drones against American citizens who have the right to due process within our own system." Jon Letman, *Cost of War: An Interview with Tulsi Gabbard*, Institute for Policy Studies (Nov. 12, 2012), https://perma.cc/HF3Y-TZFC. And she emphasized the importance of having "safeguards in place as well as accountability when these actions are taken." *Id.* Senator Rand Paul, a member of the Senate Foreign Relations Committee, similarly criticized President Obama's use of drones, asserting that "no American should be killed by a drone on American soil without first being charged with a crime, without first being found to be guilty by a court." Ashley Parker, *Rand Paul Leads Filibuster of Brennan Nomination*, N.Y. Times (Mar. 6, 2013), https://perma.cc/C4RA-9PGL.

Under the government's theory, these legislators could have been punished—including through criminal prosecutions—for "attack[ing] the legitimacy of military leadership" and bringing "discredit upon the armed forces." Gov't Br. 34 (citation omitted). That result is untenable. The Supreme Court has long made clear that "[o]fficial reprisal for protected speech 'offends the Constitution,'" precisely "'[because] it threatens to

17

inhibit exercise of the protected right.'" *Hartman*, 547 U.S. at 256 (quoting *Crawford–El v. Britton*, 523 U.S. 574, 588 n.10 (1998) (alteration in original)). That chilling effect is not limited to the actual imposition of penalties. Rather, "the threat of sanctions may deter" constitutionally protected speech "almost as potently as the actual application of sanctions." *Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965) (alterations and citations omitted).

Because the government's approach would authorize punishment of legislators for their speech, it also raises "significant separation of powers issues." *Mazars*, 591 U.S. at 866. The potential inhibition of legislators' speech is problematic because their "role as elected officials" makes it "imperative that they be allowed freely to express themselves on matters of current public importance." *Wood*, 370 U.S. at 395. Indeed, much of what a Member of Congress does involves speaking to the public—on television, at rallies, or in town halls—about issues of policy. And that speech often will entail criticizing the Executive Branch for making improper judgments or even for violating the law. *See supra* at 13-17. Allowing the Executive Branch to punish Members who criticized its conduct would likely make some Members think twice before voicing

18

their views. In turn, such a rule would "aggrandize" the Executive Branch at Congress's "expense"—and risk insulating the Executive Branch from meaningful oversight. *Mazars*, 591 U.S. at 866-67.

## II. THIS ADMINISTRATION HAS ENGAGED IN AN UNPRECEDENTED EFFORT TO PUNISH MEMBERS OF CONGRESS FOR SPEAKING ABOUT MATTERS OF NATIONAL IMPORTANCE

This Administration has done exactly what the First Amendment and separation of powers forbid: seek to punish legislators based on their speech about Executive Branch conduct.

### A. The Administration Has Unconstitutionally Retaliated Against the Members Who Posted the Video and Recited Black-Letter Military Law

The government acknowledges (at 13-14) that Secretary Hegseth attempted to discipline Senator Kelly for speaking alongside the other five Members about servicemembers' obligations to comply with the law. "Most prominently," the government explains, Senator Kelly "participated in and distributed a video titled 'Don't Give Up the Ship,'" in which he stated that" servicemembers "'can refuse illegal orders'" and "'must refuse illegal orders.'" Gov't Br. 13 (citing JA 99). The government also faults Senator Kelly for "defending the video and reinforcing [his] call for refusal of what [he] characterized as 'unlawful orders'" and for

19

continuing "'to accuse [the Secretary] and senior military officers of war crimes and to frame resistance to lawful orders as protecting against overreach.'" *Id.* (alteration in original) (citing JA 99).

The Secretary's attempt to discipline Senator Kelly because of his speech violates the First Amendment. The American people have entrusted Senator Kelly and the other five Members in the video with overseeing the military's compliance with the law—an issue of unquestionable public importance. All six Members serve on the Armed Services Committees, and throughout history, members of those committees have spoken out about the military's potential violation of the law of war—including with respect to ongoing operations. *See supra* at 15-17. By reminding servicemembers of their obligations to follow the law, Senator Kelly and the other Members simply followed that longstanding tradition in service of their core oversight duty. Any attempt to punish them for doing so violates the First Amendment.

Two features of this case underscore the egregious nature of the constitutional violation. First, the Executive Branch's reprisal was not limited to the Secretary's initiation of administrative proceedings against Senator Kelly. Rather, the Secretary's actions were only one part of a

20

broader campaign to punish Senator Kelly and the other Members for their speech. Before the Secretary even announced his intent to investigate Senator Kelly's statements, President Trump called for Senator Kelly and the other Members who appeared in the video to be prosecuted and executed. *See supra* at 7. DOJ attempted to follow through on at least part of that threat, seeking an indictment of the Members for the same speech at issue in this case. *See supra* at 8. That combination of threats and retaliatory acts—including seeking criminal prosecution—exacerbates the potential chilling effect on the constitutionally protected speech of legislators. And this Court should reject the government's attempt to strip this case of that broader context.

Second, the lack of any colorable argument for why the Members' speech was unprotected reinforces the flagrant nature of the constitutional violation. The government suggests that the Members' statements—that servicemembers have an obligation to refuse illegal orders—urged "incitement to violation of law," *Bond,* 385 U.S. at 134-35, and "counsel[ed] disobedience to lawful orders," Gov't Br. 30. But in fact, those statements reflect a core tenet of U.S. military law—that "[m]embers of the armed forces must refuse to comply with clearly illegal

21

orders to commit law of war violations." Office of General Counsel, DoD, Law of War Manual § 18.3.2 (July 2023). And the First Amendment plainly prohibits the government from punishing someone for simply stating the "truth." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 271 (1964).

Indeed, the legal principle recited by Senator Kelly and the other Members is firmly established and has been repeatedly applied throughout our Nation's history. It is settled, for example, that servicemembers must refuse "orders to fire upon the shipwrecked" and "orders to kill defenseless persons who have submitted to and are under effective physical control." Office of General Counsel, DoD, Law of War Manual § 18.3.2.1. A servicemember who nonetheless executes such an order may be held liable under the Uniform Code of Military Justice (UCMJ) if "a person of ordinary sense and understanding would have known the order[] to be unlawful." Joint Service Committee on Military Justice, DoD, The Manual for Courts Martial, R. 916(d) (2024 ed.). The servicemember cannot escape liability for such offenses by arguing that he "was acting pursuant to orders." *Id.*[2]

---

[2] The UCMJ likewise penalizes servicemembers for disobeying orders only if they are lawful. For instance, Article 90 punishes a servicemember "who willfully disobeys a *lawful* command of [his]

22

That principle dates back to the Founding Era.  During the War of 1812, Captain William Butler—a privateer commissioned by President Madison—ordered his crew to raid a neutral Portuguese vessel.  A crew member was subsequently indicted for piracy in the Circuit Court for the District of Pennsylvania; before trial, he argued that he was "bound to obey the orders of Captain Butler" and could not "be punished for having done so."  *United States v. Jones*, 26 F. Cas. 653, 655 (C.C.D. Pa. 1813).  Presiding Circuit Justice Bushrod Washington rejected that argument as "equally alarming and unfounded" and "repugnant to reason."  *Id.*  "No military or civil officer," he explained, "can command an inferior to violate the laws of his country."  *Id.* at 657.  And "[d]isobedience of an unlawful order, must not of course be punishable."  *Id.*

Since then, the Supreme Court and military courts have repeatedly reaffirmed that servicemembers are obligated to refuse illegal orders.  In *Mitchell v. Harmony*, 54 U.S. 115 (1851), the Supreme Court held that the defendant—a colonel in the U.S. Army—could not rely on the order of his commanding officer to justify seizing a merchant's property during

superior commissioned officer," 10 U.S.C. § 890 (emphasis added), and Article 92 punishes a servicemember who "violates or fails to obey any *lawful* general order or regulation," *id.* § 892 (emphasis added).

23

the Mexican-American War. The Court explained that "it can never be maintained that a military officer can justify himself for doing an unlawful act, by producing the order of his superior." *Id.* at 137. More than a century later, the U.S. Court of Military Appeals affirmed the conviction of William L. Calley, Jr., a U.S. Army lieutenant who murdered 22 civilians in the Vietnam War—allegedly pursuant to his Captain's order. *United States v. Calley*, 48 C.M.R. 19, 25 (1973). In rejecting Calley's argument that "he only carried out that order as a good disciplined soldier should," the court stated that the order was "palpably illegal" and thus could not justify Calley's action even if he was unaware of the law. *Id.* at 29.

Thus, in urging servicemembers to refuse to follow unlawful orders, the Members of Congress here were simply reciting settled legal principles. The government's brief does not meaningfully argue otherwise. The First Amendment plainly bars the Executive Branch from retaliating against them for that true speech on a matter of public concern.

24

### B.   The Government Does Not Have Broader Leeway to Punish the Speech of Legislators Who Are Retired Servicemembers

The foregoing protections apply with equal force to retired servicemembers like Senator Kelly.  Citing *Parker v. Levy*, 417 U.S. 733 (1974), the government contends (at 28) that the First Amendment does not protect a retired servicemember's speech when it could be construed as "counsel[ing] disobedience to lawful orders."  But *Parker* did not involve a retired servicemember, let alone one serving as a Member of Congress.  On the contrary, *Parker* involved an active-duty officer who expressly counseled enlisted personnel to refuse to go to Vietnam.  417 U.S. at 737.  The Court explained that the military could, consistent with the First Amendment, restrict such officers from expressing "active opposition to the military policy of the United States."  *Id.* at 753.

This Court should not extend *Parker* to cases involving retired servicemembers who are Members of Congress.  The government boldly argues (at 53) that "Kelly's role in Congress provides more, not less, reason to" permit Executive Branch punishment of his speech.  But as discussed, that argument flouts fundamental separation of power principles.  *See supra* at 12-13.

Indeed, embracing that argument would risk depriving the Nation of the insights of those who are most qualified to opine on questions of military policy—and could leave the Executive Branch's military-policy decisions largely unchecked. Given their commitment to public service, it is inevitable (and desirable) that some retired servicemembers like Senator Kelly will seek congressional offices. Historically, those Members have used their military experience to make invaluable contributions to U.S. military policy—for instance, Senator McCain's experience with torture in the Vietnam War made him a powerful voice in the debates over the military's use of enhanced interrogation techniques. *See supra* at 16. Allowing the Executive Branch to punish— or even threaten to punish—such Members for any speech that could be construed as criticizing the military's policy judgments could chill their participation in debates over issues of profound public significance. That result would violate not only the First Amendment rights of legislators like Senator Kelly, but also the separation of powers that guards against Executive Branch abuse.

## CONCLUSION

The judgment of the district court should be affirmed.

Dated: April 22, 2026        Respectfully submitted,

*/s/ Ephraim A. McDowell*
EPHRAIM A. MCDOWELL
ANDREW D. GOLDSTEIN
RAYMOND P. TOLENTINO
ANNA O. MOHAN
ELIAS S. KIM
COOLEY LLP
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 20004
(202) 842-7800
emcdowell@cooley.com

JONATHAN KRAVIS
LIU SHUR KRAVIS LLP
607 Fourteenth Street NW, Suite 625
Washington, DC 20005
(202) 240-7100

*Counsel for Amicus Curiae Representative Maggie Goodlander*

*/s/ Abbe David Lowell*
ABBE DAVID LOWELL
LOWELL & ASSOCIATES, PLLC
1250 H Street NW, 2nd Floor
Washington, DC 20005
(202) 964-6110
alowellpublicoutreach@
lowellandassociates.com

NORMAN L. EISEN
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE
Washington, DC 20003
(202) 601-8678

27

*Counsel for Amicus Curiae Representative Jason Crow*

*/s/ Zachary K. Warren*
ZACHARY K. WARREN
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
(202) 434-5000
zwarren@wc.com

*Counsel for Amicus Curiae Representative Chris Deluzio*

*/s/ Amy Jeffress*
AMY JEFFRESS
JACOB STEINER
HECKER FINK LLP
1050 K Street NW, 10th Floor
Washington, DC 20001
(212) 763-0883
ajeffress@heckerfink.com

*Counsel for Amicus Curiae Representative Chrissy Houlahan*

*/s/ Preet Bharara*
PREET BHARARA
WILMERHALE
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
preet.bharara@wilmerhale.com

*Counsel for Amicus Curiae Senator Elissa Slotkin*

28

# CERTIFICATE OF COMPLIANCE

I certify that:

1.      This brief complies with Federal Rule of Appellate Procedure 29(a)(5) because it consists of 4,949 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced, serif typeface in 14-point Century Schoolbook font.

*/s/ Ephraim A. McDowell*
Ephraim A. McDowell

## CERTIFICATE OF SERVICE

I certify that on April 22, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Ephraim A. McDowell
Ephraim A. McDowell