---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

MARK KELLY, United States Senator Representing the State of Arizona,

*Plaintiff-Appellee,*

v.

PETE HEGSETH, in his Official Capacity as Secretary of Defense; U.S. DEPARTMENT OF DEFENSE; HUNG CAO, in his Official Capacity as Acting Secretary of the Navy; U.S. DEPARTMENT OF THE NAVY,

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the District of Columbia

---

## REPLY BRIEF FOR APPELLANTS

---

BRETT A. SHUMATE
  *Assistant Attorney General*

BRAD HINSHELWOOD
CYNTHIA BARMORE
JOHN BAILEY
  *Attorneys, Civil Division*
  *Room 3618*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*

**TABLE OF CONTENTS**

**Page**

GLOSSARY

INTRODUCTION AND SUMMARY ............................................................ 1

ARGUMENT.................................................................................................3

I.      Retired Officers Are Not Entitled To Counsel Disobedience To
        Lawful Orders. ................................................................................3

II.     Kelly's Alternative Arguments All Fail................................................ 16

CONCLUSION................................................................................ 27

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

**Cases:**                                                                        **Page(s)**

*Archdiocese of Washington v. Washington Metro. Area Transit Auth.,*
897 F.3d 314 (D.C. Cir. 2018) ...................................................................21

*Arizona Free Enter. Club's Freedom Club PAC v. Bennett,*
564 U.S. 721 (2011) ...................................................................................19

*Autor v. Pritzker,*
740 F.3d 176 (D.C. Cir. 2014) ..................................................................13

*Board of Cnty. Comm'rs v. Umbehr,*
518 U.S. 668 (1996) ...................................................................................13

*Bose Corp. v. Consumers Union of U.S., Inc.,*
466 U.S. 485 (1984) .............................................................. 19, 20, 23-24

*Davilla v. Enable Midstream Partners L.P.,*
913 F.3d 959 (10th Cir. 2019) ...................................................................17

*Gilligan v. Morgan,*
413 U.S. 1 (1973) ...................................................................................... 22

*Goldman v. Weinberger,*
475 U.S. 503 (1986) ............................................................................... 4, 24

*Hernandez v. New York,*
500 U.S. 352 (1991) ...................................................................................20

*Kreis v. Secretary of the Air Force,*
866 F.2d 1508 (D.C. Cir. 1989) ................................................................ 22

*Larrabee v. Del Toro,*
45 F.4th 81 (D.C. Cir. 2022) ................................................................... 6, 9

*Millican v. United States,*
744 F. Supp. 2d 296 (D.D.C. 2010) ....................................................... 6, 26

*New Comm Wireless Servs., Inc. v. SprintCom, Inc.,*
287 F.3d 1 (1st Cir. 2002) ..................................................................... 17, 19

*Parker v. Levy,*
   417 U.S. 733 (1974) ........................................................ 2, 3, 4, 8, 11, 12, 15

*Priest v. Secretary of the Navy,*
   570 F.2d 1013 (D.C. Cir. 1977) ...........................................................14, 24

*Sherley v. Sebelius,*
   644 F.3d 388 (D.C. Cir. 2011) ....................................................... 2, 16, 17

*United States v. Bergdahl,*
   80 M.J. 230 (C.A.A.F. 2020) ............................................................... 9, 11

*United States v. Hooper,*
   26 C.M.R. 417 (C.M.A. 1958) ............................................................ 8, 11

*United States v. Priest,*
   45 C.M.R. 338 (C.M.A. 1972) ...............................................................14

*United States v. Wilcox,*
   66 M.J. 442 (C.A.A.F. 2008) ............................................................ 25, 26

*U.S. Civ. Serv. Comm'n v. National Ass'n of Letter Carriers,*
   413 U.S. 548 (1973) ...............................................................................13

## U.S. Constitution:

Art. I, § 6, cl. 2 .................................................................................. 10

## Statute:

10 U.S.C. § 688(a) ...............................................................................8, 12

## Other Authorities:

U.S. Dep't of Def., *Department of Defense Law of War Manual* § 18.3.2.1
   (Jul. 31, 2023) .................................................................................. 26

U.S. Dep't of Def., *Manual for Courts-Martial* (2024)............................... 26

# GLOSSARY

| | |
|---|---|
| UCMJ | Uniform Code of Military Justice |

## INTRODUCTION AND SUMMARY

The district court here held that the military has no ability to restrict the speech of retired officers—not even speech that counsels disobedience to lawful orders—because "[s]peech from retired servicemembers" cannot "'undermine the effectiveness of response to command' as directly as speech from active-duty soldiers" and "does not threaten 'obedience, unity, commitment, and esprit de corps' in the same way as speech from active-duty soldiers." JA36-37 (emphasis omitted). Captain Kelly's brief does not even begin to defend that holding until more than halfway through, and it does so only after advancing a series of flawed arguments the court did not consider.

Kelly's eagerness to distract from the district court's stated grounds for the injunction is understandable, as that holding is plainly wrong. Kelly does not contest that he is currently in the armed forces. He does not dispute that he could undermine military discipline by influencing active-duty servicemembers. And he does not disagree that these are the very reasons that the Supreme Court and this Court have rejected First Amendment claims by other servicemembers who counseled disobedience to lawful orders. In short, Kelly offers no basis to exempt himself or other retired officers from the ordinary rule that the military may discipline a

"commissioned officer" for "publicly urging enlisted personnel to refuse to obey orders." *Parker v. Levy*, 417 U.S. 733, 761 (1974).

Instead, Captain Kelly largely defends a preliminary injunction that the district court did not enter. Kelly challenges the Secretary's findings in the letter of censure, arguing that he neither counseled disobedience to lawful orders nor undermined military discipline, and apparently contends that the Secretary's findings are entitled to no deference. And based on his own characterization of his statements, Kelly argues that he should prevail as a matter of law under the First Amendment standards that apply to active-duty servicemembers. The court, however, did not adopt or even consider any of these arguments, and this Court's precedent is clear that it will not "uphold[] a preliminary injunction based upon a legal theory not embraced by the district court." *Sherley v. Sebelius*, 644 F.3d 388, 398 (D.C. Cir. 2011). Kelly thus cannot defend the preliminary injunction on those grounds. And even if this Court were to consider those arguments in the first instance, Kelly does not come close to establishing a likelihood of success on the merits.

# ARGUMENT

## I. Retired Officers Are Not Entitled To Counsel Disobedience To Lawful Orders.

The sole basis for the district court's injunction was its conclusion that as a retired officer and member of Congress, Captain Kelly should be treated as a civilian for First Amendment purposes, and thus that the military has *no* interest in regulating his speech, even speech directed at servicemembers counseling disobedience to lawful orders. Kelly offers no persuasive defense of this holding when he finally turns to it at the back of his brief. And he fails to grapple with the sweeping effects of the court's reasoning, which would undermine the military's ability to ensure discipline as to a considerable swath of members of the armed forces.

**1.** Kelly first argues that his speech is "unquestionably protected" under "ordinary First Amendment principles" applicable to civilians. Br. 17-21 (quotation omitted). Under *Parker v. Levy*, 417 U.S. 733 (1974), however, those ordinary principles do not govern the speech rights of servicemembers. And as a retired officer, Kelly is in the armed forces and uniquely capable of undermining military order through his words and actions. Thus, as in *Parker*, he may be subject to military discipline when he invokes his military rank, speaks directly to servicemembers, and counsels them to disobey lawful orders. *See* Opening Br. 36-53. Such

speech goes to the very core of the military's interest in ensuring discipline and good order. The Supreme Court has long recognized that "to accomplish its mission the military must foster instinctive obedience, unity, commitment, and esprit de corps," *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986), and that speech that "undermine[s] the effectiveness of response to command" is unprotected in light of "[t]he fundamental necessity for obedience, and the consequent necessity for imposition of discipline," *Parker*, 417 U.S. at 758-59 (quotation omitted).

Kelly has little response to this basic point. He instead attempts to shift the frame of reference to encompass a far broader range of speech, asserting that the military lacks an interest in regulating "retirees' public, political speech," Br. 37, or in creating a "First Amendment exception for former servicemembers," Br. 33; *see* Br. 35 (attacking argument that "retirees are fully subject to the same restrictions on speech as active-duty military personnel"); Br. 42 (asserting government seeks to curtail the "First Amendment freedoms" of retired servicemembers). But as the government explained, retired officers "have a broad right to criticize military policy, participate in public debate, and express even vehement disagreement with military leaders." Opening Br. 2. This case presents no dispute about that broader principle. The only question presented here is

4

whether retired officers, despite remaining members of the military subject to recall at a moment's notice, are free to engage in speech directed at servicemembers that urges them to disobey lawful orders—speech the Supreme Court has already held to be unprotected under the First Amendment for other members of the military.  Whatever might be said about attempts to restrict other speech by retired servicemembers, there should be no doubt that the military may properly ensure that retired officers do not urge servicemembers to disobey lawful orders.

Kelly invokes a "long tradition" of speech by retired officers, but the relevant history undermines his point.  Br. 36 (quotation omitted).  While he cites examples of retired servicemembers criticizing decisions about military operations in Afghanistan and to require that soldiers receive a COVID-19 vaccine, *id.*, he conspicuously fails to cite even a single example involving a retired officer counseling disobedience to lawful orders.  And for similar reasons, Kelly's objection that the military has not pointed to a "well-established historical tradition" of disciplining such speech, Br. 35, 37, is irrelevant.  Kelly can point to no historical tradition of retired officers urging disobedience to lawful orders, and no historical support for the proposition that such speech would have escaped discipline if it had occurred.  Indeed, it is a testament to the historical discipline and good

order of the military that reported cases involving courts-martial for such conduct even by active-duty soldiers are themselves rare. And given that respect for the chain of command is often enforced through non-judicial means—such as through censures or other administrative actions—looking solely at courts-martial in any event would be underinclusive. *See, e.g.*, *Millican v. United States*, 744 F. Supp. 2d 296, 307-08 (D.D.C. 2010) (challenge to decision to remove officer from promotion list based on urging soldiers to refuse order to take anthrax vaccine).

For similar reasons, Kelly's attempt (at 36-37) to discount part of this historical practice because he was subject to a censure, not prosecution under the Uniform Code of Military Justice (UCMJ), is beside the point. Kelly correctly observes that the letter of censure and reopening of Kelly's retired grade are administrative actions that do not subject Kelly to incarceration or other criminal punishment. *See* Opening Br. 17 (noting that the "least favorable outcome" in Kelly's case would be that his "separation is characterized as Honorable and that [he is] retired at an inferior pay grade" (alteration in original) (quoting JA96)). But if retired servicemembers are constitutionally subject to court-martial jurisdiction and resulting criminal punishment as members of the armed forces, *see Larrabee v. Del Toro*, 45 F.4th 81, 89 (D.C. Cir. 2022), they necessarily are

constitutionally subject to lesser forms of administrative action as members of the armed forces.

The same can be said of Kelly's efforts to exempt all retired officers from *Parker*'s rule. Kelly emphasizes (at, *e.g.*, 32-33) that no case has addressed the First Amendment rights of retired officers. That is true but irrelevant: at a minimum, the reasoning of *Parker* and other cases applies with full force to retired officers when they counsel disobedience to lawful orders. Retired officers are in the armed forces; they may influence other servicemembers to disobey lawful orders; and, in doing so, they may undermine military discipline. *See* Opening Br. 43-49.

Kelly offers no response to these basic points. He instead largely catalogs ways in which retired officers—though still members of the military—are different from active-duty servicemembers. In particular, he notes that he has "no special statutory ability" to influence active-duty troops, Br. 40, that retired officers "do not live under a day-to-day chain of command in which the military functions as both employer and landlord," Br. 33-34, and that "officers hold no current command, issue no orders, and fall outside the chain of command," Br. 39-40.

But those arguments to distinguish retired officers ignore both *Parker*'s justification for its rule and the continuing military status of

retired officers, including their obligation to obey military orders. *Parker* held that speech by "a commissioned officer publicly urging enlisted personnel to refuse to obey orders which might send them into combat" is "unprotected under the most expansive notions of the First Amendment"; that conclusion derived from the Court's recognition that "[t]he armed forces depend on a command structure that at times must commit men to combat" and that speech that may "undermine the effectiveness of response to command" is thus "constitutionally unprotected" even if that same speech "is protected in the civil population." 417 U.S. at 759, 761 (quotation omitted). Kelly does not seriously contend with this rationale, even though it holds equally true for retired officers as it does for active-duty servicemembers. As the government explained (at 38-47), retired officers "form a vital segment of our national defense for their experience and mature judgment are relied upon heavily in times of emergency," *United States v. Hooper*, 26 C.M.R. 417, 425 (C.M.A. 1958), and Congress has provided that such officers may be subject to recall to active duty "at any time," 10 U.S.C. § 688(a). Because retired officers may be recalled to command at any time, their "preparedness depends" in part on "their continued responsiveness to discipline," *Hooper*, 26 C.M.R. at 425, and they may influence active-duty soldiers through their speech in ways that

8

civilians do not, *see, e.g.*, *United States v. Bergdahl*, 80 M.J. 230, 233-35 (C.A.A.F. 2020).

Kelly does not fundamentally dispute that he remains a member of the military, but he attempts (at 34-35, 41-42) to distinguish the many cases making clear that retired servicemembers remain part of the military community and subject to military discipline by arguing that those cases did not address First Amendment claims. But the central point of those cases is that retired servicemembers remain part of the military community, retaining their "military status" because of their "formal relationship with the military that includes an obligation to obey military orders." *Larrabee*, 45 F.4th at 89, 95; *see* Opening Br. 41-45. That status underscores why retired servicemembers can undermine military discipline through their words and actions as members of the armed forces—the same reason *Parker* held that other servicemembers have no First Amendment right to counsel disobedience to lawful orders. And against this backdrop, there is plainly no force to Kelly's analogy between retired officers and "all able-bodied men in the United States," Br. 40—an analogy this Court has already rejected. *See Larrabee*, 45 F.4th at 99.

Kelly retreats to the suggestion that a recall to active service is unlikely as a retired officer. Br. 40-41. Yet Kelly offers no reason why the

frequency of recalls should leave retired officers free to urge active-duty servicemembers to disobey lawful orders.  In the exercise of its constitutional authority to prepare the Nation for future armed conflict, Congress has determined that retired officers are part of our military forces who should be prepared to reenter active service at a moment's notice, and recalls of retired servicemembers have in fact occurred.  *See* Opening Br. 40-41.  Ensuring that those officers remain subject to discipline is plainly appropriate.  And if retired officers are entitled to urge disobedience to lawful orders, the military may be inhibited from recalling those who have urged such disobedience, cognizant of the effect that recalling such officers may have on command discipline—consequences that could undermine national defense in the event future circumstances require the recall of retired officers.[1]

---

[1] Kelly's suggestion that the Incompatibility Clause of the Constitution would preclude his recall (Br. 40) is incorrect.  The Incompatibility Clause provides that "no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office."  U.S. Const. art. I, § 6, cl. 2.  It does not restrict the military's ability to recall a retired officer to active duty.  If Kelly were recalled, he at most would face a choice whether to resign his Senate seat or resign his commission.  The possibility that Kelly would retain his commission underscores that *Parker*'s rationale continues to apply to him.  And in no event can Kelly simultaneously assert that he is entitled to keep his commission—and the benefits that come with it, including pay—while bearing none of the burdens that come with that commission, including recall.

Moreover, even without a current command, retired servicemembers are uniquely positioned to influence active-duty soldiers. Because of their rank and distinguished service, retired officers serve as "examples of discipline to the officers and men" currently in active service. *Hooper*, 26 C.M.R. at 424 (quotation omitted). The influence such retired officers wield is also reflected in the recognition that they are capable of improperly influencing military-justice proceedings. *Bergdahl*, 80 M.J. at 233-35.

Kelly also asserts (at 33) that *Parker*'s rationale does not apply to retired officers because they "make public statements as civilians participating in public debate, not as officers directing subordinates in an operational setting." But nothing suggests that *Parker* would have been resolved differently if the officer in that case had prefaced his statements by asserting that they were made in his capacity as a "civilian" or had made the statements while off duty. *Parker* instead recognizes that servicemembers are restricted from engaging in certain types of speech because of "[t]he fundamental necessity for obedience, and the consequent necessity for imposition of discipline" that the military has, particularly as to speech that would "undermine the effectiveness of response to command." 417 U.S. at 758-59 (quotation omitted). A retired officer is no less capable of undermining discipline through his speech, in whatever capacity, to his

fellow members of that separate "specialized society." *See id.* at 743; Opening Br. 38-43. And, in any event, this case would be a particularly unlikely candidate for first recognizing such a distinction: Kelly here invoked his military rank, stating that he was "'a Captain in the United States Navy,'" and spoke "'directly to members of the military'" in that capacity. JA99. Even if such a disclaimer could be relevant, Kelly did not say that he was speaking "as a civilian" or "as a Senator." Kelly's own words thus reflect his intention to speak to other servicemembers in his capacity as a retired officer and underscore the influence retired officers may wield.

Kelly further errs (at 42) by arguing that his "commission" or "pension" cannot be conditioned on his "'willingness to limit' his First Amendment rights." Again, that misses the point and proves too much. Kelly holds a commission and receives retired pay because he chose to remain in the military as a retired officer, and he thus remains subject to the requirements of military service, including an order to return to active duty "at any time." 10 U.S.C. § 688(a). It is membership in the armed forces, and the ability to influence other servicemembers in that capacity, that cause servicemembers—whether active-duty soldiers or retired officers—to have fewer First Amendment rights than civilians as part of the overriding needs of the military mission. That is no more an

12

unconstitutional condition for retired officers than for the active-duty officers who have diminished speech rights under *Parker*. And more generally, there is nothing unusual about speech restrictions that come with government employment, even outside the military context. *See, e.g.*, *U.S. Civ. Serv. Comm'n v. National Ass'n of Letter Carriers*, 413 U.S. 548, 564-67 (1973) (rejecting constitutional challenge to the Hatch Act). The cases cited by Kelly (at 42) recognize this basic principle. *See Board of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 673-74 (1996) (contractor speech subject to *Pickering* balancing test); *Autor v. Pritzker*, 740 F.3d 176, 183 (D.C. Cir. 2014) ("The Supreme Court has long sanctioned government burdens on public employees' exercise of constitutional rights 'that would be plainly unconstitutional if applied to the public at large.'").

Kelly attempts (at 43-44) to downplay the sweeping implications of the district court's holding, arguing that courts may "give 'weight to the military's interest'" in other cases even if *Parker* does not apply to retired officers. The court did not limit its holding in this way, and in any event, if the balance does not favor the military's interest in a circumstance in which a retired officer urges servicemembers to disobey lawful orders, it is difficult to imagine any circumstance where Kelly believes that balance could favor the military. This Court has already explained that in that

circumstance, "[t]he government does not have the burden of showing a causal relationship between [a servicemember's statements] and specific examples of weakened loyalty, discipline or morale," because the relevant question is whether speech has a "tendency" to interfere with military discipline; not whether speech "already" had that effect." *Priest v. Secretary of the Navy*, 570 F.2d 1013, 1018 (D.C. Cir. 1977) (citing *United States v. Priest*, 45 C.M.R. 338, 344-45 (C.M.A. 1972)). As the Court explained, "[t]he danger resulting from an erosion of military morale and discipline is too great to require that discipline must have already been impaired before a prosecution for uttering statements can be sustained." *Id.* (quoting *Priest*, 45 C.M.R. at 344).

Finally, Kelly also errs (at 34, 40, 44-45) by invoking his status as a Senator. Kelly does not expressly defend the district court's assertion that his status confers "heightened free speech protection." *See* Opening Br. 51-53 (quoting JA37). He instead attacks a strawman in arguing (at 45) that "the government cannot 'apply a stricter standard to its legislators' when it comes to policing expression." As we explained, the censure letter here simply holds Kelly to the same "generally applicable" standards that apply to non-legislators in his position. Opening Br. 52.

At bottom, although Kelly insists (at 35) that the government seeks to create a "new carve-out for military retirees" under the First Amendment, there is nothing novel about treating retired officers as the servicemembers they are and always have been. Retired officers have been part of the armed forces since the retired lists were created in the mid-1800s, have been subject to court-martial jurisdiction for just as long, and have been subject to the UCMJ since its enactment. *See* Opening Br. 6, 38-41. As members of the armed forces, retired officers can undermine military discipline through their words and actions. They therefore are subject to this longstanding First Amendment rule that applies to all officers: When an officer invokes his military rank, speaks directly to servicemembers, and counsels disobedience to lawful orders, that speech is "unprotected under the most expansive notions of the First Amendment." *Parker*, 417 U.S. at 761. If Kelly feels that he cannot comply with his military obligations while serving in Congress, he may resign his commission and be discharged from the military. Nothing compels Kelly to wear the hats of retired Naval officer and legislator simultaneously. Virtually all retired officers have proven willing and able to refrain from urging disobedience to lawful orders while holding legislative office. If Kelly is unwilling to abide by that minimal restriction, he is free to leave the Navy. What Kelly cannot do is insist on

retaining his military position and the benefits that come with it, while refusing to comply with the obligations of continued military service.

## II.   Kelly's Alternative Arguments All Fail.

**A.**  As discussed above, the sole basis for the district court's injunction was its conclusion that the military lacks "the same 'legitimate interest in prohibiting' speech by retired veterans" as a class, and thus that any regulation of Captain Kelly's speech was subject to the standards applicable to civilians.  JA37.  Kelly opens his brief (at 22-31) not by defending that reasoning, but instead by advancing a variety of other arguments not addressed or adopted by the court.

Though Kelly's desire to avoid defending the district court's actual reasoning is understandable, Kelly errs by raising these other matters on appeal.  This Court has made clear that while "ordinarily" it "'may affirm the judgment of the district court on the basis of a different legal theory,'" that rule does not apply to the affirmance of a preliminary injunction, because "the decision whether to grant a preliminary injunction is a matter of discretion, not a question of right."  *Sherley v. Sebelius*, 644 F.3d 388, 397-98 (D.C. Cir. 2011).  Thus, this Court will not "uphold[] a preliminary injunction based upon a legal theory not embraced by the district court," as "in every such case, it is for the district court to determine, in the first

instance, whether the plaintiffs' showing on a particular claim warrants preliminary injunctive relief." *Id.* at 398; *accord Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959, 974 (10th Cir. 2019); *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 13 (1st Cir. 2002).

Application of that rule is particularly appropriate here, as Kelly's arguments ask this Court to review the Secretary's factual findings in the first instance. *See, e.g.*, *New Comm Wireless Servs.*, 287 F.3d at 13 (noting application of the rule where alternative ground would "require differential factfinding"). Kelly argues at length (at 22-30) that his statements did not, in fact, counsel disobedience to lawful orders or undermine military discipline. But to the extent a court could review the Secretary's findings to the contrary, *see infra* pp. 20-25, making that determination would necessarily require examining the statements Kelly made that formed the basis of the Secretary's findings and deciding whether, in context, those statements urged disobedience to lawful orders. *See* JA99 (describing "sustained pattern of public statements" and referring to statements "fram[ing] resistance to lawful orders as protecting against overreach" "[t]hroughout December 2025").

The district court did not undertake that inquiry—and indeed did not even determine which of Kelly's statements would be relevant to that

inquiry—because its categorical holding made such an inquiry unnecessary. The court believed that the questions it needed to answer—"the extent of the First Amendment's application to retired servicemembers, and whether the Retirement Grade Proceeding constitutes First Amendment retaliation"—were "purely legal," and thus did not turn on the content or context of Kelly's statements. JA31 (quotation omitted). And because of this focus, the court granted a preliminary injunction based on Kelly's claim "that Defendants' choice to censure him because of his speech violates the First Amendment *regardless* of Secretary Hegseth's ultimate judgment as to the effect of that speech," without needing to determine whether Kelly's statements "*in fact* disrupted the chain of command, eroded confidence in leadership, or constituted conduct unbecoming an officer," which the court recognized implicated "discretionary military decisions." JA26.

The same considerations apply to Kelly's passing assertion (at 31) that he should prevail as a matter of law under his conception of the First Amendment standards applicable to active-duty servicemembers, which on Kelly's telling would require courts to "conduct[] a balancing" of the speech against the military mission. Here, too, the district court did not even begin to undertake that inquiry.

Kelly does not acknowledge the rule against affirmance of a preliminary injunction on an alternate legal theory, much less explain how this Court could depart from it.  Kelly invokes (at 46 n.8) the general proposition that this Court may affirm a decision on alternative grounds, but as discussed, *Sherley* recognizes an exception in the specific context where a plaintiff seeks affirmance of a preliminary injunction.  Kelly notes (at 29) that the district court "nowhere endorsed" the Secretary's findings in the letter of censure, but the point is that the court did not reject them either, and Kelly cannot defend the injunction based on "factbound" "new theories" for affirmance, *New Comm Wireless Servs.*, 287 F.3d at 13.  Kelly also cites (at 29-30) cases that support "independent review of the record" under Federal Rule of Civil Procedure 52(a) by an appellate court for certain questions relevant to First Amendment claims.  *See Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 487, 499-511 (1984) (subjecting finding of "actual malice" to "independent review" on appeal from final judgment rejecting First Amendment defense); *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 744 (2011) (similar).  Those cases provide for heightened review—more searching than the ordinary clear error inquiry—by an appellate court considering a district court's resolution of mixed questions of law and fact made as part of a final

19

judgment adverse to a particular speaker, in order to ensure "that the speech in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within acceptably narrow limits." *Bose Corp.*, 466 U.S. at 505; *see Hernandez v. New York*, 500 U.S. 352, 367 (1991) (explaining that *Bose* and related cases "turn on the Court's determination that [certain] findings … involve legal, as well as factual, elements"). But Kelly cites no case applying such a rule to a case granting a preliminary injunction to a speaker, much less one in which the district court made no factual findings at all.

**B.** In any event, Kelly cannot show a likelihood of success on the merits of his alternative arguments, particularly given the truncated state of the record and the absence of any findings from the district court.

Kelly primarily contends that "the factual premise … that Senator Kelly's 'statements, in context, counseled disobedience to lawful orders and undermined military discipline'" is "unsupportable," Br. 22, and that the censure letter "collapsed a range of plainly protected speech with other unspecified statements to reach a conclusory determination that Senator Kelly engaged in misconduct," Br. 30. But those arguments only underscore why the procedural posture here dooms Kelly's claim. On Kelly's own reading of *Parker*, a court would have to inquire into the

"factual premise" of the censure letter, Br. 22, and conclude that the Secretary's findings about the meaning and effect of Kelly's statements were incorrect. To the extent any such inquiry is appropriate, that is the province of the district court in the first instance.

Kelly thus gets matters exactly backwards in complaining that the censure letter and the Department did not identify every statement on which the censure letter was based. Br. 26 (asserting that military has not explained how "unidentified statements amount to counseling disobedience of lawful orders"). It is Kelly's burden to demonstrate likely success on the merits for a preliminary injunction. *See Archdiocese of Washington v. Washington Metro. Area Transit Auth.*, 897 F.3d 314, 319 (D.C. Cir. 2018). A necessary consequence of Kelly's choices to bring suit now, to seek a preliminary injunction based solely on the censure letter, and to press the sweeping theory that the district court adopted is that neither Kelly nor the district court developed any record or made any findings about the statements underlying the censure letter. Indeed, Kelly could have participated in the proceedings to determine whether to reduce his retired grade, *see* Opening Br. 9-11, 17-18, in which he could have requested "copies of the materials that will be forwarded to the Secretary of the Navy to support his recommendation," JA96. Those proceedings may have

provided more information about the context that led the Secretary to conclude that Kelly's statements over several months, "viewed in totality," demonstrated "specific intent to counsel servicemembers to refuse lawful orders" to the detriment of military discipline. JA100. Having chosen to proceed as he has, Kelly cannot now invert the relevant burdens to obtain affirmance of a preliminary injunction on grounds never considered by the district court.

Kelly's arguments on this score are especially remarkable given that the Secretary's determinations about whether particular speech undermines military discipline are "professional military judgments" about the "control of a military force." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973). These types of judgments were "intended by the Constitution to be left to the political branches," and "it is difficult to conceive of an area of governmental activity in which the courts have less competence." *Id.* Thus, the Secretary's findings would at minimum be entitled to substantial deference—a proposition the district court appeared to accept. *See* JA24 (recognizing the "substantial deference" that federal courts give to military judgments); *Kreis v. Secretary of the Air Force*, 866 F.2d 1508, 1511, 1514-15 (D.C. Cir. 1989) (noting that the Secretary's reasons not to alter an applicant's military record are reviewed "under such a deferential standard

of review" that "[p]erhaps only the most egregious decisions may be prevented").

This Court thus should reject Kelly's apparent invitation (at 27-30) not only to review a truncated record in the first instance, but also to reach its own independent conclusion about the meaning and effect of his statements without any deference to the Secretary. Indeed, Kelly offers no roadmap for that novel approach. He acknowledges "the need for deference in appropriate cases," Br. 28, and does not apparently dispute that the Secretary's findings here—regarding the contextual meaning of speech by a servicemember and the effect of that speech on military discipline—reflect the Secretary's professional military judgments. And rather than articulate a particular level of deference or workable approach, Kelly instead devotes his attention almost entirely to attacking the strawman of "complete deference." Br. 27.

Kelly cites no precedent supporting the novel proposition that this Court should submit the Secretary's professional military judgments to searching review simply because they affect the First Amendment calculus. Kelly principally relies (at 29-30) on *Bose*, but as discussed, *Bose* addressed how an appellate court should review a district court's resolution of mixed questions of law and fact under Federal Rule of Civil Procedure 52(a). 466

U.S. at 487, 499-501. That analysis does not determine the deference a court should grant to professional military judgments, which stems from the recognition that courts are particularly ill-suited to judge military affairs. And when the Supreme Court has considered First Amendment claims in the military context—as in *Parker* or *Goldman v. Weinberger*, 475 U.S. 503 (1986)—it has done so while acknowledging the need for deference to military judgment. *See Goldman*, 475 U.S. at 507 ("[W]hen evaluating whether military needs justify a particular restriction on religiously motivated conduct, courts must give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest.").

Moreover, even where this Court has reviewed comparable factual findings by a court-martial, it has recognized that the effect of particular statements is a matter of military expertise. In *Priest*, this Court explained that in cases involving a similar First Amendment defense, a court-martial "evaluate[s] the potential of the words themselves to erode loyalty, discipline, and morale, in light of the context in which they are uttered, to determine the likely effect of the words on military efficiency." 570 F.2d at 1018. In doing so, the court-martial conducts "the essence of 'balancing First Amendment rights against the military necessity of the moment,'" a

24

process that "is 'inextricably bound to the fact-finding' role of the court-martial" conducted on the basis of "experience in the military." *Id.* There is no basis for subjecting the Secretary's professional military judgments to more searching review than factfinding by a court-martial.

Similar problems beset Kelly's passing contention (at 31) that he should prevail as a matter of law under the First Amendment standards applicable to active-duty servicemembers. In advancing this argument, Kelly invites the Court to adopt a "balancing" test that would weigh the military's interest against a retired officer's First Amendment rights, or that would require "a 'reasonably direct and palpable connection' between the speech and 'the military mission.'" Br. 31 (quoting *United States v. Wilcox*, 66 M.J. 442, 449 (C.A.A.F. 2008)). But as discussed, the Supreme Court and this Court have already determined how that balance is resolved where a servicemember urges other servicemembers to disobey lawful orders. *See supra* pp. 3-4. Even setting that aside, Kelly does not explain how the balancing he contemplates could occur here, as Kelly's description of that balance depends on his characterization of his speech as addressing only the "recitation of settled law." Br. 31.[2]

---

[2] To the extent Kelly invokes military-court precedents holding that a First Amendment balancing is unnecessary where prosecutors failed to establish a connection between the speech at issue and the military

*Continued on next page.*

In any event, Kelly's own characterization of the few identified statements continues to elide crucial elements. Kelly repeatedly characterizes his statements as describing a "hornbook legal obligation to disregard unlawful orders." *E.g.*, Br. 24. But as we explained (Opening Br. 31)—and as the source Kelly cites explains—the duty to disobey attaches only to "patently illegal" orders, and military orders are presumed to be lawful. *See* U.S. Dep't of Def., *Manual for Courts-Martial* pt. IV, at 24 (2024); *accord* U.S. Dep't of Def., *Department of Defense Law of War Manual* § 18.3.2.1 (Jul. 31, 2023) (discussing "clearly illegal" orders). That important qualification appears nowhere in Kelly's quoted description of his own statements. *See* Br. 24. And Kelly quite properly does not question the basic principle (Opening Br. 31-33) that an officer cannot urge others to disobey orders based on the officer's subjective belief that such orders are unlawful—even if a court later holds that an order of debatable legality was in fact illegal. *See Millican*, 744 F. Supp. 2d at 307-08. Those maxims

---

mission, those cases are plainly inapposite here. There is no question that the stated purpose of Kelly's speech was to address servicemembers about their compliance with orders and that such speech is obviously related to the military mission, as in *Parker* itself. Such speech thus bears no resemblance to, for example, anonymous racist posts on a public internet forum. *See Wilcox*, 66 M.J. at 445-46, 448, 450 (explaining that in cases like *Parker*, "the effect of the speech on the military mission was both palpable and obvious").

would clearly be material to any assessment of the Secretary's determination that Kelly's statements, in context, went beyond providing "abstract legal education about the duty to refuse patently illegal orders." JA100.

## CONCLUSION

For the foregoing reasons, the preliminary injunction should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

BRAD HINSHELWOOD
CYNTHIA BARMORE

 */s/ John Bailey*
JOHN BAILEY
  *Attorneys, Civil Division*
  *Room 3618*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*
  *John.Bailey@usdoj.gov*

April 2026

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 5,785 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Georgia 14-point font, a proportionally spaced typeface.

*/s/ John Bailey*
John Bailey

## CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/ John Bailey*
John Bailey